AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

**United States of America**

**v.**

DENNIS SMITH aka "Fish"
DARREN SMITH aka "Fat Boy"
KALEAF BALL aka "Leaf"
REGINALD STREETER aka "Street"
JUAN SAMPEL
ANGEL OCASIO
JOSE QUINTANA
LUZ MORALES aka "Leida"
JASON GIBSON
KELLY SHANKS

_____ Defendants _____

Case No. 16-MJ- **4055**



## CRIMINAL COMPLAINT

I, CHRISTOPHER R. MAHAFFY, the complainant in this case, state that the following is true to the best of my knowledge and belief.

In or about 2015 and April 26, 2016, in the Western District of New York, the defendants violated an offense described as follows:

did knowingly, willfully and unlawfully conspire together and with others, known and unknown, to possess with intent to distribute and to distribute 5 kilograms or more of cocaine, and cocaine base, in violation of Title 21, United States Code, Section 846.

This Criminal Complaint is based on these facts:

SEE ATTACHED AFFIDAVIT OF SPECIAL AGENT CHRISTOPHER R. MAHAFFY

☒ Continued on the attached sheet.

_____
*Complainant's Signature*

S/A CHRISTOPHER R. MAHAFFY
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April **26**, 2016

City and State:  Rochester, New York

_____
*Judge's Signature*

HONORABLE CHARLES J. SIRAGUSA
UNITED STATES DISTRICT JUDGE
*Printed name and title*

#1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF
THE PREMISE AT:

16-mJ-4055

1045 SOUTH CLINTON AVENUE-APARTMENT #3, ROCHESTER, NEW YORK
(**Premise 1**);
1076 GLIDE STREET, ROCHESTER, NEW YORK (**Premise 2**);
7 EISENBERG PLACE, ROCHESTER, NEW YORK (**Premise 3**);
4 BRU MAR DRIVE, ROCHESTER, NEW YORK (**Premise 4**);
425 LAKEVIEW PARK, ROCHESTER, NEW YORK (**Premise 5**);
35 OAKMAN STREET, ROCHESTER, NEW YORK (**Premise 6**);
50 BENNETT AVENUE, ROCHESTER, NEW YORK (**Premise 7**);
834 SOUTH GOODMAN STREET, ROCHESTER, NEW YORK (**Premise 8**);
155/157 BURROWS STREET-UPSTAIRS, ROCHESTER, NEW YORK (**Premise 9**);
5908 STONEHILL ROAD LOT 10, LAKEVILLE, NEW YORK (**Premise 10**);

IN THE MATTER OF THE SEARCH OF
THE VEHICLES:

2007 GMC YUKON, NEW YORK STATE REGISTRATION FLF-7845 WITH VIN
NUMBER OF 1GKFK668X7J267207 (**Vehicle 1**);
2006 NISSAN PATHFINDER, NEW YORK STATE REGISTRATION GUS-3580
WITH VIN NUMBER OF 5N1AR18W86C661593 (**Vehicle 2**);
2007 HYUNDAI ENTOURAGE, NEW YORK STATE REGISTRATION GXT-4203
WITH VIN NUMBER OF KNDMC233276015620 (**Vehicle 3**);
2013 HYUNDAI SONATA, NEW YORK REGISTRATION AFS-2074,
WITH VIN NUMBER OF 5NPEC4ACXDH779235 (**Vehicle 4**);
2010 HONDA ACCORD, NEW YORK STATE REGISTRATION EJC-4180 WITH VIN
NUMBER OF 1HGCP2F30AA063778 (**Vehicle 5**);
2007 FORD F-150 XLT, NEW YORK STATE REGISTRATION 94008-MH WITH VIN
NUMBER OF 1FTPW14VX7FA73862 (**Vehicle 6**); AND
2004 HONDA ODYSSEY, NEW YORK LICENSE PLATE HBB-7266, WITH VIN
NUMBER OF 5FNRL18094B148972 (**Vehicle 8**)

IN THE MATTER OF
UNITED STATES OF AMERICA

   v.

DENNIS SMITH aka "Fish"
DARREN SMITH aka "Fat Boy"
KALEAF BALL aka "Leaf"
REGINALD STREETER aka "Street"
JUAN SAMPEL
ANGEL OCASIO
JOSE QUINTANA
LUZ MORALES aka "Leida"
JASON GIBSON
KELLY SHANKS

Defendants.

## AFFIDAVIT IN SUPPORT OF SEARCH & SEIZURE WARRANTS
## AND CRIMINAL COMPLAINT

**CHRISTOPHER MAHAFFY, being duly sworn, deposes and states:**

1. Your affiant is a Special Agent with the United States Department of Justice, Drug Enforcement Administration (DEA), assigned to the New York Field Division, Rochester Resident Office. I have been employed as a DEA Special Agent since May 4, 2014. Prior to being a DEA Special Agent, I received a Bachelor's of Arts in Public Justice from the State University of New York at Oswego in May 2007. My primary duties as a DEA Special Agent include investigating violations of federal drug laws such as individuals engaged in illegal drug trafficking, unlawful possession of drug, as well as the possession of firearms during the commission of drug trafficking crimes, and money laundering offenses.

2.     During my tenure with DEA, I have participated in numerous investigations relating to armed individuals that were involved in the distribution of controlled substances, including heroin, cocaine, cocaine base and other substances, in violation of federal drug laws, including Title 21, United States Code, Sections 841 and 846, and Title 18 United States Code, Sections 922 and 924. I have also participated in numerous interviews and debriefings of individuals involved in armed drug trafficking. I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the armed trafficking of illegal drugs. Additionally, I am familiar with the methods of use, effects, distribution, appearance, as well as the methods of manufacture of controlled substances. I have been the affiant on multiple federal and state search warrants, arrest warrants and other applications. During my time at the Rochester Resident Office, I have participated in two long-term narcotics investigations that utilized the court-authorized interception of wire communications that have resulted in the arrest of drug distributors, and the seizures of quantities of controlled substances and firearms. In addition, I have had the opportunity to work with other DEA agents and law enforcement officers, who have also investigated armed drug trafficking networks.

3.     This affidavit is made in support of search warrants for the premises located at: 1045 South Clinton Avenue-Apartment 3, Rochester, New York (**Premise 1**); 1076 Glide Street, Rochester, New York (**Premise 2**); 7 Eisenberg Place, Rochester, New York (**Premise 3**); 4 Bru Mar Drive, Rochester, New York (**Premise 4**); 425 Lakeview Park, Rochester, New York (**Premise 5**); 35 Oakman Street, Rochester, New York (**Premise 6**); 50 Bennett Avenue, Rochester, New York (**Premise 7**); 834 South Goodman Street, Rochester,

New York (**Premise 8**); 155/157 Burrows Street-Upstairs, Rochester, New York (**Premise 9**); and 5908 Stonehill Road Lot 10, Lakeville, New York (**Premise 10**).

4.     This affidavit is also made in support of search warrants for the following vehicles: a 2007 GMC Yukon, New York State registration FLF-7845 with vin number of 1GKFK668X7J267207 (**Vehicle 1**); a 2006 Nissan Pathfinder, New York State registration GUS-3580 with vin number of 5N1AR18W86C661593 (**Vehicle 2**); a 2007 Hyundai Entourage, New York State registration GXT4203 with vin number of KNDMC233276015620 (**Vehicle 3**); a 2013 Hyundai Sonata, New York registration AFS-2074, vehicle identification number 5NPEC4ACXDH779235 (**Vehicle 4**); a 2010 Honda Accord, New York State registration EJC-4180 with vin number of 1HGCP2F30AA063778 (**Vehicle 5**); a 2007 Ford F-150 XLT, New York State registration 94008-MH with vin number of 1FTPW14VX7FA73862 (**Vehicle 6**); and a 2004 Honda Odyssey with New York registration HBB-7266, vehicle identification number 5FNRL18094B148972 (**Vehicle 8**).[1]

5.     This affidavit is made in support of search warrants for the above listed Premises and Vehicles for fruits, records, instrumentalities and evidence of violations of Title 21, United States Code, Section 841(a)(1) (the unlawful possession with the intent to distribute cocaine and cocaine base); Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute and distribute cocaine and cocaine base); Title 18, United States Code, Section 924 (c)(1) (the unlawful possession of a firearm in furtherance of a drug trafficking crime); Title 18, United States Code Sections 1956 and 1957 (money laundering offenses).

---

[1] There is no Vehicle 7 in this affidavit.

6.     This affidavit is also made in support of a criminal complaint charging DENNIS SMITH a/k/a "Fish," DARREN SMITH a/k/a "Fat Boy," KALEAF BALL a/k/a "Leaf," REGINALD STREETER a/k/a "Street," JUAN SAMPEL, ANGEL OCASIO, JOSE QUINTANA, LUZ MORALES a/k/a "Leida," JASON GIBSON and KELLY SHANKS with a violation of Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine and cocaine base).

7.     As a result of my personal participation in this investigation, thorough analysis of documents and records obtained by DEA agents, Rochester Police Department (RPD) Investigators, agents of the Criminal Investigation Division of the Internal Revenue Service (IRS), members of the Greater Rochester Area Narcotics Enforcement Team (GRANET), U.S. Postal Inspection Service, and other law enforcement officers, information provided by confidential informants, the basis of whose knowledge and reliability will be described below, interception of wire and electronic communications pursuant to court authorization on six telephones as detailed below, information learned through analysis of pen registers and subpoenaed tolls and other records, and information gathered from court authorized GPS tracking devices on multiple vehicles, I am familiar with all aspects of this investigation. Since this affidavit is being submitted for limited purposes, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish the required foundation for the requested warrants and those facts that relate to the issue of

whether probable cause exists to believe that the above-named defendants committed the above-mentioned offense.

## BACKGROUND

8.    Since 2015, DEA and RPD (the investigative team) have been investigating the narcotics trafficking and money laundering activities of an organization responsible for the distribution of controlled substances, including cocaine and cocaine base in Rochester, New York and elsewhere.    The following individuals have been identified by law enforcement officers as co-conspirators in this narcotics and money laundering organization: DENNIS SMITH a/k/a "FISH," DARREN SMITH a/k/a "Fat Boy," KALEAF BALL a/k/a "Leaf," REGINALD STREETER a/k/a "Street," JUAN SAMPEL, ANGEL OCASIO, JOSE QUINTANA, LUZ MORALES, SHAVONNE RIVERA, JASON GIBSON, and KELLY SHANKS and others, known and unknown. Many of the members of this narcotics organization have prior arrests for drug trafficking and illegal firearms possessions.    To date, multiple controlled purchases of narcotics have been made from one member of this organization, DENNIS SMITH.

### Interception of Wire Communication

9.    Between January 22, 2016, and April 6, 2016, United States District Court Judge Charles J. Siragusa issued orders authorizing the interception of wire and electronic communications over several telephone numbers related to this investigation, including:

a.    (585) 733-9383 (**Target Telephone 1**), which has no subscriber information listed and is utilized by DENNIS SMITH;

b.    (585) 857-1888 (**Target Telephone 2**), which is subscribed to MJS

Insurance, 1038 Lyell Avenue, Rochester, New York, with JUAN SAMPEL listed as a contact name, and utilized by JUAN SAMPEL;

      c.     (585) 503-4746 (**Target Telephone 3**), which is subscribed to Big Dude, 1084 South Laurel Road, London, Kentucky 40744, and utilized by Kaleaf BALL;

      d.     (585) 201-1510 (**Target Telephone 4**), which is subscribed to and utilized by Angel OCASIO, 425 Lakeview Park, Rochester, New York;

      e.     (585) 524-8457 (**Target Telephone 5**), which has no subscriber information listed and is utilized by Angel OCASIO;

      f.     (585) 483-5164 (**Target Telephone 6**), which has no subscriber information listed and is utilized by Angel OCASIO.

      10.     Essentially, the interception of the wire and electronic communications has shown that DENNIS SMITH a/k/a "FISH," DARREN SMITH a/k/a "Fat Boy," KALEAF BALL a/k/a "Leaf," REGINALD STREETER a/k/a "Street," JUAN SAMPEL, ANGEL OCASIO, JOSE QUINTANA, LUZ MORALES, SHAVONNE RIVERA, JASON GIBSON, and KELLY SHANKS, and others known and unknown, engage in ongoing drug trafficking and money laundering activities in the Western District of New York, and elsewhere, distributing controlled substances, including powder cocaine and cocaine base to a number of individuals who in turn distribute the controlled substances to others.

### Use of Coded Language/Identification of Callers

      11.     Confidential sources who have demonstrated familiarity with the narcotics trafficking of DENNIS SMITH (hereinafter "SMITH"), DARREN SMITH, KALEAF

BALL, ANGEL OCASIO, and JOSE QUINTANA have provided information regarding the use of coded and cryptic language by members of this drug trafficking organization and their associates to conceal their narcotics trafficking activities. I have also used my experience, and the experience of other law enforcement officers involved in this investigation, including interviews with drug dealers and drug users, the information learned during the course of this investigation, the substance of communications intercepted in this investigation, along with the observations of surveillance members, to interpret the coded and cryptic language utilized in the calls described throughout this affidavit. The meaning of coded and cryptic language is sometimes apparent in the excerpts of intercepted calls presented below and is sometimes confirmed by surveillance and other investigative means.

12.     Excerpts of calls intercepted pursuant to the wiretap Orders are presented below. In many instances, participants in the conversations identify themselves by name or nickname. Telephone subscriber and address checks were conducted for numbers dialed to and from the cellular telephones subject to the wiretap Orders. Surveillance conducted in conjunction with intercepted communications was also utilized to confirm the identity of callers. Frequently, the voices of participants in the telephone conversations are identified because law enforcement personnel who have heard the recorded conversations are familiar with the speakers' voices. One or all of these methods has been used to identify speakers in the excerpts of intercepts presented below. Additionally, some communications, or portions thereof, occurred in the Spanish language and have been translated to the English language by Spanish language interpreters and/or by members of the investigative team who are

fluent in both Spanish and English.   The drafts of excerpts of intercepted telephone conversations below may contain some minor errors, but I believe that they are substantially accurate and that they substantially reflect the words used by the participants.

## MAINTENANCE OF EVIDENCE

13.    Based on my training, experience, and participation in this and other drug trafficking and money laundering investigations and based upon my discussions with other experienced DEA Agents, and Federal, State, and Local drug investigators, I know that:

a.  Traffickers of controlled substances frequently maintain, at their residence, place of business or inside their vehicles, quantities of cocaine, crack cocaine, heroin, marijuana and/or other illicit drugs to maintain their ongoing drug business;

b.  In addition to drugs, traffickers of controlled substances usually keep, at their residence, place of business or inside their vehicles, paraphernalia for the packaging, diluting, cutting, weighing, processing and distributing of controlled substances, including scales, plastic bags, cutting agents and utensils;

c.  Traffickers of controlled substances commonly keep firearms in their homes, vehicles, and businesses to protect themselves, their narcotics, and the proceeds from their narcotics sales, and I am aware that many courts, including the Second Circuit United States Court of Appeals, have found that weapons and firearms are among the "tools of the trade" in the narcotics business;

d.  In addition to firearms, traffickers of controlled substances commonly possess and maintain ammunition, body armor, firearm cleaning kits, scopes, stocks, holsters, and manufacturer's firearm cases on their person, or in their homes or vehicles or businesses;

e.  Traffickers of controlled substances commonly maintain records, notes, and other papers relating to drug trafficking, some of which may be in code,

including but not limited to sales receipts, shipping labels, shipping receipts, shipping boxes, order forms, storage receipts, records, operating manuals, computer records, publications, notes, checks, money orders, and money transfer receipts. The aforementioned records, notes, and other papers are commonly maintained where the drug possessor/trafficker has ready access to them, such as on their person, or in their homes, vehicles or businesses, or even in electronic storage devices, including, but not limited to computers, computer storage devices, tablets, and cellular telephones;

f.   Traffickers of controlled substances commonly maintain records, books or papers that reflect addresses or telephone numbers for their associates or sources of supply and such items may be in code. The above addresses and telephone numbers may also be stored in electronic storage mediums, including but not limited to cellular telephones, computers, and computer storage devices;

g.   Traffickers of controlled substances commonly take, or cause to be taken, photographs/videos of themselves, their associates, their property, their drugs, or their firearms, and usually maintain these photographs/videos in their residences.   The above photographs/videos may also be stored in electronic storage mediums, including but not limited to cellular telephones, digital cameras, tablets, home computers, and computer storage devices;

h.   Traffickers of controlled substances commonly maintain cellular telephones and other communication devices on their person, in their residences, in their vehicles, and in their businesses, that are utilized to further their firearm and drug trafficking activities, including contacting other individuals that they are involved in drug trafficking activities with; certain electronic devices, including i-Phones, Blackberries, i-Pods, and Android phones, store information such as email messages, chats, multimedia messages, installed applications or other electronic communications, calendars, notes, passwords, dictionary entries, Global Positioning Satellite ("GPS") entries, internet protocol connections, and location entries, including cell tower and WiFi entries internet or browser entries or history. In addition, these devices often contain proprietary software, in the form of system, data, or configuration information, which enable the types of information and data described above to be accessed and analyzed. These items remained stored on the electronic devices even if the device in question has lost all battery power, and has not been used for an extended period of time;

i.  Traffickers of controlled substances commonly keep and utilize personal computers and tablets to further their drug trafficking activities. The use of personal computers and Tablets by drug traffickers, as well as by the general public, has increased dramatically during the past several years. During the past two years alone, myself and/or other members of the investigative team have participated in investigations where computers, tablets and cellular telephones were seized and searched pursuant to court authorized search warrants that contained digital photographs of drugs, firearms, and bulk cash as well as text messages indicating locations of drug transactions. I am also familiar that that the search, retrieval, analysis, documentation and authentication of all such electronically stored computer data (to include cellular telephones) requires analysis by a qualified computer specialist to prevent the loss of data either from accidental or deliberate destruction; and

j.  Traffickers of controlled substances commonly maintain their drugs or firearms in a secured location, including but not limited to safes, safe deposit boxes, vaults, or hidden compartments in their residences, vehicles, businesses or financial institutions;

k.  Traffickers of controlled substances must maintain, on hand, United States currency in order to maintain and finance their ongoing drug business and the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers;

l.  Traffickers of controlled substances commonly hide contraband; proceeds of drug sales, including currency, financial instruments, precious metals, jewelry, and other items of value; and records of drug transactions, drug sources, and drug customers in secure locations within their residences, vehicles, safe deposit boxes, businesses and storage areas for ready access and to conceal such items from law enforcement authorities;

m.  When traffickers of controlled substances amass large proceeds from the sale of drugs, they attempt to legitimize these profits by utilizing banks, and their attendant services: securities, cashiers checks, money drafts, letters of credit, brokerage houses, real estate, and business fronts, among other things;

n.  Traffickers of controlled substances often place assets in names other than

their own to avoid detection of those assets by government agencies while continuing to use those assets and exercise dominion and control over them; and

o. Traffickers of controlled substances often seem to live above their means and I am aware that courts have recognized that unexplained wealth is probative evidence of crimes motivated, at least in part, by greed, and in particular, trafficking in controlled substances.

p. Drug traffickers utilize U. S. currency (cash) as the method of conducting their illegal activity;

q. The sale of illegal drugs can generate large quantities of cash and often involve small denomination bills, such as $5, $10, $20, and $50 bills, which are commonly referred to as "street money;"

r. Drug traffickers are motivated by the profits that can be generated in the sale of drugs, which they use to enhance their lifestyle or recognition in the community through the purchase of personal assets, including automobiles;

s. Drug traffickers often do not maintain personal bank accounts because such accounts will generate a record of their cash deposits, which records can identify that the individual is involved in some form of illegal activity. Therefore, drug traffickers often use the raw "street cash" to purchase personal assets, such as automobiles;

t. Drug traffickers often cannot rely on checks or credit to purchase assets, such as cars, because such instruments leave trails which are unfavorable to their illegal activity. Therefore, drug traffickers often use their cash proceeds when purchasing assets;

u. The conversion or disposition of large amounts of cash at financial institutions is problematic for drug traffickers due to banks' currency reporting requirements;

v. Drug traffickers spend their cash drug proceeds in a manner designed to hinder law enforcement's detection of the assets acquired, such as an automobile. They commonly use various money laundering schemes to accomplish this goal;

w. Money laundering is the "washing" of illegal proceeds (cash) in order to disguise its true source, i.e., to conceal the underlying illegal activity by which the proceeds were generated. Often times drug traffickers set up businesses as a "front," usually in someone else's name, to launder their drug proceeds through to give the appearance that the money is generated from a legitimate business.

x. The U.S. government has attempted to combat and identify the laundering of cash by individuals involved in illegal activities, such as drug trafficking, and to discourage those businesses, such as automobile dealerships and casinos, who willingly accept large amounts of cash, by imposing requirements to file Forms 8300 documents and Currency Transaction Reports (CTR) with the Financial Crimes Enforcement Network (FinCEN) and the Internal Revenue Service;

y. The Currency Transaction Report (also known as FinCEN Form 104) is required to be filed by financial institutions (i.e. banks) when a customer conducts a transaction involving more than $10,000 cash. The Currency Transaction Report by Casinos (CTRC), which is also known as FinCEN Form 103, is required to be filed by casinos when a customer conducts a transaction involving more than $10,000 cash.

z. FinCEN Form 8300, "Report of Cash Payments Over $10,000 Received in a Trade or Business," is required to be filed by a trade or business (i.e. car dealers, etc.) upon the receipt of more than $10,000 cash from a customer;

aa. Both the CTRC and Form 8300 cause tremendous problems for individuals when they attempt to spend amounts of illegally-obtained cash in amounts exceeding $10,000, in that the forms are required by law to be filed with the IRS and FinCEN and must identify both the person who paid the cash and the individual on whose behalf the transaction was conducted;

bb. Individuals involved in illegal activities attempt to evade or avoid the filing of CTR's and Form 8300's because these forms create a "paper trail" which can be used by law enforcement as evidence to convict those involved in criminal activity and those who laundered the proceeds;

## NO-KNOCK AND NIGHTTIME REQUEST

14.     I respectfully request that a search warrant for **Premise 1-6 and 9-10**, authorize the agents/officers on the search team to enter the Premise without first knocking and announcing their presence.  In this particular case, I believe that requiring the officers to first knock and announce their presence would allow the occupants of the Premise an opportunity dispose of or destroy illegal controlled substances and/or reach for weapons to use against law enforcement officers.

15.     The basis of my "No-Knock" request is as follows:

a.     Controlled substances are easily and readily disposed of or destroyed. Cocaine generally comes in powder or base (crack cocaine) form and valuable quantities of cocaine are not particularly large or bulky.  Cocaine traffickers often attempt to dispose of controlled substances by flushing it down the toilet, or sending it down the drain, either within packaging or not, when they are aware of police intent to execute a search warrant;

b.     Moreover, drug traffickers often attempt to flee and/or destroy, carry away, or hide cocaine, heroin, proceeds of drug sales, records, and other evidence upon learning of law enforcement intent to question, search, or arrest;

c.     Drug traffickers often attempt to fortify or barricade locations where they store and distribute controlled substances, as well as locations where they keep proceeds of drug sales.  Drug traffickers frequently utilize surveillance cameras in those locations as well.  These measures serve to protect the drugs and proceeds from the police and individuals seeking to steal them, by attempting to prevent or delay entry into the location and providing notice of the police presence.  The delayed entry and advance notice provide an

–14–

opportunity to those inside the Premise to destroy evidence, flee, and/or arm themselves with weapons.

d.      Most importantly, drug traffickers frequently protect themselves, their drug product and/or their drug proceeds with firearms.   Armed drug traffickers usually keep their firearms in an area readily accessible to the occupants of the Premise.   The firearms are often carried either on the individuals' person or within an arms-length reach of the occupants.   If law enforcement is required to knock and hesitate, it would allow the occupants an opportunity to observe who is coming and potentially arm themselves. This could create an ambush situation for law enforcement officers.

e.      In this case, the occupants of the residential Premises, **Premise 1-6** and **9-10** are involved in the on-going distribution of controlled substances, including cocaine and cocaine base in amounts that are easily destroyed or disposed of.   For example, on April 4, 2016, at approximately 2:55 p.m., OCASIO received an incoming text message on **Target Telephone 5** from GIBSON[2] utilizing telephone number (585) 447-4864.   In the text message, GIBSON stated, "Flushed shit when kel started flipping."   I believe[3] that GIBSON's reference to "kel" "flipping" was reference to an earlier incident between GIBSON and SHANKS wherein SHANKS called the police on GIBSON.   I further believe that when GIBSON said he "flushed shit," he was advising OCASIO that he flushed controlled substances down the toilet so the

---

[2] Paragraph 12, above, sets forth the basis and the methods used to identify the call participants throughout the affidavit.
[3] As indicated in paragraph 11 above, the basis for my belief as to the meaning of intercepted communications and surveillance observations throughout this affidavit is based upon my training and experience, the substance of the intercepted communications in this case, the information obtained during the investigation thus far, including conversations with confidential informants concerning coded language utilized by members of this drug organization, conversations with other drug dealers and surveillance observations made during the course of this investigation.

police would not locate them if they came to GIBSON's residence on Stonehill Road (**Premise 10**). Moreover, SMITH, DARREN SMITH, OCASIO, QUINTANA, BALL and others are involved in the distribution of significant quantities of controlled substances and based upon my training and experience, are likely to possess firearms. On February 9, 2016, SMITH and DARREN SMITH had telephone conversations over **Target Telephone 1** during which DARREN SMITH advised SMITH that DARREN SMITH had just gotten into a confrontation with another individual. DARREN SMITH asked SMITH to come to the location where the incident occurred, and told SMITH, "don't come over here empty handed" explaining to SMITH that the individual DARREN SMITH just punched "might not call the police, he might have ran and got something." I believe that when DARREN SMITH said, "don't come over here empty handed," he was telling DENNIS to bring a firearm with him for protection in case the individual DARREN SMITH punched went to get a firearm to retaliate. During the conversation SMITH said, "you got that one at your house though. Let me see if I could get this other one;" I believe SMITH was referring to a firearm that DARREN had at his residence (**Premise 3**) and was indicating that there was another gun SMITH could get.

16.     Your affiant additionally requests that the search warrant for **Premise 1-6 and 9-10** authorize the agents/officers on the search team to enter the Premise at any time of the day or night. In this particular case, the investigation has revealed that the business of this conspiracy is conducted at all hours of the day and that good cause exists for nighttime execution pursuant to Federal Rule of Criminal Procedure 41. For example, as detailed in paragraphs 58 through 74 below, SMITH, SAMPEL, and OCASIO completed a cocaine transaction in the late night hours on April 14, 2016. After obtaining cocaine from

OCASIO, SAMPEL traveled to SMITH's residence (**Premise 1**) to provide SMITH with the cocaine at approximately 9:37 p.m. On the same date, SAMPEL traveled to OCASIO's residence (**Premise 5**) at approximately 10:14 p.m. to complete the transaction before departing at approximately 10:28 p.m.

17.     During the course of this investigation, the investigative team has determined that the members of this narcotics conspiracy frequently transport drugs and drug proceeds in vehicles. As you will see from the surveillance detailed below, SMITH, DARREN SMITH, SAMPEL, OCASIO, QUINTANA, and others frequently drive to various locations throughout Rochester to meet with drug customers and/or to obtain drugs. Members of the investigative team have observed members of the conspiracy, including SMITH, DARREN SMITH, STREETER, BALL, SAMPEL, OCASIO, QUINTANA, and GIBSON, operating multiple vehicles on numerous occasions during the course of the investigation.

## CONFIDENTIAL SOURCE INFORMATION
## AND CONTROLLED PURCHASES

### A.     Confidential Source One

18.     Beginning in the middle of 2014 and continuing to the present time, a confidential source, hereafter CS-1, advised Special Agent Sabatino Smith and RPD Investigator Pearce that a black male named Dennis Smith a/k/a "Fish," who CS-1 has known personally for over ten years, is selling large amounts of cocaine in the Rochester, New York area. Law enforcement confirmed via visual surveillance during the course of this investigation that the individual CS-1 knows as Dennis Smith a/k/a "Fish" is in fact

SMITH. The information provided by CS-1 has been corroborated through independent investigation, by information received from other confidential and reliable sources, consensual recordings of face-to-face conversations, and by information received independently and separately from other law enforcement agencies. CS-1 has provided agents reliable information in the past, relative to narcotics trafficking, which has been independently corroborated and has led to controlled purchases of controlled substances. Agents have found no instances where CS-1 has been found to have been untruthful or has attempted to deceive agents relating to the information provided, therefore, agents have determined CS-1 to be reliable.

19. CS-1 is a cooperating federal defendant, who has entered a guilty plea to a violation of Title 21, United States Code, Section 846. CS-1 is cooperating pursuant to a plea agreement with the Government in exchange for consideration at sentencing. The identity of CS-1 is being withheld from this affidavit to protect CS-1 from retaliation and to further utilize CS-1 in this and future investigations. CS-1 indicated that the information CS-1 provided was based upon either personal observations or personal conversations either directly with the individuals involved or persons CS-1 knows to be closely associated with the individuals.

20. CS-1 has been purchasing cocaine from SMITH from 2010 to the present. CS-1 knows SMITH to go by the nickname "Fish," and advised that SMITH is operating his cocaine trafficking in the area of South Clinton Avenue in Rochester, New York. Between 2010 and the present, CS-1 has observed SMITH in possession of multiple kilograms of cocaine. CS-1 most recently saw SMITH in possession of cocaine in January

2016 when law enforcement utilized CS-1 to conduct a controlled purchase of cocaine from SMITH. According to CS-1, SMITH's brother DARREN SMITH, as well as KALEAF BALL, are associates of SMITH's narcotics trafficking organization. Specifically, SMITH has told CS-1 that DARREN SMITH and BALL distribute cocaine that they purchase from SMITH. In the past year, CS-1 has personally observed DARREN SMITH in possession of cocaine that was thereafter distributed by SMITH.

21.    SMITH told CS-1 that SMITH has a cocaine source of supply that is a "Spanish" male who owns a "Farmers Insurance company" located on Lyell Avenue. SMITH told CS-1 that the "Spanish" male utilizes this business to conceal cocaine shipments in automobile batteries to facilitate his cocaine operation. CS-1 provided agents with a description of where SMITH said the insurance company is located on Lyell Avenue. Farmers Insurance Company, located at 1038 Lyell Avenue, Rochester, New York, is the only business matching the description provided by CS-1. JUAN SAMPEL and his wife Miriam Sampel are the listed owners of that Farmers Insurance Company.

22a.    Additionally, CS-1 stated that approximately 10 years ago, he/she observed SMITH and his brother DARREN SMITH assaulting an Asian male known to CS-1 as "Vez." CS-1 knows, via conversation with SMITH that the assault was the result of a dispute that arose from a narcotics transaction. During this assault, CS-1 observed SMITH brandishing a handgun. CS-1 additionally stated that SMITH told him/her that SMITH has purchased multiple properties in the Rochester, New York area. Public records from the Monroe County Clerk's Office reveal that SMITH currently owns eight properties in the City of Rochester. Based on my training and experience, your affiant is aware that

individuals involved in narcotics trafficking sometimes attempt to conceal proceeds from drug transactions by laundering them in the form of rental properties.  CS-1 provided agents with the **Target Telephone 1** as a telephone number used by SMITH and identified **Premise 1** as a location SMITH referred as "the club house" and a location that SMITH utilized to store and distribute cocaine.  CS-1 identified **Premise 2** as SMITH's residence.

22b.    Between May 2015 and November 2015, agents utilized CS-1 to conduct six controlled purchases of cocaine from SMITH.  The total amounts purchased are in excess of 200 grams.  During all but one of the controlled purchases, CS-1 contacted SMITH via **Target Telephone 1** to arrange the purchase.[4] During communications to arrange the controlled purchases, CS-1 and SMITH used previously arranged coded language to signify that CS-1 wanted to meet with SMITH to purchase cocaine.  During each controlled purchase, CS-1 met SMITH in the vicinity of the 1000 block of South Clinton Avenue, Rochester, New York, and **Premise 1**, an area where CS-1 knows, via personal observation, SMITH to frequently conduct narcotic trafficking activities.  Law enforcement officers conducted surveillance during each of the six controlled purchases and all but two purchases were consensually recorded and monitored.  Smith's white Yukon, **Vehicle 1**, was present in the parking lot of **Premise 1** during each of the controlled purchases.

### 1.    August 2015 Controlled Purchase

23.    During the week of August 3, 2015, a plan was formulated to utilize CS-1 to

---

[4] Unless otherwise noted, all calls between CS-1 and SMITH were consensually recorded and verified by either agents who were present at the time of the call or by telephone records, all text messages were read and photographed on the face of CS-1's phone, by agents who saw that they were sent from **Target Telephone 1**.

make a controlled purchase of cocaine from SMITH.  On a date during that week and at the direction of agents, CS-1 contacted SMITH by sending a coded text message to **Target Telephone 1** to let SMITH know that CS-1 was ready to purchase more cocaine.  SMITH responded by sending CS-1 a coded text message from **Target Telephone 1**.  Special Agent Smith observed the text messages sent to and from **Target Telephone 1** and in sum and substance, SMITH told CS-1 to meet him at Loop Lounge, a bar which is located at 1031 South Clinton Avenue, Rochester, New York, and is situated next to the South Clinton Apartments and **Premise 1**.  I believe that SMITH advised CS-1 to meet him at Loop Lounge so SMITH could sell CS-1 a quantity of cocaine.

24.     On that same date, Investigator Timothy Pearce and Special Agent Smith searched CS-1 and his/her vehicle which yielded negative results for contraband.  Agents did not provide CS-1 with a consensual monitoring and recording device because one was unavailable at the time of this controlled purchase.  Agents did provide CS-1 with a predetermined amount of US currency, which was at least $1,400 and not more than $3,000.[5] On the same day, at approximately 8:15 p.m., law enforcement established surveillance in the area of Loop Lounge.  Upon arrival, surveillance members observed SMITH's white Yukon (**Vehicle 1**) parked in the parking lot west of Loop Lounge.  At approximately 8:52 p.m., CS-1 arrived to the location and Special Agent Smith observed CS-1 walk into Loop Lounge where SMITH then sold him/her a quantity of cocaine of at least 31 grams, but not more than 65 grams.  CS-1 stated that when he/she entered Loop Lounge, CS-1 observed SMITH and

---

[5] The exact amount of funds provided or cocaine purchased is being withheld in an effort to protect the identity of CS-1.

SMITH's brother DARREN SMITH. CS-1 stated that shortly after he/she entered the Loop Lounge, DARREN SMITH left the bar. When DARREN SMITH returned a short while later, DARREN SMITH handed a quantity of cocaine to SMITH, who in turn sold that cocaine, which was at least 31 grams to CS-1.

25. Shortly after CS-1 entered Loop Lounge, Investigator Pearce observed what appeared to be a male exit the bar and walk towards the South Clinton Apartments (**Premise 1**) where Investigator Pearce then observed the individual walk out of view in the direction of the South Clinton Apartments and **Premises 1**. Minutes later, Investigator Pearce observed this same individual walking towards the bar coming from the direction of the South Clinton Apartments and **Premises 1** and re-enter the Loop Lounge. Approximately 30 minutes later, CS-1 departed Loop Lounge, re-entered his/her vehicle and drove directly to the pre-determined location where CS-1 immediately handed Special Agent Smith and Investigator Pearce a plastic bag containing a quantity of suspected cocaine. Special Agent Smith and Investigator Pearce again searched the CS and his/her vehicle for contraband with negative results. The suspected cocaine was field tested and the result was positive for the presence of cocaine. Law enforcement continued surveillance at Loop Lounge for a period of time after CS-1 left the location, however, no further observations of SMITH or the other individual were made.

### 2.    September 2015 Controlled Purchase

26. During the week of September 14, 2015, a plan was formulated to utilize CS-1 to make a fourth controlled purchase of cocaine from SMITH. On a date during that week and at the direction of agents, CS-1 contacted SMITH indicating in code that CS-1 was ready

to purchase more cocaine by sending a text message to **Target Telephone 1** and SMITH responded by sending a test message to CS-1 from **Target Telephone 1**, which stated, "Same pl." Special Agent Smith observed the text messages sent to and from **Target Telephone 1**. I believe that when SMITH texted CS-1, "Same pl," SMITH was advising CS-1 to meet him at the same location of the prior controlled purchase, namely the Loop Lounge, so that SMITH could sell CS-1 a quantity of cocaine.

27.     On that same date, Investigator Pearce and Special Agent Smith searched CS-1 and his/her vehicle which yielded negative results for contraband and provided CS-1 with a consensual monitoring and recording device, as well as a predetermined amount of US currency, which was at least $1,400 but not greater than $3,000. On that same date, law enforcement established surveillance in the vicinity of the 1000 block of South Clinton Avenue, Rochester, New York. At approximately 7:40 p.m., surveillance members observed **Vehicle 1** (white Yukon) parked unoccupied in the parking lot to the west of Loop Lounge. At approximately 8:02 p.m., CS-1 arrived in the vicinity of Loop Lounge and entered the bar. The CS stated that shortly after he/she arrived, SMITH entered Loop Lounge. CS-1 stated that they exchanged greetings and then SMITH sold CS-1 at least 31 grams of cocaine, but less than 65 grams. CS-1 stated that during the controlled purchase, he/she went with SMITH to the South Clinton Apartments and CS-1 observed SMITH retrieve additional cocaine from an apartment inside this location (**Premises 2**). At approximately 8:37 p.m., Special Agent Smith observed CS-1 and SMITH depart Loop Lounge and walk across the parking lot where they entered a door attached to the South Clinton Apartments (exterior door to **Premises 2**). A short time later, Special Agent Smith

–23–

observed CS-1 and SMITH exit the exterior door to **Premise 2** and walk back towards Loop

Lounge. CS-1 then entered his/her vehicle and departed the area, while SMITH reentered

Loop Lounge. CS-1 drove directly to the predetermined meeting location where CS-1

immediately handed Special Agent Smith and Investigator Pearce a plastic bag containing a

quantity of suspected cocaine. Special Agent Smith and Investigator Pearce again searched

CS-1 and his/her vehicle for contraband with negative results. The suspected cocaine was

field tested and the result was positive for the presence of cocaine. Law enforcement

discontinued surveillance in the vicinity of Loop Lounge shortly after SMITH returned to

the bar, and no additional observations of SMITH were made.

### January 2016 Controlled Purchase

28.     During the week of January 4, 2016, a plan was formulated to utilize CS-1 to

make a sixth controlled purchase of cocaine from SMITH. On a date during that week and at

the direction of agents, Special Agent Smith observed CS-1 place a recorded telephone call to

SMITH on **Target Telephone 1** and, using their coded language, indicate to SMITH that CS-1

wanted to meet to purchase cocaine. SMITH answered the telephone call to the **Target

Telephone 1** and SMITH told CS-1, "I'ma be over there mostly all day anyways so hit me

when you break free." I believe that SMITH was referring to the Loop Lounge when he

advised CS-1 that he would be "over there mostly all day" and that he was instructing CS-1

to meet him at Loop Lounge when CS-1 was free so SMITH could sell CS-1 a quantity of

cocaine. Approximately two hours later on that same day, Special Agent Smith observed CS-1

place a second recorded phone call to SMITH on **Target Telephone 1**, but SMITH did not

answer. Minutes later, SMITH responded by sending a text message to CS-1 from **Target Telephone 1** that stated, "im here," which Special Agent Smith observed on CS-1's phone. I believe that when SMITH texted "im here," he was advising CS-1 that he was at Loop Lounge and ready to sell CS-1 a quantity of cocaine.

29.     On that same date, Special Agent Mahaffy and Special Agent Smith searched CS-1 and his/her vehicle with negative results for contraband and provided CS-1 with a consensual monitoring and recording device, as well as a pre-determined amount of United States currency that was at least $1,400, but less than $3,000. CS-1 then drove to the area of Loop Lounge and **Premise 1**, as witnessed by Special Agent Mahaffy and Special Agent Smith. On that same date, surveillance was established in the vicinity of **Premise 1**. At approximately 5:47 p.m., United States Custom and Border Patrol Task Force Agent Alex Abreu observed SMITH's white GMC Yukon (**Vehicle 1**) occupied by one individual pull into the parking lot for **Premise 1**, to the west of Loop Lounge. Due to Task Force Agent Abreu's position at that time, he was unable to identify who exited the vehicle.

30.     On that same date, at approximately 6:13 p.m., CS-1 arrived at Loop Lounge as observed by Special Agent Smith and Special Agent Mahaffy and entered the bar. CS-1 stated that when he/she arrived, SMITH was not inside Loop Lounge. CS-1 stated that he/she spoke with two individuals inside the location while waiting for SMITH and that after several minutes, SMITH walked into Loop Lounge. CS-1 stated that SMITH was wearing a light grey hat and pants and a white jacket. CS-1 stated he/she greeted SMITH and then SMITH sold him/her a quantity of cocaine that was at least 31 grams, but less

–25–

than 65 grams. CS-1 stated that SMITH exited the bar and walked towards the South Clinton Apartments (**Premise 1**) and CS-1 left in his/her car.

31.     On that same date, at approximately 6:37 p.m., Task Force Agent Abreu observed a male wearing a white hat and white pants and jacket (identified as SMITH from description provided by CS-1 and recorded conversation on the consensual monitoring device) exit the South Clinton Apartments (**Premise 1**) and walk to SMITH's Yukon (**Vehicle 1**). Surveillance members observed the lights flash on **Vehicle 1** in a manner consistent with a vehicle being locked. Surveillance members then observed SMITH enter Loop Lounge. At the time SMITH entered Loop Lounge, Special Agent Smith was able to hear CS-1 begin talking with SMITH.

32.     On that same date, at approximately 6:40 p.m., Immigration and Customs Enforcement Task Force Agent Allen Wood observed CS-1 and SMITH exit the rear of Loop Lounge. Moments later Agent Wood observed SMITH walk towards the South Clinton Apartments (**Premise 1**), where Task Force Agent Abreu observed SMITH take keys out of his pocket and use them to unlock the exterior door before entering the apartment building. Task Force Agent Wood observed CS-1 depart in his/her vehicle and CS-1 drove directly to the predetermined meeting location where CS-1 immediately handed Special Agent Smith and Special Agent Mahaffy a plastic bag containing a quantity of suspected cocaine. Special Agent Smith and Special Agent Mahaffy again searched CS-1 and his/her vehicle for contraband with negative results. The suspected cocaine was field tested and the result was positive for the presence of cocaine. Law enforcement continued

–26–

surveillance at Loop Lounge for a period of time after CS-1 left the location, however, no further observations of SMITH were made.

### B.   Confidential Source Two

33.   At the end of 2014, a confidential source, hereafter CS-2, advised Special Agent Smith and RPD Investigator Pearce that a black male named Dennis with the nickname "Fish" and his brother Darren have been selling large amounts of cocaine in the Rochester, New York area over the course of the last five years. Based upon information learned during the investigation, Special Agent Smith and Investigator Pearce determined that the individual CS-2 knows as Dennis is in fact SMITH and the individual CS-2 knows as Darren is in fact DARREN SMITH. The information provided by CS-2 has been corroborated through independent investigation by information received from other confidential and reliable sources and by information received independently and separately from other law enforcement agencies. CS-2 has provided agents with reliable information in the past relative to narcotic trafficking, which has been independently corroborated. Agents have found no instances where CS-2 has been found to have been untruthful or has attempted to deceive agents relating to the information provided, therefore, agents have determined CS-2 to be reliable.

34.   CS-2 is a cooperating federal defendant, who has entered a guilty plea to violations of Title 21, United States Code, Section 846. CS-2 is cooperating pursuant to a plea agreement with the Government in exchange for consideration at sentencing. The identity of CS-2 is being withheld from this affidavit to protect CS-2 from retaliation and to further utilize CS-2 in this and future investigations. CS-2 indicated that the information

CS-2 provided was based upon either personal observations or personal conversations either directly with the individuals involved or persons CS-2 knows to be closely associated with the individuals.

35.    CS-2 stated that during 2012 and 2013, he/she purchased in excess of five kilograms of cocaine from SMITH.   CS-2 advised that he/she would typically pay approximately $39,000 per kilogram of cocaine when purchasing from SMITH.   CS-2 knows, via personal observations, that SMITH lives on Glide Street in Rochester, New York and distributes cocaine from **Premise 1**, an apartment in the South Clinton Apartments.   CS-2 referred to **Premise 1** as SMITH's "club house."   SMITH advised CS-2 around approximately April of 2014 that SMITH has a "Spanish male" in the Philadelphia area that supplies him with cocaine.

### C.    Confidential Source 5

36.    In approximately November 2015, a Confidential Source, hereinafter CS-5, provided information to RPD Investigator Edmond Bernabei, who is assigned to the ATF Task Force, concerning the drug trafficking activities of BALL.   CS-5 has given Investigator Bernabei and RPD Officer Paul Helfer reliable information in the past, relative to narcotic trafficking and illegal firearms, which has been independently corroborated by independent police investigation and which has led to the arrests of several individuals.   Investigator Bernabei and Officer Helfer have found no instances where CS-5 has been found to have been untruthful or has attempted to deceive agents relating to the information provided, therefore, they have determined CS-5 to be reliable.   CS-5 is a paid cooperating source from October 2015 to the present.   The identity of CS-5 is being withheld from this affidavit to

protect CS-5 from retaliation and to further utilize CS-5 in this and future investigations. CS-5 indicated that the information CS-5 provided was based upon either personal observations or personal conversations either directly with the individuals involved or persons CS-5 knows to be closely associated with the individuals.

37.    CS-5 knows, via conversation with BALL, that BALL is involved in the distribution of cocaine and identified the telephone assigned number (585) 503-4746 as a telephone number utilized by BALL. CS-5 stated that BALL gave him/her this phone number in November 2015 to utilize to contact BALL for cocaine purchases.  Law enforcement has been unsuccessful in utilizing CS-5 to make controlled purchases of cocaine from BALL. CS-5 believes that this is due to BALL's suspicions that CS-5 is cooperating with law enforcement.

D.    **Confidential Source Six**

38.    In February of 2016, a Confidential Source, (hereinafter CS-6), provided information to RPD Officer Stan Kaminski and RPD Investigator Edmond Bernabei who is assigned to an ATF task force, concerning the drug trafficking activities of Jose QUINTANA.    CS-6 has given Officer Kaminski and Investigator Bernabei reliable information in the past, relative to narcotics trafficking, which has been independently corroborated by independent police investigation and which has led to the seizure of a firearm. Officer Kaminski and Investigator Bernabei have found no instances where CS-6 has been found to have been untruthful or has attempted to deceive officers relating to the information provided, therefore, they have determined CS-6 to be reliable. CS-6 has been a paid cooperating source from January 2016 to the present. The identity of CS-6 is being

–29–

withheld from this affidavit to protect CS-6 from retaliation and because CS-6 is an active cooperating source. CS-6 indicated that the information CS-6 provided was based upon either personal observations or personal conversations either directly with the individuals involved or persons CS-6 knows to be closely associated with the individuals.

39.    CS-6 stated that QUINTANA is the brother of Angel OCASIO and is involved in distributing cocaine with OCASIO. CS-6 stated that through conversation with associates of OCASIO and QUINTANA, he/she learned that they are distributing approximately 40 kilograms of cocaine per week and are smuggling the cocaine to Rochester from an unknown out of state supplier utilizing tractor trailers. CS-6 further stated that OCASIO and QUINTANA stash large amounts of cocaine and drug proceeds at 35 Oakman Street, Rochester, New York (**Premise 6**). According to records from the New York State Department of Motor Vehicles (DMV), 35 Oakman Street, Rochester, New York, is the residence listed on QUINTANA's New York State driver's license.

## ONGOING DRUG TRAFFICKING ACTIVITY

40.    I have been advised by Assistant United States Attorney Jennifer M. Noto that "staleness" is an issue that is considered by the Court in terms of applying for this search warrant. However, she advised me that the ongoing and lengthy duration of this conspiracy, and the investigation into it which dates back to 2015, counters a staleness argument. AUSA Noto informed me that the Second Circuit has held that there are "two critical factors" in determining whether the evidence in a search warrant application is stale: the time elapsed between the evidence and the application, and the type of crime involved. United States v. Ortiz, 143 F.3d 728, 732 (2d Cir. 1998). Thus the age of the information

must be assessed in light of the nature of the criminal activity suspected.  Where ongoing criminal conduct, such as a narcotics conspiracy is suspected, "the passage of time between the last described act and the presentation of the application becomes less significant." United States v. Gallo, 863 F.2d 185, 192 (2d Cir. 1988) (internal citations omitted).  See also, United States v. Singh, 390 F.3d 168, 181-82 (2d Cir. 2004) (finding that lapse of 20 months between information in affidavit and search warrant application was not stale).  As the Second Circuit has held, "narcotics conspiracies are the very paradigm of the continuing enterprises for which the courts have relaxed the temporal requirements of non-staleness." United States v. Rowell, 903 F.2d 899, 903 (2d Cir. 1990) (internal citations omitted).  See also, United States v. James Andre Clark, 05-CR-6041 (L) (District Court relied on ongoing nature of conspiracy to deny suppression of evidence for defendant's home even where there was no allegation that narcotics had been seen inside the location for almost one year).

41.     The investigation has shown that SMITH, KALEAF BALL, DARREN SMITH, REGINALD STREETER, JUAN SAMPEL, ANGEL OCASIO, JOSE QUINTANA, LUZ MORALES, SHAVONNE RIVERA, JASON GIBSON, KELLY SHANKS and others are engaged in on-going drug-trafficking conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine as well as cocaine base.  A sample of conversations and communications intercepted pursuant to the wiretap Orders is set forth below to illustrate the continuing drug-trafficking activities of this organization.

### February 12, 2016 at 3:34 p.m.

42.     On February 12, 2016, at approximately 3:34 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing telephone call to OCASIO on **Target Telephone 4**.  The

following is a transcript of a pertinent portion[6] of that call:

**Angel Ocasio (AO):** Yeah.

**Juan Sampel (JS):** How you doing, mister?

**AO:** I got you set, but you have to give me a few. I already got it, but you got to give me a few.

**JS:** Oh, ok, because no I was just a, I was just on my way outta, I just left my driveway, and I was on the expressway on my way home I figured I could drive by, and go pick up that, that from you.

**AO:** Yeah, yeah give me a few. Hey, you talk to your boy about the other houses.

**JS:** No, not yet. I haven't heard from him yet.

**AO:** Oh, the other houses they ready, they ready to go. Get that room (Unintelligible), and all that.

\* \* \*

43.     I believe that when OCASIO said, "Hey, you talk to your boy about the other houses," OCASIO was asking SAMPEL if he talked to SMITH to see if SMITH was ready to purchase more kilograms of cocaine. I further believe that when SAMPEL said, "No, not yet. I haven't heard from him yet," SAMPEL was telling OCASIO that he had not talked to SMITH about purchasing more cocaine yet. I believe that when OCASIO said, "Oh, the other houses they ready, they ready to go. Get that room (Unintelligible), and all that," OCASIO was telling SAMPEL that he received more kilograms of cocaine and they are ready to be distributed.

### February 12, 2016 at 4:35 p.m. and 4:36 p.m.

44.     On that same date, at approximately 4:35 p.m., SAMPEL utilized **Target Telephone 2** to place two outgoing texts to SMITH on **Target Telephone 1**, which read,

---

[6]Omitted portions will be indicated by the use of three asterisks (\* \* \*) in transcripts throughout the affidavit.

"Hey buddy the power washer is ready from the repair shop let me now how long ur going to need it for 2or 3 hours to power wash that mold in that basement," and "that will clean that." On that same date, at approximately 4:36 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text to OCASIO on **Target Telephone 4**, which read, "Waiting for response." At approximately 4:36 p.m., **Target Telephone 2** then received an incoming text from **Target Telephone 4** stating, "K." I believe that when SAMPEL texted, "Hey buddy the power washer is ready from the repair shop let me now how long ur going to need it for 2or 3 hours to power wash that mold in that basement," SAMPEL was telling SMITH SAMPEL's source (OCASIO) was ready to sell cocaine.

### February 12, 2016 at 4:42 p.m.

45.     On that same date, at approximately 4:42 p.m., SAMPEL received an incoming text message on **Target Telephone 2** from **Target Telephone 1**, which read, "I can take care of one but ill take whatever." At approximately 4:44 p.m., **Target Telephone 2** then sent an outgoing text to **Target Telephone 1** stating, "K." I believe that when SMITH texted, "I can take care of one but ill take whatever," SMITH was telling SAMPEL that he only has enough money to purchase one kilogram of cocaine, but would take more cocaine if SAMPEL and SAMPEL's source fronted the cocaine to SMITH.

### February 12, 2016 at 4:46 p.m.

46.     On that same date, at approximately 4:46 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text to **Target Telephone 4**, which read, "He available to do one room right now he ok if u want him to help do him whatever." At approximately 4:47 p.m., **Target Telephone 2** then received an incoming text from **Target Telephone 4** stating, "OK hold on." I believe that when SAMPEL texted, "He available to do one room

right now he ok if u want him to help do him whatever," SAMPEL was telling OCASIO that SMITH can pay for one kilogram of cocaine right now, but that SMITH would take more cocaine if SAMPEL and OCASIO fronted the cocaine to SMITH.

### February 12, 2016 at 5:09 p.m.

47.     On that same date, at approximately 5:09 p.m., SAMPEL received an incoming text message on **Target Telephone 2** from **Target Telephone 4**, which read, "OK it set me back a little cause had to go get more dry wall he needs." At approximately 5:12 p.m., **Target Telephone 2** then placed an outgoing text to **Target Telephone 4** stating, "How long abouts so I no." I believe that when OCASIO texted, "OK it set me back a little cause had to go get more dry wall he needs," OCASIO was telling SAMPEL that he has to get more cocaine because he did not have enough for SMITH. I further believe that when SAMPEL stated, "How long abouts so I no," SAMPEL was asking OCASIO how long will it be until OCASIO gets more cocaine.

### February 12, 2016 at 5:13 p.m.

48.     On that same date, at approximately 5:13 p.m., SAMPEL received an incoming text message on **Target Telephone 2** from **Target Telephone 4**, which read, "but 30 mind waiting on my bro so we can pick up the dry wall in his truck." At approximately 5:14 p.m., **Target Telephone 2** then placed an outgoing text to **Target Telephone 4** stating, "K." I believe that when OCASIO texted, "but 30 mind waiting on my bro so we can pick up the dry wall in his truck," OCASIO was telling SAMPEL that he is going to pick up the cocaine with his brother QUINTANA in QUINTANA's truck and will be back in about thirty minutes.

### February 12, 2016 at 5:15 p.m.

49.     On that same date, at approximately 5:15 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text to SMITH on **Target Telephone 1**, which read, "Getting paint supplies together I'll call u." At approximately 5:16 p.m., **Target Telephone 2** then received an incoming text from **Target Telephone 1** stating, "ok." I believe that when SAMPEL texted, "Getting paint supplies together I'll call u," SAMPEL was telling SMITH that he is waiting for the cocaine and will call SMITH when it is ready.

### February 12, 2016 at 5:29 p.m.

50.     On that same date, at approximately 5:29 p.m., SAMPEL received an incoming text message on **Target Telephone 2** from OCASIO on **Target Telephone 4**, which read, "6pm be there ok." I believe that when OCASIO texted, "6pm be there ok," OCASIO was telling SAMPEL that he will have the cocaine by six o'clock and to meet OCASIO at his house (**Premise 5**). Based on the intercepted communications, agents established surveillance in area of SAMPEL's residence located at 4 Bru Mar Drive, (**Premise 4**) and at approximately 5:30 p.m., agents observed **Vehicle 2** parked in the driveway of SAMPEL's residence. At approximately 6:18 p.m., GPS data revealed that **Vehicle 2** departed **Premise 4** and drove directly to OCASIO's residence, **Premise 5** (425 Lakeview Park). Special Agent Smith then observed SAMPEL walk up the front steps and enter the front door of **Premise 5**. Additionally, Special Agent Smith observed **Vehicle 6** (tan Ford F-150 XLT pickup truck) idling in front of **Premise 5**. On that same date, at approximately 6:39 p.m., DEA Special Agent James Schmitz observed SAMPEL's gray Pathfinder backing out of the driveway of 425 Lakeview Park. At approximately 6:43 p.m.,

GPS data reveals that **Vehicle 2** was stopped in close proximity to SMITH's residence located at 1076 Glide Street, (**Premise 2**). At this same time, agents observed, via covert camera surveillance, a Pathfinder matching the description of the gray Pathfinder, pull up and park across the street from SMITH's residence at 1076 Glide Street. No one was observed exiting the gray Pathfinder and after approximately two minutes, **Vehicle 2** departed the area.

### February 12, 2016 at 6:41 p.m.

51. On February 12, 2016, at approximately 6:41 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing telephone call to SMITH on **Target Telephone 1**. The following is a transcript of that call:

**Dennis Smith (DS):** Yo.

**Juan Sampel (JS):** Yeah, I was just driving by the park over here looking at the snow and I see your vehicle parked at the mansion, you heard?

**DS:** Nah, I'm up at the clubhouse, my girl car ain't working right, so, I let her keep my truck.

**JS:** Okay that's a beautiful thing, no problem I was just checking because you know I just um, I got that equipment with me so that way you can do that job tomorrow morning but, I be there in a few I will call you when I am close.

**DS:** Alright, cause I am just going to open the door, oh shit you on your way, I will just open the door.

**JS:** Got you.

**DS:** Alright.

52. I believe that when SAMPEL said, "Yeah, I was just driving by the park over here looking at the snow and I see your vehicle parked at the mansion, you heard," SAMPEL was telling SMITH that he just drove by SMITH's house at 1076 Glide Street,

Rochester (**Premise 2**), and noticed **Vehicle 1** was parked there. I further believe that when SMITH responded, "Nah, I'm up at the clubhouse, my girl car ain't working right, so, I let her keep my truck," SMITH was telling SAMPEL that he was at **Premise 1**. I further believe that when SAMPEL said, "I got that equipment with me so that way you can do that job tomorrow morning," SAMPEL was telling SMITH that he had the cocaine on him right now. I further believe that when SMITH said, "Alright, cause I am just going to open the door, oh shit you on your way, I will just open the door," SMITH was telling SAMPEL to come to the South Clinton Apartments and that SMITH will unlock the door so SAMPEL can just walk in with the cocaine.

53.    On that same date, GPS data revealed that after leaving Glide Street, **Vehicle 2** drove to SAMPEL's residence (**Premise 4**) where DEA Special Agent Brian Hanley observed **Vehicle 2** parked and idling in the driveway of **Premise 4** and the garage door open. Special Agent Hanley observed vehicles being rearranged in SAMPEL's driveway. At approximately 7:18 p.m., Special Agent Hanley observed **Vehicle 2** depart SAMPEL's residence. At approximately 7:28 p.m., Special Agent Smith observed **Vehicle 2** arrive at the parking lot for **Premise 1**, occupied by only the driver. **Vehicle 2** parked and Special Agent Smith observed SAMPEL exit the driver side and enter the exterior door to **Premise 1**. At approximately 7:29 p.m., Special Agent Smith observed SAMPEL exit the exterior door to **Premise 1**, enter driver side of **Vehicle 2** and depart the area.

**February 12, 2016 at 7:40 p.m.**

54.    On February 12, 2016, at approximately 7:40 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing telephone call to OCASIO on **Target Telephone 4**. The following is a transcript of that call:

**Angel Ocasio (AO):** Yeah?

**Juan Sampel (JS):** Yo, I'm with some peoples, you wanna come and see me man?

**AO:** I'm not home. I'm still not home man.

**JS:** You haven't gone nowhere?

**AO:** No, yeah I went out, but I came back if you come over here.

**JS:** I'm good.

**AO:** Huh!

**JS:** You want me to go over there, I'm with somebody?

**AO:** (Unintelligible)

**JS:** Donte and Enna.

**AO:** Oh, no, no, no. Um, hold on. Yo, Juan.

**JS:** Yeah.

**AO:** Watcha driving?

**JS:** I'm in my truck.

**AO:** Ok I'm going to send my wife to Family Dollar.

**JS:** To Family Dollar?

**AO:** Where you at?

**JS:** I'm a, I'm a, I'm at Miriam and Donte and Enna.

**AO:** All right, go to Family Dollar right there on Dewey and Driving Park.

**JS:** Yeah, ok.

**AO:** All right.

55.    I believe that when SAMPEL said, "Yo, I'm with some peoples, you wanna

come and see me man," SAMPEL was telling OCASIO that he had OCASIO's money from the drug transaction with SMITH, but does not want to go to OCASIO's house (**Premise 5**) because SAMPEL has friends with him. I further believe that when OCASIO said, "Ok I'm going to send my wife to Family Dollar" and "All right, go to Family Dollar right there on Dewey and Driving Park," OCASIO was telling SAMPEL that he will send his wife LUZ MORALES to the Family Dollar at Dewey Avenue and Driving Park to pick up the money from SAMPEL.

56.     On that same date, at approximately 7:44 p.m., Special Agent Hanley observed **Vehicle 6** parked idling in front of 425 Lakeview Park and then observed it pull away at high rate of speed. Based on intercepted communications on **Target Telephone 2**, surveillance units set up surveillance at the Family Dollar located at the corner of Dewey Avenue and Driving Park, Rochester, New York. At approximately 7:53 p.m., Special Agent Hanley observed SAMPEL's gray Pathfinder (**Vehicle 2**) pull into the Family Dollar parking lot and park in front of the doors to the store. Special Agent Hanley's view was blocked and moments later **Vehicle 2** pulled away. The tracking device on **Vehicle 2** showed that **Vehicle 2** was at the Family Dollar for approximately one minute. The tracking device showed that **Vehicle 2** then went directly to SAMPEL's residence (**Premise 4**) and surveillance was terminated at that time.

57.     Based on my training and experience, the substance of the above listed intercepted communications on February 12, 2016, the observations of the investigative team members on that date, and the information obtained during this investigation, I believe SAMPEL obtained two kilograms of cocaine from OCASIO at 425 Lakeview Park

(Premise 5) and then parked outside of SMITH's residence at 1076 Glide Street (Premise 2) waiting to see if SMITH was home. SAMPEL then took the cocaine to his residence located at Bru Mar Drive (Premise 4). A short time later, SAMPEL then transported the cocaine to SMITH at 1045 South Clinton Avenue-Apartment 3 (Premise 1). After leaving 1045 South Clinton Avenue-Apartment 3 (Premise 1), SAMPEL met MORALES at the Family Dollar at the corner of Dewey Avenue and Driving Park Avenue to give her the money that SAMPEL had gotten from SMITH for the cocaine.

### April 14, 2016 at 12:14 p.m.

58.     On April 14, 2016, at approximately 12:14 p.m., OCASIO placed an outgoing text message from **Target Telephone 5** to SAMPEL on **Target Telephone 2**, which read, "How many boxes of tiles he need." I believe that when OCASIO texted, "How many boxes of tiles he need," OCASIO was asking SAMPEL how many kilograms of cocaine did SMITH want for the next transaction.

### April 14, 2016 at 2:55 p.m.

59.     On the same date, at approximately 2:55 p.m., SMITH received an incoming telephone call on **Target Telephone 1** from SAMPEL on **Target Telephone 2**. The following is a transcript of that call:

**Dennis Smith (DS):** Hello.

**Juan Sampel (JS):** What's going on, son?

**DS:** What's up, man?

**JS:** Oh, nothing much man. My man called me, ya heard. Ya, he just wanted to know how many boxes of tile you needed to do that kitchen.

**DS:** Ok, ok, let me put it together. Damn I have a baseball game today, too.

**JS:** (Laughing) What a fucking day right.

**DS:** All right listen, um. Let's, let's put it together for about, like 8 o'clock.

**JS:** Ya, no problem.

**DS:** All right then boom. I will shoot you, let put a few things together, run around and then I'm going hit you in like about an hour, all right.

**JS:** Yep, no problem. Probably like 5. Right?

**DS:** Um, probably, maybe a little more. I am not sure.

**JS:** Ya, ok no problem. I'll, I'll wait for you, I gotta let him know. I gotta wait for you to call me back and let me know, and try to get situated right quick and then you are up. I'll call him in a hour because you know whatever. The thing about it is we gotta move real quick so that way he can get up in the warehouse, and the warehouse closes after a certain time that's why.

**DS:** Ok.

**JS:** All right.

**DS:** Ok.
[End of Call]

    60.    I believe that when SAMPEL stated, "My man called me, ya heard. Ya, he just wanted to know how many boxes of tile you needed to do that kitchen," he was asking SMITH how many kilograms of cocaine SMITH wanted for the next transaction. I further believe that when SMITH replied, "let's put it together for about, like 8 o'clock," SMITH was telling SAMPEL that he was available to do the cocaine transaction around 8 o'clock p.m. I further believe that when SAMPEL stated, "Yep, no problem. Probably like 5. Right," he was asking SMITH if he wanted five kilograms of cocaine.

**April 14, 2016 at 3:14 p.m.**

61.     On the same date, at approximately 3:14 p.m., SAMPEL placed an outgoing text message from **Target Telephone 2** to OCASIO on **Target Telephone 5**, which read, "He's taking all the measurements of the space he's doing to let me no he said 5-6 maybe more he'll call me I'll let u no." I believe that when SAMPEL texted, "He's taking all the measurements of the space he's doing to let me no he said 5-6 maybe more he'll call me I'll let u no," SAMPEL was telling OCASIO that SMITH wanted five or six kilograms of cocaine but SMITH would call SAMPEL back with the exact number.

### April 14, 2016 at 3:15 p.m. and 3:16 p.m.

62.     On the same date, at approximately 3:15 p.m., OCASIO placed an outgoing text message from **Target Telephone 5** to SAMPEL on **Target Telephone 2**, which read, "I only got two guys for the job." On the same date, at approximately 3:16 p.m., OCASIO utilized **Target Telephone 5** to place another outgoing text message to SAMPEL on **Target Telephone 2**, which read, "I'll be hiring more by next week." I believe that when OCASIO texted, "I only got two guys for the job," OCASIO was telling SAMPEL that he only had two kilograms of cocaine to sell to SMITH and that when OCASIO texted, "I'll be hiring more by next week," OCASIO was telling SAMPEL that he will be getting more cocaine next week.

### April 14, 2016 at 5:12 p.m.

63.     On the same date, at approximately 5:12 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text message to SMITH on **Target Telephone 1**, which read, "Hey homei he got two helpers that can help you." I believe that when SAMPEL

texted, "he got two helpers that can help you," SAMPEL was telling SMITH that SAMPEL's cocaine supplier (OCASIO) only had two kilograms of cocaine right now.

### April 14, 2016 at 5:41 p.m.

64.     On the same date, at approximately 5:41 p.m., SMITH utilized **Target Telephone 1** to place an outgoing text message to SAMPEL on **Target Telephone 2**, which read, "6." I believe that when SMITH texted, "6," SMITH was telling SAMPEL that he wanted a total of six kilograms of cocaine.

### April 14, 2016 at 5:49 p.m.

65.     On the same date, at approximately 5:49 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing call to OCASIO on **Target Telephone 5**. The following is a transcript of that call:

**Juan Sampel (JS)**: Yo, what's up nigger?

**Angel Ocasio (AO):** (Unintelligible)

**JS:** Hey, listen can I, can I talk to the, the guys you that you got doing the work?

**AO:** What?

**JS:** All right, let me know when there, so that way I can go talk to the guys that you got for me to help my man out.

**AO:** All right, give me like a half hour.

**JS:** Ya, ok no problem.

**AO:** Ok. If I don't call you, call me.

**JS:** Ya, ok.
[End of Call]

66.    I believe that when SAMPEL stated, "can I talk to the, the guys you that you got doing the work," and "let me know when there, so that way I can go talk to the guys that you got for me to help my man out," SAMPEL was telling OCASIO that SAMPEL was ready to pick up the cocaine that OCASIO had for SMITH. I believe that when OCASIO replied, "All right, give me like a half hour," OCASIO was telling SAMPEL to come pick up the cocaine in half an hour.

### April 14, 2016 at 6:06 p.m.

67.    On the same date, at approximately 6:06 p.m., SAMPEL utilized **Target Telephone 2** to placed an outgoing text message to SMITH on **Target Telephone 1**, which read, "He only have 2 homies that want to work for u." I believe that when SAMPEL texted, "He only have 2 homies that want to work for u," SAMPEL was telling SMITH again that SAMPEL's cocaine supplier (OCASIO) only had two kilograms of cocaine right now.

### April 14, 2016 at 7:11 p.m. and 7:22 p.m.

68.    On the same date, at approximately 7:11 p.m., SAMPEL used **Target Telephone 2** to place an outgoing text message to OCASIO on **Target Telephone 5**, which read, "On way." On the same date, at approximately 7:22 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text message to OCASIO on **Target Telephone 5**, which read, "Here."

69.    On that same date, at approximately 7:25 p.m., law enforcement observed

SAMPEL's gray Pathfinder (**Vehicle 2**) park in front of OCASIO's residence at 425 Lakeview Park (**Premise 5**). A couple of minutes later, SAMPEL was observed exiting **Vehicle 2** and entering into OCASIO's residence, **Premise 5**. At approximately 7:31 p.m., SAMPEL and OCASIO were observed exiting **Premise 5**. OCASIO was then observed moving a rental vehicle OCASIO and MORALES picked up on an earlier occasion to the other side of the street and SAMPEL was observed entering **Vehicle 2** and then driving directly to SAMPEL's residence at 4 Bru Mar Drive, Rochester, New York (**Premise 4**).

### April 14, 2016 at 9:19 p.m.

70.     On the same date, at approximately 9:19 p.m., SMITH utilized **Target Telephone 1** to place an outgoing text message to SAMPEL on **Target Telephone 2**, which read, "my house."

### April 14, 2016 at 9:29 p.m.

71.     On the same date, at approximately 9:29 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing call to SMITH on **Target Telephone 1**. The following is a transcript of a pertinent portion of that call:

**Dennis Smith (DS):** Yo.

**Juan Sampel (JS):** Yea, I will be there in five.

**DS:** What?

**JS:** I will be at the park at five, in five minutes.

**DS:** All right, well swing by the house.

                                    * * *

72.     I believe that when SMITH texted, "my house," SMITH was directing

SAMPEL to meet him at his residence at 1076 Glide Street, Rochester, New York (**Premise 2**) with the cocaine. I further believe that when SAMPEL stated, "Yea, I will be there in five," and "I will be at the park at five, in five minutes," he was telling SMITH that SAMPEL would be to SMITH's residence at 1076 Glide Street (**Premise 2**) in five minutes with the cocaine.

73.     On that same date, GPS data for SMITH's white Yukon (**Vehicle 1**) indicated that **Vehicle 1** departed **Premise 1** (1045 South Clinton Avenue, Apartment 3) at approximately 9:20 p.m. and arrived at **Premise 2** (1047 Glide Street) at approximately 9:31 p.m. **Vehicle 1** remained at that location until approximately 10:40 p.m. On that same date, at approximately 9:30 p.m., GPS data revealed that SAMPEL's gray Pathfinder (**Vehicle 2**) departed his residence (**Premise 4**) and traveled directly to 1076 Glide Street (**Premise 2**) without stopping, arriving at approximately 9:37 p.m. Law enforcement then observed SAMPEL walk up on the porch of **Premise 2**. A couple of minutes later, law enforcement observed the door to **Premise 2** open and observed SAMPEL enter **Premise 2**. At approximately 10:07 p.m., SAMPEL was observed exiting **Premise 2** and entering the gray Pathfinder (**Vehicle 2**). GPS data for **Vehicle 2** revealed that SAMPEL then drove directly to OCASIO's residence (**Premise 5**).

### April 14, 2016 at 10:12 p.m.

74.     On the same date, at approximately 10:12 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text message to OCASIO on **Target Telephone 5**, which read, "Here." At approximately 10:14 p.m., law enforcement observed SAMPEL arrive at

OCASIO's residence (**Premise 5**) in **Vehicle 2**. SAMPEL remained in **Vehicle 2** for approximately twelve minutes. At approximately 10:26 p.m., SAMPEL was observed exiting **Vehicle 2** and walking to the passenger side of the vehicle. SAMPEL was then observed taking something out of the passenger side of the vehicle and walking into OCASIO's residence (**Premise 5**). At approximately 10:28 p.m., SAMPEL was observed entering the gray Pathfinder (**Vehicle 2**) and GPS data revealed that SAMPEL then drove directly to SAMPEL's residence at 4 Bru Mar Drive (**Premise 4**).

## PREMISES AND VEHICLES TO BE SEARCHED
## AND DEFENDANTS TO BE ARRESTED

75.    The following is information with respect to each of the Premises and Vehicles that are the subject of this application, as well as each defendant that an arrest warrant is sought for. Based upon the information contained in this affidavit, your affiant submits that there is probable cause to believe that items listed in the annexed Schedule of Items to be Seized, which is incorporated by reference as if fully repeated here, will be found at each of **Premise 1-6 and 10**, and in **Vehicles 1-6 and 8,** and that there is probable cause to believe that the items listed in the annexed Schedule of Items to be Seized – Books and Records, which is incorporated by reference as if fully repeated here, will be found at each of **Premise 7-9**, and that those items are evidence, fruits, records, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 846, and Title 18, United States Code, Sections 922(g)(1), 924 (c)(1), 1956 and 1957. Further, your affiant submits that there is probable cause to believe that DENNIS SMITH a/k/a "Fish," DARREN SMITH a/k/a "Fat Boy," KALEAF BALL a/k/a "Leaf," REGINALD STREETER

a/k/a "Street," JUAN SAMPEL, ANGEL OCASIO, JOSE QUINTANA, LUZ MORALES a/k/a "Leida," JASON GIBSON and KELLY SHANKS have committed and are currently engaged in committing a violation of Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine and cocaine base).

**Premise 1:** **1045 South Clinton Avenue, Apartment 3, Rochester, New York**

**Premise 2:** **1076 Glide Street, Rochester, New York**

**Premise 8:** **834 South Goodman Street, Rochester, New York**

**Vehicle 1:** **2007 GMC Yukon, New York State registration FLF-7845 with VIN number of 1GKFK668X7J267207**

**DENNIS SMITH:** **21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute 5 kilograms or more of cocaine and cocaine base)**

76.     The investigative team has determined that SMITH is involved in an ongoing conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine and cocaine base, in violation of Title 21, U.S.C. § 846. Further, the investigative team has determined that SMITH resides at 1076 Glide Street, Rochester, New York **(Premise 2)** and utilizes his "club house" located at 1045 South Clinton Avenue, Apartment 3, Rochester, New York **(Premise 1)** to store and distribute cocaine. The investigation team has further determined that SMITH's mother, Bessie Smith, resides at 834 South Goodman Street, Rochester, New York **(Premise 8)**. The investigative team confirmed this from physical surveillance, public records databases, and other investigative techniques, including confidential informant information.

77.    References to the South Clinton Apartments throughout this and prior affidavits refer to the apartment building located at 1045 South Clinton Avenue. Agents have identified Apartment 3 as the apartment inside of 1045 South Clinton Avenue that SMITH uses to distribute controlled substances based upon identification and descriptions provided by CS-1 and CS-2; physical surveillance of SMITH and others using the exterior door to Apartment 3; intercepted wire and electronic communications over **Target Telephone 1** wherein SMITH refers to a drug associate staying at **Premise 1** named "Tom" (see paragraphs 90-91, below wherein SMITH directs "Tom" to let STREETER into **Premise 1**); records from Rochester Gas and Electric received on April 19, 2016, showing that utilities for **Premise 1** have been in the name of Thomas Perino since January 25, 2012; and the name "Tom Perin" appears on the mailbox outside the entrance to Apartment 3.

78.    On April 19, 2016, your affiant received records from Rochester Gas and Electric pursuant to a Federal Grand Jury subpoena that showed that the utilities at 1076 Glide Street (**Premise 2**) have been in the name of Bessie Smith since March 5, 2007. Further, records from the Monroe County Clerk's Office indicate that **Premise 2** (1076 Glide Street) is currently owned by Bessie Smith, of 834 South Goodman Street, Rochester, New York. Through the analysis of various public records databases, agents have identified Bessie Smith of 834 South Goodman Street, Rochester, New York, as the mother of SMITH and Darren SMITH. Records from the Monroe County Clerk's Office indicate that **Premise 8** (834 South Goodman Street) has been owned by Bessie Smith since approximately 1986.

79.   **Premise 1** (1045 South Clinton Avenue Apartment 3, Rochester, New York)
1045 South Clinton Avenue is a two story commercial and residential building with a brick
front along with yellow siding located on South Clinton Avenue in Rochester, New York
between Benton Street and Linden Street.  The number 1045 is in white above a glass door
facing Clinton Avenue that reads "TATTOO" in gold lettering.   Apartment #3 has a clear
glass door with dark trim that faces Clinton Avenue approximately 65 feet from the
sidewalk off Clinton Avenue in the back of the 1045 building.  A small mailbox is located to
the left of this door.  A three stall garage is located to the right of the front door to apartment
#3 in a separate structure.  The apartment to be searched is Apartment 3.

80.   **Premise 2** (1076 Glide Street, Rochester, New York) is a two story single
family dwelling, tan in color with brown colored trim, located on the east side of Glide
Street.  The numeral "1076" is clearly affixed to the west side of the dwelling.  The door to
be entered is the only door located on the west side of the dwelling.  This door leads you
directly into the dwelling to be searched.

81.   **Premise 8** (834 South Goodman Street, Rochester, New York) is a single
family residence located on Goodman Street approximately 100 feet north of the
intersection with Benton Street in Rochester, New York.  This residence has yellow siding
with white trim.  The front door to this residence is white and faces west toward South
Goodman Street.  The numbers 834 are in black numbers located to the left of the front door
on a wood mounting.

82.   **Vehicle 1** is a 2007 GMC Yukon, color white, bearing New York State
license plate FLF-7845, vehicle identification number 1GKFK668X7J267207, registered to

Bessie L. Smith, of 834 South Goodman Street, Rochester, New York. The investigative team has determined through physical surveillance that SMITH regularly operates this vehicle. Specifically, SMITH has been observed operating this vehicle on numerous occasions during the investigation and **Vehicle 1** has been observed parked at **Premises 1 and 2** on a regular basis, the most recent occasion being April 24, 2016, for **Premise 2** and April 25, 2016, for **Premise 1**.

83.     The investigation has established probable cause to find that SMITH utilizes **Premise 1** (1045 Glide Street), **Premise 2** (1045 South Clinton Avenue, Apartment 3) and **Vehicle 1** (white Yukon) to maintain and distribute controlled substances, including cocaine and cocaine base. The following is a sample of various intercepted telephone conversations, and other investigative findings, which demonstrate SMITH's drug trafficking activities:

84.     As set forth above, CS-1 and CS-2 both have identified **Premise 2** (1076 Glide Street) as SMITH's residence and **Premise 1** (1045 South Clinton Avenue, Apartment 3) as a location that SMITH refers to as "the club house" and utilizes to store and distribute cocaine. Both CS-1 and CS-2 know SMITH to be involved in distributing large quantities of cocaine and as set forth at paragraphs 22b-32, above, the investigative team utilized CS-1 to purchase in excess of 200 grams of cocaine from SMITH between May 2015 and January 2016. During each of the six controlled purchases, SMITH's white Yukon (**Vehicle 1**) was observed in the parking lot for the South Clinton Apartments and **Premise 1**, which is next to the Loop Lounge. Additionally, during the controlled purchase in November 2015, CS-1 went with SMITH to **Premise 1** (1045 South Clinton Avenue, Apartment 3) and observed SMITH retrieve cocaine from inside the apartment. During the controlled purchase in

–51–

January 2016, after exiting **Premise 1** and prior to entering the Loop Lounge to meet CS-1 to provide CS-1 with the cocaine, surveillance members observed SMITH walk to **Vehicle 1** (white Yukon) and then observed the lights flash on the Yukon in a manner consistent with a vehicle being locked.

85.     The sequence of intercepted wire and electronic communications between SMITH utilizing **Target Telephone 1**, SAMPEL utilizing **Target Telephone 2**, and OCASIO utilizing **Target Telephones 4 and 5**, on February 12, 2016 and April 14, 2016, set forth at paragraphs 42 through 74, above, demonstrate SMITH's involvement in an ongoing conspiracy with SAMPEL, OCASIO and others to distribute cocaine.     Similar communications were intercepted between SMITH, SAMPEL and OCASIO on multiple other dates during this investigation.     Based upon intercepted communications and surveillance, agents have determined that after obtaining cocaine through SAMPEL, SMITH frequently distributed the cocaine to others in and around **Premise 1** (1045 South Clinton Avenue, Apartment 3).   Kaleaf Ball, Reginald Streeter, and George McFadden are several individuals that the investigative team identified as individuals SMITH distributed cocaine to.   As set forth below, based upon intercepted communication and surveillance, agents have also determined that Darren SMITH stores quantities of cocaine for SMITH at Darren Smith's residence at 7 Eisenberg Place, Rochester, New York (**Premise 3**) and that SMITH manufactures some of the cocaine into cocaine base to distribute.

### January 28, 2016 6:23 p.m.

86.     On January 28, 2016, at approximately 6:23 p.m., SMITH utilized **Target Telephone 1** to receive an incoming telephone call from REGINALD L. STREETER

utilizing the telephone assigned number (315) 573-5663.  The following is a transcript of that call:

**Reginald Streeter (RS):** (Unintelligible), what's going on, brother?

**Dennis Smith (DS):**  What's up which ya.

**RS:** Shit man, I was just on the way to the house. (Unintelligible)

**DS:** I got darts tonight, I mean, I going be, I going be over there. Shit, you called me a little earlier you catch me, I got darts at seven o'clock. You know what I am saying, but shit.

**RS:**  What time is it now?

**DS:**  Isn't it 6:30?

**RS:**  Well um, damn. (Unintelligible), I am coming right now. If you can put that bitch together then boom. (Unintelligible).

**DS:**  Watcha ya trying to do?

**RS:**  (Unintelligible) 20 put 12 on it.

**DS:**  Ok. Huh, which you want me to put 12 on it?

**RS:** Yea.

**DS:**  Um, I am dancing it, or just putting it together.

**RS:**  Yea, dancing, dancing.

**DS:**  All right. Let me try to get over there (cough) get over there and do it, and just have it my pocket.

**RS:**  All right. I appreciate it.

**DS:**  all right (coughing) bye.

     87.    I believe that STREETER called SMITH to purchase a quantity of cocaine base and when SMITH said, "I got darts tonight, I mean, I going be, I going be over there. Shit, you called me a little earlier you catch me, I got darts at seven o'clock. You know what

I am saying, but shit," SMITH was telling STREETER that SMITH is on his way to play darts and if STREETER wanted cocaine then he should have called earlier. I further believe that when STREETER said, "I'm coming right now. If you can put that bitch together boom," that STREETER was telling SMITH that STREETER had already left and was on the way to pick up the drugs. I further believe that when SMITH said, "Watcha ya trying to do?" SMITH was asking STREETER how much cocaine STREETER wanted to purchase and that when STREETER replied, "20 put 12 on it," STREETER was referring to the amount of cocaine he wanted to purchase using a cryptic code. I further believe that when SMITH said, "Um, I am dancing it, or just putting it together," SMITH was asking STREETER, in code, whether STREETER wanted the cocaine cooked into cocaine base. When STREETER responded, "Yea, dancing, dancing," I believe that STREETER was indicating to SMITH that he wanted the cocaine cooked into crack cocaine. Based on my training and experience, including conversations with reliable confidential informants and other drug dealers, "dancing" is coded language commonly utilized by drug dealers when referencing the process of cooking powder cocaine into cocaine base.

### February 11, 2016 at 5:08 p.m.

88.    On February 11, 2016, at 5:08 p.m., SMITH received an incoming call on **Target Telephone 1** from Reginald STREETER at (315) 359-0741. The following is a transcript of a pertinent portion of that call:

**Dennis Smith (DS):** Street

**Reginald Streeter (RS):** You in now?

**DS:** Street

–54–

**RS:** You in now?

**DS:** No no, I fuck around fuck around man my motherfucking my motherfucking girl bought me some motherfucking fish from Friendly's and shit and I had my little man. It made me so sick, I didn't want to bring him outside and nigga I get ready to leave, I stood up nigga, I said shit my motherfucking stomach rumbling. Nigga I don't know what the fuck was in that I just threw all that shit up.

\* \* \*

**DS:** Hey listen I'm headed over there, is Tom white truck there?

**RS:** Yeah Tom there.

**DS:** Cause I really umm I just really all let you go in.

**RS:** Alright.

**DS:** I just going to tell him to let you all in there. Cause if I gotta do something for you?

**RS:** Yeah

**DS:** Yeah you might as well...your man with you?

**RS:** Yeah

**DS:** He can go upstairs, I'm going to call Tom and let you all in, he can go upstairs and watch TV. And then I'll call you you can come down he can stay up there. I don't want you sitting in the parking lot that long.

**RS:** Alright then

**DS:** I'm on my way.

**RS:** Alright.

89.     I believe that when STREETER said, "You in now?" STREETER was asking

SMITH if he was at **Premise 1** (1045 South Clinton Avenue, Apartment 3) and available to

sell him cocaine. I further believe that when SMITH then stated, "Hey listen I'm headed

over there, is Tom white truck there?" and "I just going to tell him to let you all in there"

SMITH was telling STREETER that he was on his way over to **Premise 1** and was going to have his drug associate "Tom" let STREETER and the person with STREETER into the apartment to wait for SMITH. I further believe that when SMITH said, "I'll call you you can come down he can stay up there," SMITH was telling STREETER that when SMITH arrives in the parking lot, he will call STREETER so SMITH can sell cocaine to STREETER. I believe that when SMITH told STREETER, "I don't want you sitting in the parking lot that long," SMITH was telling STREETER to wait inside until he comes because SMITH does not want STREETER and the person that is with STREETER sitting in the parking lot loitering because SMITH does not want to draw any attention from law enforcement.

### February 11, 2016 at 5:11 p.m.

90.     On that same date at 5:11 p.m., SMITH utilized **Target Telephone 1** to place an outgoing telephone call to "Tom" at (585) 329-7722. The following is a transcript of that call:

**Tom (Tom):** Hello

**Dennis Smith (DS):** Hey, What's up Tom?

**Tom:** Not much man. What are you doing?

**DS:** Going to. Listen, I am headed that way. I just ate a bad piece of fucking fish. Just got through hurling my ass off.

**Tom:** Oh. Oh yea.

**DS:** Yea. But um, I am running a little late. I got uh, Street and them outside. Street and them is in the parking lot and Van too. I was just, I am gonna. Take the lock off the door man. Just let them come in there and sit down for a second. I don't want them sitting there in the parking lot like that.

**Tom:** Yea, sure. Alright.

**DS:** Alright. I am on my way.

**Tom:** Ok. Bye.

91.    I believe that when SMITH stated, "Street and them is in the parking lot and Van too. I was just, I am gonna. Take the lock off the door man. Just let them come in there and sit down for a second. I don't want them sitting there in the parking lot like that," SMITH was telling his drug associate "Tom" that STREETER and another customer, "Van," are outside in the parking lot and that SMITH wants Tom to unlock the door to SMITH's apartment in the South Clinton Apartments (**Premises 1**) and let STREETER and "Van" inside so that they are not waiting outside drawing the attention of law enforcement.

92.    On that same day, at approximately 5:08 p.m., agents observed a blue Honda sedan pull into and park in the parking lot of the South Clinton Apartments. Agents, via covert camera surveillance, were able to observe that the blue Honda sedan bore New York Registration EAV-4668. Records from the New York State Department of Motor Vehicles show that the vehicle bearing New York registration EAV-4668 is a blue 2004 Honda Accord registered to Rebecca Streeter of 131 West Pearl Street, Newark, New York. At this same time, a GPS tracking device showed that SMITH's white Yukon (**Vehicle 1**) was parked at his residence located at 1076 Glide Street, Rochester, New York. At approximately 5:11 p.m., agents, via covert camera surveillance located at 1076 Glide Street, Rochester, observed SMITH exit the residence and enter **Vehicle 1** and depart the area. At approximately 5:16 p.m., agents observed, via covert camera surveillance, a male with a gray jacket walk from the area of the exterior door to **Premise 1** (1045 South Clinton

-57-

Avenue, Apartment 3) to the blue Honda. Agents then observed STREETER immediately exit the driver's door of the Honda and an unknown white male wearing a black jacket exit the passenger door of the Honda and walk towards the exterior door to **Premise 1** where the camera lost sight of them. At approximately 5:25 p.m., the data from tracking device revealed that **Vehicle 1** (SMITH's white Yukon) arrived at the South Clinton Apartments and Special Agent MacMillan observed SMITH's Yukon parked in the parking lot for **Premises 1**. At approximately 5:35 p.m., agents observed STREETER, via the covert camera, walk to his Honda, open the driver's door, lean inside and then exit the vehicle again and walk back to the exterior door for **Premise 1**. At approximately 6:41 p.m., agents, via the covert camera, observed two individuals walk from the exterior door to **Premise 1** and enter STREETER's Honda and depart the area. Agents were unable to positively identify the two individuals at that time due to the poor lighting conditions. I believe that SMITH met STREETER and an unknown male at **Premise 1** on February 11, 2016, to conduct a cocaine transaction.

### Financial Investigation

93.     Public records form the Monroe County Clerk's Office reveal that SMITH currently owns eight properties in the City of Rochester. On March 23, 2007, SMITH transferred three properties he owned at the time to his mother, Bessie Smith via quit claim deeds. On September 22, 2009, all three of the properties were transferred back to SMITH from his mother, again via quit claim deeds.

94.     According to subpoenaed records from Canandaigua National Bank, account 1105819034 held in the name of Dennis SMITH, 1076 Glide Street, Rochester, NY

(**Premise 2**) between May 4, 2015, and October 5, 2015, six cash deposits were made into this account totaling $15,500. According to subpoenaed records from Eastman Savings & Loans FCU accounts held in the name of Bessie Smith, 834 S. Goodman Street, Rochester, NY (**Premise 8**), revealed that between April 2, 2015, and October 14, 2015, there were eleven cash deposits totaling $53,410. A further review of these records shows that four of these cash deposits were made between February 20, 2015 and March 4, 2015 and appear to have been structured in an attempt to avoid the reporting requirements for cash deposits in excess of $10,000. On October 2, 2015 and October 5, 2015 two of these cash deposits also appear to be structured in an effort to avoid the reporting requirement. The structured deposits are as follows:

> February 20, 2015 - $6,000 cash;
> February 24, 2015 - $7,000 cash;
> February 28, 2015 - $7,000 cash;
> March 4, 2015 - $5,000 cash
>
> October 2, 2015 - $5,000;
> October 5, 2015 - $7,000

95.     Additionally, records from Canandaigua National Bank indicate that the monthly payments made on SMITH's white Yukon (**Vehicle 1**), that is registered in the name of Bessie Smith, have been made in cash.

96.     According to tax disclosure records obtained from the Internal Revenue Service (IRS) as of April 20, 2016, SMITH has not filed tax returns for the tax years 2013, 2014, and 2015. Bessie Smith did file tax returns for 2013 reporting income of $72,956, a return for the tax year 2014 reporting income of $18,958, and as of April 20, 2016, has not filed a tax return for tax year 2015. Based upon a review of these financial and tax records

the above cash deposits cannot be sufficiently explained.

97.     On August 13, 2014, Bessie Smith opened Safe Deposit Box #115 at Eastman
Savings and Loan, FCU at the Chestnut Street, Rochester, New York Branch. Bessie Smith
is the only person listed on the account for the safe deposit box and it has only been
accessed one time, on November 24, 2015. Based upon my training and experience, drug
traffickers commonly maintain assets in the names of relatives, including safe deposit boxes,
in an attempt to conceal their relationship to the asset from authorities.

98.     GPS tracker data for **Vehicle 1** has revealed that SMITH makes trips back
and forth between **Premise 1**, a location where SMITH is known to sell cocaine, and
**Premise 8** (834 South Goodman Street). For instance, on March 18, 2016, **Vehicle 1**
departed a residence on Lake Avenue (likely 1008 Lake Avenue) at approximately 3:00 p.m.
and traveled directly to the vicinity of **Premise 8**, arriving at approximately 3:13 p.m. At
approximately 3:29 p.m., **Vehicle 1** departed **Premise 8** and traveled directly to the vicinity
of **Premise 1**. On March 22, 2016, **Vehicle 1** departed **Premise 2** (1076 Glide Street) at
approximately 7:54 p.m. and traveled directly to the vicinity of **Premise 8**, arriving at
approximately 8:03 p.m. Approximately four minutes later, at 8:07 p.m., **Vehicle 1**
departed **Premise 8** and traveled directly to the vicinity of **Premise 1**. On March 29, 2016,
**Vehicle 1** departed **Premise 1** at approximately 7:46 p.m. and traveled directly to the
vicinity of **Premise 8**, arriving at approximately 7:47 p.m. At approximately 8:41 p.m.,
**Vehicle 1** departed **Premise 8** and traveled directly back to the vicinity of **Premise 1**. On
April 1, 2016, **Vehicle 1** departed **Premise 1** at approximately 6:20 p.m. and traveled
directly to the vicinity of **Premise 8**, arriving at approximately 6:21 p.m. At approximately

7:24 p.m., **Vehicle 1** departed **Premise 8** and traveled directly back to the vicinity of

**Premise 1**. Finally, on April 16, 2016, at approximately 6:46 p.m., agents intercepted

communication between SMITH and another individual on **Target Telephone 1** wherein

SMITH directed that individual to meet him at **Premise 8**. Based upon the nature and

content of prior intercepted communications between SMITH and this individual, including

information learned during the course of the investigation, agents believe that SMITH

engages in financial transactions with this individual, as well as drug activities.

99.     Based on the foregoing, and following information contained in this affidavit,

your affiant has probable cause to believe that SMITH is involved in an ongoing conspiracy

to possess with intent to distribute and distribute 5 kilograms or more of cocaine and

cocaine base, in violation of Title 21, U.S.C., 846. Your affiant further believes that there is

probable cause to conclude, based upon the apparent structuring of cash deposits, SMITH's

use of vehicle (**Vehicle 1**) and residence (**Premise 2**) in Bessie Smith's name, and the

transfer of properties between SMITH and Bessie Smith, that SMITH utilizes Bessie Smith

to assist him in concealing assets, including cash proceeds of SMITH's drug activities. Your

affiant believes that there is probable cause to believe that proceeds and records concerning

SMITH's drug and money laundering activities will be found at the residence of SMITH's

mother, Bessie Smith – **Premise 8** (834 South Goodman Street) and that items listed on the

annexed "Schedule of Items to be Seized- Books and Records" will be found there, and that

those items are evidence, fruits and instrumentalities of violations of Title 21, United States

Code, Sections 841(a)(1), 846, and Title 18, United States Code, Sections 1956 & 1957. I

submit that based upon the foregoing, that items listed on the annexed Schedule of Items to

be Seized will be found at Smith's clubhouse - **Premise 1** (1045 South Clinton Avenue,

Apartment 3), Smith's residence - **Premise 2** (1076 Glide Street), and in Smith's **Vehicle 1**

(white Yukon), and that those items are evidence, fruits and instrumentalities of violations

of Title 21, United States Code, Sections 841(a)(1), 846, and Title 18, United States Code,

Sections 924 (c)(1), 1956 & 1957.   Moreover, your affiant believes that it is likely that

controlled substances will be located at **Premises 1 and 2** and that requiring law

enforcement to knock and announce their presence before entering will allow the occupants

the opportunity to detroy or dispose of the controlled substances and possibly arm

themselves.   Accordingly, your affiant requests that execution of the warrant for **Premise 1**

**and 2** be exempt from the knock-and-announce requirement of 18 U.S.C. § 3109 and related

legal authority.   Finally, given that SMITH and other members of this organization conduct

drug transactions during late night hours, your affiant requests that execution of the warrant

be at any time of the day or night.

<u>Premise 3:</u> 7 Eisenberg Place, Rochester, New York

<u>Vehicle 3:</u> 2007 Hyundai Entourage, New York State registration GXT-4203, vehicle
identification number KNDMC233276015620
<u>DARREN SMITH:</u> 18 U.S.C. 846 (Conspiracy to Possess with Intent to Distribute and
Distribute 5 kilograms or more of cocaine and cocaine base)

100.   The investigative team has determined that DARREN SMITH is involved in
an ongoing conspiracy to possess with intent to distribute and to distribute five kilograms or
more of cocaine, as well as cocaine base in violation of Title 18, United States Code, Section
846.  The team has also determined that DARREN SMITH resides at 7 Eisenberg Place,
Rochester, New York **(Premise 3)** and along with his brother SMITH, uses that location to
store   and process cocaine.    The investigative team confirmed this from physical
surveillance, public records databases, and other investigative techniques, including
confidential informant information.  On April 19, 2016, your affiant received records from
Rochester Gas and Electric pursuant to a Federal Grand Jury subpoena that showed that
the utilities at **Premise 3** (7 Eisenberg Place) have been in the name of DARREN SMITH
since June 12, 2014.  Records obtained from the Monroe County Clerk's Office reflect that
DARREN SMITH is the owner of **Premise 3** having purchased the residence in May 2014.
**Vehicle 3**, which is registered to DARREN SMITH at 7 Eisenberg Place, Rochester, New
York has been observed at **Premise 3** during this investigation, including as recently as April
25, 2016.

101.   **Premise 3** (7 Eisenberg Place, Rochester, New York) is an one and half story
single family dwelling, green in color with white colored trim, located on the west side of
Eisenberg Place.  The numeral "7" is clearly affixed to the east side of the dwelling. Entry to

the location is through the only door on the east side of the dwelling.  This door leads you directly into the dwelling to be searched.

102.  **Vehicle 3,** a 2007 Hyundai Entourage, color tan, bearing New York State license plate GXT-4203, vehicle identification number KNDMC233276015620, registered to Darren SMITH, date of birth 03-20-1971 of 7 Eisenberg Place, Rochester, New York. DARREN SMITH has been observed operating this vehicle several occasions during this investigation, including February 12, 2016.

103.  The investigation has established probable cause to find that DARREN SMITH is involved in an ongoing conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine, as well as cocaine base in violation of Title 18, United States Code, Section 846.  Further the investigation has revealed that DARREN SMITH utilizes **Premise 3 and Vehicle 3** to maintain, distribute and/or transport controlled substances, including cocaine and cocaine base.  The following is a sample of various intercepted telephone conversations, and other investigative findings, which demonstrate DARREN SMITH'S drug trafficking activities:

104.  As detailed above, CS-1 advised that DARREN SMITH is an associate of SMITH's narcotics trafficking organization.  Specifically, SMITH has told CS-1 that DARREN SMITH distributes cocaine for the narcotics trafficking organization that he receives from SMITH.  CS-2 also advised that CS-2 knew SMITH and DARREN SMITH to be involved in the distribution of large amounts of cocaine in the Rochester, New York area over the past five years.  Further, as set forth above, during the past year, CS-1 has personally observed DARREN SMITH in possession of cocaine that was thereafter

distributed by SMITH during the August 2015 controlled purchase.

### February 9, 2016 at 8:39 p.m.

105.    On February 9, 2016, at approximately 8:39 p.m., SMITH utilized **Target**

**Telephone 1** to place an outgoing telephone call to DARREN SMITH on (585) 498-0414.

The following is a transcript of that call:

**Dennis Smith (DS):** What's up big dog?

**Darren Smith (Darren):** Yo.

**DS:** You home?

**Darren:** Huh!

**DS:** You home?

**Darren:** No, I ain't home, I'm about to get out of work.

**DS:** Ok, Ok, I should've, I should've, I should've have fucking kept that.

**Darren:** Huh!

**DS:** I said, I should keep that.

**Darren:** Say it again?

**DS:** Yo, let me wait, wait, I said I should, should, should have keep that earlier. Cus shit, I was going to come over there and put that shit, but you ain't there.

**Darren:** Oh.

**DS:** Yea, let me, me, when you get off, let me, me, when you get off let me, let me get that. And I'm, I'm, I'm going to come through there and get it back.

**Darren:** All right.

**DS:** All right.

**Darren:** All right.

–65–

[End of Call]

106.    Based upon the investigation to date, including surveillance and intercepted communication on **Target Telephone 1**, the investigative team believes that SMITH previously received a quantity of cocaine from SAMPEL. I further believe that when SMITH said, "I . . . should have keep that earlier. Cus shit, I was going to come over there and put that shit, but you ain't there," SMITH was telling DARREN SMITH that he should have not given DARREN SMITH so much of the cocaine to hold at his house because SMITH is out of cocaine and needs more to supply his customers.

### February 9, 2016 at 9:30 p.m.

107.    On that same date, at approximately 9:30 p.m., SMITH utilized **Target Telephone 1** to place an outgoing text to DARREN SMITH utilizing telephone instrument (585) 498-0414, which read, "break it in half at loop dont take forever." I believe that when SMITH texted "break it in half" he was directing DARREN SMITH to cut the cocaine that DARREN SMITH had in half. I further believe that when SMITH texted, "at loop don't take forever," he was indicating to DARREN SMITH that SMITH was at the Loop Bar and wanted DARREN SMITH to bring the cocaine there quickly.

### February 9, 2016 at 9:35 p.m. - 9:44 p.m.

108.    On that same date, at approximately 9:35 p.m., SMITH utilized **Target Telephone 1** to place an outgoing text to DARREN SMITH on telephone instrument (585) 498-0414, which read, "how close" and another outgoing text to DARREN SMITH at 9:43 p.m., which read, "hello." I believe that when SMITH texted "how close," he was asking DARREN SMITH how long before DARREN SMITH would be at the Loop Lounge with

the cocaine. I further believe that when SMITH texted "hello," he was asking DARREN SMITH to respond to him indicating that DENNIS SMITH was getting inpatient. On that same date, at approximately 9:44 p.m., DARREN SMITH with a text message that read, "Omw." I believe that when DARREN SMITH texted "Omw," it was shorthand for "on my way," indicating to SMITH that he was on his way with the cocaine.

109. Based on my training and experience, the substance of the above listed intercepted communications on February 9, 2016, the observations of the investigative team members on that date, and the information obtained during this investigation, I believe SMITH, who was at or in the area of **Premise 1**, was waiting for DARREN SMITH to bring him more cocaine to distribute that SMITH and DARREN SMITH had stored at DARREN's residence, **Premise 3**.

### February 12, 2016 at 12:59 p.m.

110. On February 12, 2016, at approximately 12:59 p.m., SMITH utilized **Target Telephone 1** to place an outgoing call to DARREN SMITH utilizing telephone instrument (585) 709-4730. The following is a transcript of a pertinent portion of that call:

**Darren Smith (Darren):** Hello

**Dennis Smith (DS):** What up Fat Boy?

**Darren:** Yup, what up with you Pimp?

**DS:** Cooling, cooling, you home?

**Darren:** Ah, I'm about to be home, I just had to come out here real quick, I'm about to head right now.

**DS:** Alright, um, drop by 2, you know what I'm saying?

**Darren:** Huh?

**DS:** Do the same thing you did yesterday.

**Darren:** Alright.

\* \* \*

**DS:** Alright, shoot me a text when you do that.

**Darren:** Alright.

**DS:** Alright.
[End of Call]

111.    I believe that when SMITH stated, "drop by 2, you know what I'm saying," and "Do the same thing you did yesterday," SMITH was instructing DARREN SMITH to drop off two of a certain quantity of cocaine to SMITH, just as DARREN SMITH had done on the previous day.  When DARREN SMITH stated, "Alright," I believe that DARREN SMITH was confirming to SMITH that DARREN SMITH knew how much cocaine SMITH desired and would do that.  I further believe that when SMITH stated, "shoot me a text when you do that," he was instructing DARREN SMITH to send him a text message when DARREN SMITH had the cocaine.

### February 12, 2016 at 1:48 p.m.

112.    On that same date, at approximately 1:48 p.m., SMITH received an incoming text message on **Target Telephone 1** from DARREN SMITH utilizing telephone instrument (585) 498-0414, which read, "Here."  I believe that when DARREN SMITH stated, "Here," DARREN SMITH was informing SMITH that he had arrived in the area of **Premise 1**.

113.    On the same date, at approximately 1:51 p.m., GRANET Task Force Officer Joseph Bates observed a gold minivan pull into the parking lot for **Premise 1** (1045 South

Clinton Avenue, Apartment 3), later determined to a 2007 tan Hyundai Entourage with New York registration number GXT-4203 (**Vehicle 3**), registered to DARREN SMITH at 7 Eisenberg Place (**Premise 3**), Rochester, New York. TFO Bates observed a black male that he positively identified as DARREN SMITH exit **Vehicle 3** and walk towards the entrance of **Premise 1**. On the same day, at approximately 1:53 p.m., GRANET Task Force Officer Brandon Goater physically observed DARREN SMITH return to **Vehicle 3** and depart the parking lot adjacent to **Premise 1**. On the same day, at approximately 2:01 p.m., GRANET Task Force Officer Frank Alvarado physically observed **Vehicle 3** parked unoccupied in front of **Premise 3**. On the same day, at approximately 2:04 p.m., TFO Alvarado physically observed DARREN SMITH walk from the porch of **Premise 3** and open the driver's side, sliding door of **Vehicle 3**.

114. Based on my training and experience, the substance of the above listed intercepted communications on February 12, 2016, the observations of the investigative team members on that date, and the information obtained during this investigation, including information from CS-1, I believe DARREN SMITH retrieved cocaine from his residence, **Premise 3** (7 Eisenberg Place), brought the cocaine over to SMITH at **Premise 1** (1045 South Clinton Avenue, Apartment 3) and then returned back to **Premise 3**.

### February 28, 2016 at 2:34 p.m.

115. On February 28, 2016, at approximately 2:34 p.m., SMITH utilized **Target Telephone 1** to place an outgoing call to George MCFADDEN, utilizing telephone instrument (504) 463-4938. The following is a transcript of that call:

**George McFadden (GM):** What up big brother?

–69–

**Dennis Smith (DS):** What's up OT?

**GM:** You know me.

**DS:** I know that's why I'm calling cause I'm about to shoot over there now. You want me to do it I gotta do it right now cause I got me somebody at 3:30.

**GM:** Alright then yeah I'm going to come over there and ah and ah get with you yep you going over there now.

**DS:** I'm going over there right now do. Do you need me to do the same way.

**GM:** No, no.

**DS:** Oh beautiful. That's even better cause I don't feel (unintelligible).

**GM:** Alright.

**DS:** That's even better.

**GM:** Alright. Alright.
[End of Call]

116. During the investigation, agents have identified MCFADDEN as an individual who purchases cocaine from SMITH to distribute to others based upon (1) information provided by CS-2, who identified MCFADDEN as an individual who was selling large quantities of cocaine that he purchased from SMITH; (2) the content of this and other intercepted communications; (3) and surveillance observations. I believe that when MCFADDEN stated, "yeah I'm going to come over there and ah and ah get with you," MCFADDEN was telling SMITH that he wanted to meet with SMITH in order to purchase a quantity of narcotics. When SMITH immediately responded, "I'm going over there right now do. Do you need me to do the same way," I believe that SMITH was using coded language to ask MCFADDEN if MCFADDEN wanted a quantity of cocaine to be cooked into crack cocaine. When MCFADDEN stated, "No, no," MCFADDEN was informing

SMITH that he did not need the quantity of cocaine to be cooked into crack cocaine. Information obtained from the GPS tracking device placed on Vehicle 1 (SMITH's white Yukon) showed that on the same date, at approximately 2:39 p.m., which was right after SMITH spoke with MCFADDEN, Vehicle 1 departed Premise 2 (1076 Glide Street) and traveled directly to the vicinity of Premise 3 (7 Eisenberg Place), arriving at approximately 2:48 p.m. On the same date, at approximately 2:53 p.m., Vehicle 1 departed the vicinity of Premise 3 and traveled to Premise 1 (1045 South Clinton Avenue, Apartment 3) arriving at approximately 2:54 p.m. The data obtained from the GPS tracking device showed that Vehicle 1 remained in the vicinity of Premise 1 until approximately 3:45 p.m.

117.    Based on my training and experience, the substance of the above described intercepted communications on February 28, 2016, along with the observations of the investigative team members on that date and the information obtained during this investigation, I believe that SMITH needed cocaine to supply MCFADDEN and SMITH left his residence at Premise 2 and traveled to DARREN SMITH's residence, Premise 3, where SMITH picked up the cocaine and then traveled to Premise 1 (1045 South Clinton Avenue, Apartment 3) to then sell the cocaine to MCFADDEN.

### March 15, 2016 at 4:29 p.m. through 4:48 p.m.

118.    On March 15, 2016, at approximately 4:29 p.m., SMITH utilized Target Telephone 1 to place an outgoing text to DARREN SMITH utilizing telephone instrument (585) 498-0414, which read, "when I hit u take off." On the same date, at approximately 4:43 p.m., SMITH utilized Target Telephone 1 to place another outgoing text to DARREN SMITH utilizing telephone instrument (585) 498-0414, which read, "u get the message."

On the same date, at approximately 4:48 p.m., DARREN SMITH replied, sending SMITH the following text message on **Target Telephone 1**, "Yeah." I believe that when SMITH said, "when I hit u take off," SMITH was informing DARREN SMITH that when SMITH gets a hold of him again, SMITH needs Darren SMITH to bring the money to the clubhouse (**Premise 1**) so that SMITH can purchase more cocaine from SAMPEL.[7]

### March 15, 2016 at 7:48 p.m.

119.    On the same date, at approximately 7:48 p.m., SMITH utilized **Target Telephone 1** to place an outgoing text to DARREN SMITH utilizing telephone instrument (585) 498-0414, which read, "come on." I believe that when SMITH said, "come on," he was telling DARREN SMITH to bring the money to the clubhouse (**Premise 1**) so SMITH can complete the cocaine transaction with SAMPEL. Information obtained from the GPS tracking device placed on SAMPEL's gray Nissan Pathfinder (**Vehicle 2**) showed that on the same date, at approximately 7:41 p.m., SAMPEL's vehicle arrived in the vicinity of OCASIO's residence, **Premise 5** (425 Lakeview Park). On the same date, at approximately 7:48 p.m., **Vehicle 2** departed **Premise 5** and returned to SAMPEL's residence, **Premise 4** (4 Bru Mar Drive) at approximately 7:59 p.m., where it remained stationary. On the same date, at approximately 8:50 p.m., cellular site data showed that SAMPEL's phone, **Target Telephone 2**, was in the vicinity of **Premise 1** (1045 South Clinton Avenue, Apartment 3), indicating that SAMPEL had utilized another vehicle to travel to SMITH's apartment. Law enforcement members observed **Vehicle 1** in the parking lot in front of **Premise 1** at that

---

[7] On March 15, 2016, agents intercepted communications between SMITH and SAMPEL on **Target Telephones 1 and 2** indicating that SMITH was arranging to purchase a quantity of cocaine from SAMPEL that SAMPEL was going to obtain from OCASIO.

time, but were unable to confirm what vehicle SAMPEL utilized to travel to the area.

120.    Based on my training and experience, the substance of the above listed intercepted communications on March 15, 2016, the observations of the investigative team members on that date, and the information obtained during this investigation, I believe SMITH was waiting SAMPEL to bring him a quantity of cocaine and directed DARREN SMITH bring money to SMITH at **Premise 1** before SAMPEL arrived.

### April 15, 2016 at 7:46 p.m.

121.    On April 15, 2016, at approximately 7:46 p.m., SMITH utilized **Target Telephone 1** to place an outgoing call to DARREN SMITH utilizing telephone instrument (585) 709-4730.  The following is a transcript of that call:

**Darren Smith (Darren):** Yo.

**Dennis Smith (DS):** Bitch, you cooking?

**Darren:** What?

**DS:** You cooking?

**Darren:** Ya.

**DS:** Nice you let me know, bitch.

**Darren:** Bitch, you (unintelligible). I don't know where you be at motherfucker, you be here, you be there, you be everywhere. You Rico suave, you over here, motherfucker.

**DS:** You home?

**Darren:** What?

**DS:** Where you cooking at, North street or over here?

**Darren:** I'm at my house.

**DS:** All right I will see you in a little bit.

—73—

[End of Call]

122.    Based on my training and experience, the substance of this and other intercepted communications, and the information contained in the affidavits submitted with the prior applications referenced above, I believe that when SMITH asked, "You home," and "Where you cooking at, North street or over here," he was asking DARREN SMITH where he was located. I further believe that when DARREN SMITH replied, "I'm at my house," DARREN SMITH was informing SMITH that he was located at his residence on Eisenberg Place (**Premise 3**).

123.    On this same date at approximately 7:57 p.m., a covert camera observed SMITH depart **Premise 1** (1045 South Clinton Avenue, Apartment 3) and enter **Vehicle 1** (white Yukon) and depart the area. At approximately 7:58 p.m., agents utilized a covert surveillance camera to observe SMITH enter DARREN SMITH's residence, **Premise 3** (7 Eisenberg Place).

124.    Based on the foregoing, and following information contained in this affidavit, your affiant has probable cause to believe that DARREN SMITH is involved in a conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and cocaine base in violation of 18 U.S.C. 846. I further believe that there is probable cause to believe that DARREN SMITH resides at **Premise 3** and owns and utilizes **Vehicle 3**. Your affiant further believes that there is probable cause to conclude that items listed on the annexed Schedule of Items to be Seized will be found at his residence (**Premise 3**) and in his vehicle (**Vehicle 3**) and that those items are evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 846, and

Title 18, United States Code, Sections 924 (c)(1), 1956 & 1957. Moreover, your affiant believes that it is likely that controlled substances will be located at **Premise 3** and that requiring law enforcement to knock and announce their presence before entering will allow the occupants the opportunity to detroy or dispose of the controlled substances and possibly arm themselves. Accordingly, your affiant requests that execution of the warrant be exempt from the knock-and-announce requirement of 18 U.S.C. § 3109 and related legal authority.

Additionally, because the members of this drug trafficking organization conduct their drug trafficking business at all hours of the day, your affiant requests permission to execute the search warrants at **Premise 3** and **Vehicle 3** at any time of the day or night.

**Premise 4: 4 Bru Mar Drive, Rochester, New York**

**Vehicle 2: 2006 Nissan Pathfinder, New York State registration GUS-3580 with VIN number of 5N1AR18W86C661593**

**Vehicle 4: 2013 Hyundai Sonata, New York registration AFS-2074, vehicle identification number 5NPEC4ACXDH779235**

**JUAN SAMPEL:   18 U.S.C. 846 (Conspiracy to Possess with Intent to Distribute 5 kilograms or more of cocaine)**

125.    The investigative team has determined that JUAN SAMPEL is involved in an ongoing conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine and cocaine base, in violation of Title 21, U.S.C. § 846. The investigative team has further determined that JUAN SAMPEL resides at 4 Bru Mar Drive, Rochester, New York **(Premise 4)** and drives **Vehicle 2** (Nissan Pathfinder) and **Vehicle 4** (Hyundai Sonata). The investigative team has confirmed this from physical surveillance, public records databases, and other investigative techniques. On April 20, 2016, your affiant received records from

Rochester Gas and Electric (RG&E) pursuant to a Federal Grand Jury subpoena related to **Premise 4.** RG&E records showed that the utilities at 4 Bru-Mar Drive have been in the name of Miriam Rivera since April 8, 2013. Further, records from the Monroe County Clerk's Office show that 4 Bru-Mar Drive, Rochester (**Premise 4**) was purchased by Miriam Rivera in April 2013. Rivera is also the registered owner of **Vehicles 2 and 4.** Based upon information obtained during the investigation to date, including the search of public databases, Miriam Rivera has been identified as SAMPEL's wife, also known as Miriam Sampel.

126. **Premise 4, 4 Bru Mar Drive, Rochester, New York**, is a one story single family dwelling, white in color with off white brick front, located on the west side of Bru Mar Drive. The numeral "4" is clearly affixed to the east side of the dwelling. The door to be entered is the only door located on the east side of the dwelling. This door leads you directly into the dwelling to be searched.

127. **Vehicle 2,** a 2006 Nissan Pathfinder, color gray, bearing New York State license plate GUS-3580, vehicle identification number 5N1AR18W86C661593, registered to Miriam Rivera, of 4 Bru Mar Drive, Rochester, New York.

128. **Vehicle 4,** a 2013 Hyundai Sonata, color black, bearing New York State license plate AFS- 2074, vehicle identification number 5NPEC4ACXDH779235, registered to Miriam Rivera, of 4 Bru Mar Drive, Rochester, New York.

129. The investigative team has determined, through source information and physical surveillance that JUAN SAMPEL operates **Vehicle 2** and **Vehicle 4.** Specifically, JUAN SAMPEL has been observed by members of the investigative team operating **Vehicle**

2 on a regular basis to transport cocaine and cash drug proceeds. Moreover, as set forth below, agents observed SAMPEL operate **Vehicle 4** on March 26, 2016 to pick up cash from SMITH to transport to OCASIO. Further, as illustrated at paragraph 119, above, agents believe, based upon GPS data on **Vehicle 2** and **Target Telephone 2**, as well as covert camera surveillance, that SAMPEL utilized a vehicle other than **Vehicle 2** to transport cocaine to SMITH on March 15, 2016. Additionally, both **Vehicle 2** and **Vehicle 4** have been observed parked at **Premise 2** on a regular basis, the most recent occasion being April 25, 2016 for **Vehicle 2** and April 22, 2016 for **Vehicle 4**.

130.    The investigation has established probable cause to find that JUAN SAMPEL is involved in an ongoing conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine and cocaine base. Further, the investigation has established probable cause that SAMPEL utilizes **Premise 4** (4 Bru Mar Drive), **Vehicle 2** and **Vehicle 4,** to maintain, distribute and transport controlled substances, including cocaine. The following is a sample of various intercepted telephone conversations, and other investigative findings, which demonstrate SAMPEL's drug trafficking activities:

131.    As set forth above, SMITH told CS-1 that SMITH has a cocaine source of supply that is a "Spanish" male who owns a "Farmers Insurance company" located on Lyell Avenue. SMITH told CS-1 that the "Spanish" male utilizes this business to conceal cocaine shipments in automobile batteries to facilitate his cocaine operation. CS-1 provided agents with a description of where SMITH said the insurance company is located on Lyell Avenue. Farmers Insurance Company, located at 1038 Lyell Avenue, Rochester, New York, is the only business matching the description provided by CS-1. JUAN SAMPEL

and his wife Miriam Sampel are the listed owners of that Farmers Insurance Company. During the investigation, agents have confirmed, via visual surveillance, subpoenaed bank records, and interception of wire and electronic communications over **Target Telephone 2**, that SAMPEL and his wife Miriam are, in fact, the owners of the insurance company identified by CS-2.

132.   The sequence of intercepted wire and electronic communications between SMITH utilizing **Target Telephone 1**, SAMPEL utilizing **Target Telephone 2**, and OCASIO utilizing **Target Telephones 4 and 5** on February 12, 2016, and April 14, 2016, set forth at paragraphs 42 through 74, above, demonstrate SAMPEL's involvement in an ongoing conspiracy with SMITH, OCASIO and others to distribute cocaine. Similar communications were intercepted between SMITH, SAMPEL and OCASIO on multiple other dates during this investigation, including as recently as April 22, 2016.

## February 17, 2016 at 5:14 p.m.

133.   On February 17, 2016, at approximately 5:14 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text to **Target Telephone 1**, which read, "So how many jobs should I tell the company u have situated so they no how much material they need to give u for the next job." SAMPEL then received an incoming text message on **Target Telephone 2** from **Target Telephone 1** stating, "what I owe plus one." SAMPEL then utilized **Target Telephone 2** to place an outgoing text to **Target Telephone 1**, which read "Got u I'll see what's up now." I believe that when SAMPEL texted, "So how many jobs should I tell the company u have situated so they no how much material they need to give u for the next job," SAMPEL was asking SMITH how much of the cocaine SMITH had sold

and how many kilograms of cocaine SMITH needed to be re-supplied. I further believe that when SMITH responded, "what I owe plus one," SMITH was indicating to SAMPEL that SMITH had the money for the one kilogram of cocaine that was fronted to him, and wanted to get an additional kilogram of cocaine. I believe that when SAMPEL stated, "Got u I'll see what's up now," SAMPEL was confirming to SMITH that SAMPEL understands the amount of cocaine that SMITH desires and that SAMPEL will reach out to his source of supply to obtain the kilograms of cocaine for SMITH.

### February 17, 2016 at 5:40 p.m.

134. On the same date, at approximately 5:40 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing call to OCASIO on **Target Telephone 4**. The following is a transcript of that call:

**Angel Ocasio (AO):** Yeah.

**Juan Sampel (JS):** How are you doing, buddy?

**AO:** All right.

**JS:** Oh shit, I got, I got the call man. You heard, and um, he was telling me that he did, he did the job for your apartment, you know, and um, they did, he did another job so, you know. I was just letting you know that he wanted whatever you want to do, I am just saying, we can, we do, we going, we going too fast.

**AO:** (Laughing)

**JS:** You know what I am saying, so. Whatever, whatever you going to do, I mean he's, he's set, but you know. He's, he's got enough jobs right now, but he's just not giving them enough time that you know, but whatever you want to do he is still going to put you first anyways so. He already took two. He already, he got, he got your job done, and he took care of another job. So he is ready for that one so, but you know whatever you want to do it don't matter.

**AO:** (Unintelligible)

**JS:** Oh, that, that, the, the, you know the apartment that you had him paint all ready.
**AO:** Yeah.

**JS:** The apartment you had paint, that you gave, that you let him do the other day, well he did that.

**AO:** Ok.

**JS:** And, he did another one. So, you know he's, he's only, he's only going to be able to do one for you right now you know what I am saying, because he's still, he's still good right now you know what I am saying, but a like I said he's willing to help you do some, do some work for you so. Like I said whatever you want to do, if you want to do the thing you did last, you want to give him the same work you give him the last time so. He's good at electric so. He's good at electrical work so.

**AO:** Ok.

**JS:** You know that.

**AO:** Ok I will call you in a few.

**JS:** Yea, Ok.

**AO:** Bye.
[End of Call]

135.   I believe that when SAMPEL said, "the apartment you had paint, that you gave, that you let him do the other day, well he did that...And, he did another one," SAMPEL was informing OCASIO that SMITH had sold two kilograms of cocaine since OCASIO last supplied SMITH via SAMPEL. I further believe that when SAMPEL stated, "like I said whatever you want to do, if you want to do the thing you did last, you want to give him the same work you give him the last time so," SAMPEL was telling OCASIO that if OCASIO wants to provide SMITH with the same amount of cocaine, SMITH will be able to sell it. I further believe that when OCASIO stated, "Ok I will call you in a few," he was informing SAMPEL that OCASIO will obtain the requested amount of cocaine and that

OCASIO will then contact SAMPEL when he is ready to provide SAMPEL with the cocaine.

### February 17, 2016 at 6:40 p.m.

136.     On the same date, at approximately 6:40 p.m., SAMPEL received an incoming text message on **Target Telephone 2** from OCASIO on **Target Telephone 5**, which read, "Where u at pa. I have the paint for the other house." I believe that when OCASIO texted, "I have the paint for the other house," I believe that OCASIO was informing SAMPEL that OCASIO has the kilograms of cocaine that SAMPEL had previously requested for SMITH.

### February 17, 2016 at 6:55 p.m.

137.     On the same date, at approximately 6:55 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text to SMITH on **Target Telephone 1**, which read, "30m." SAMPEL then received an incoming text message on **Target Telephone 2** from **Target Telephone 1**, which read, "club got a game at 8." I believe that when SAMPEL said, "30m," SAMPEL was informing SMITH that SAMPEL made contact with his source of supply and that SAMPEL would be able to meet SMITH in approximately 30 minutes in order to provide SMITH with cocaine. I further believe that when SMITH replied, "club," SMITH was instructing SAMPEL to meet him at his clubhouse located at **Premise 1** (1045 South Clinton Avenue, Apartment 3) to complete the cocaine transaction.

### February 17, 2016 at 7:20 p.m.

138.     On the same date, at approximately 7:20 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text to OCASIO on **Target Telephone 5**, which read,

"On w." Shortly thereafter, SAMPEL received an incoming text on **Target Telephone 2** from **Target Telephone 5**, which read, "K." Shortly after that, SAMPEL utilized **Target Telephone 2** to place an outgoing text to OCASIO on **Target Telephone 5**, which read, "Here." I believe that when SAMPEL said, "On w," it was shorthand to inform OCASIO that SAMPEL was on his way to meet with OCASIO to pick up cocaine.

### February 17, 2016 at 7:27 p.m.

139.    On the same date, at approximately 7:27 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text to SMITH on **Target Telephone 1**, which read, "On wa." On the same date, at approximately 7:47 p.m., agents utilized a covert surveillance camera to observe SAMPEL's gray Pathfinder (**Vehicle 2**) pull into to the parking lot adjacent to the **Premise 1** (1045 South Clinton Avenue, Apartment 3). Additionally, GPS tracking devices on both the gray Pathfinder (**Vehicle 2**) and SMITH's white Yukon (**Vehicle 1**) showed that both vehicles were simultaneously located in the vicinity of **Premise 1**. Monitoring agents observed **Vehicle 2** depart the vicinity of the **Premise 1** at approximately 7:53 p.m.

### February 17, 2016 at 7:49 p.m.

140.    On the same date, at approximately 7:49 p.m., SAMPEL received an incoming text on **Target Telephone 2** from OCASIO on **Target Telephone 5**, which read, "Call me when on your way." I believe that when OCASIO stated, "Call me when on your way," OCASIO was instructing SAMPEL to contact OCASIO after SAMPEL had completed the cocaine transaction with SMITH and when SAMPEL was on his way to OCASIO's location to pay OCASIO for the cocaine provided to SMITH.

**February 17, 2016 at 8:03 p.m.**

141.   On the same date, at approximately 8:03 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing call to **Target Telephone 4.** The following is a transcript of a pertinent portion of that call:

**Angel OCASIO (AO):** Yeah.

**Juan SAMPEL (JS):** Hey, it's, you, you leaving anywhere?

**AO:** No, no, no.

**JS:** Alright, I didn't know if you wanted to come out for a minute or something.

**AO:** No, I just, text me when you on your way.

**JS:** Yeah, yeah, no cuz I a, umm, I got that umm, I got the panel box that I, the panel box for you.

**AO:** Ok.

**JS:** You know what I am saying, I got the panel box so, so we can install it, to umm. During the summer time we can upgrade it. You know what I am saying.

**AO:** Ok.

* * *

**AO:** Alright, but I am here.

**JS:** Yeah, no problem.
[End of Call]

142.   I believe that when SAMPEL said, "I got that umm, I got that panel box that I, the panel box for you," SAMPEL was informing OCASIO that SAMPEL has completed the cocaine transaction with SMITH and that he is traveling to OCASIO's residence (**Premise 5**) in order to provide OCASIO with the money that SMITH gave to SAMPEL for the cocaine. On the same date, at approximately 8:15 p.m., GRANET Task Force Officer Brandon Goater observed **Vehicle 2** (the gray Pathfinder) parked in the driveway of

–83–

OCASIO's residence at 425 Lakeview Park (**Premise 5**).

143.    Based on my training and experience, the substance of the above listed intercepted communications on February 17, 2016, the observations of the investigative team members on that date, and the information obtained during this investigation, I believe SAMPEL obtained a quantity of cocaine from OCASIO at 425 Lakeview Park (**Premise 5**) and then transported the cocaine in **Vehicle 2** to SMITH at 1045 South Clinton Avenue, Apartment 3 (**Premise 1**). I further believe that after leaving SMITH's clubhouse (**Premise 1**), SAMPEL met OCASIO at 425 Lakeview Park (**Premise 5**) to give OCASIO the money that SAMPEL had received from SMITH for the cocaine.

### February 22, 2016 at 7:42 a.m.

144.    On February 22, 2016, at approximately 7:42 a.m., SAMPEL received an incoming text on **Target Telephone 2** from SMITH on **Target Telephone 1**, which read, "in the am +1 got it xtr is always plus." I believe that when SMITH said, "in the am +1 got it xtr is always plus," SMITH was informing SAMPEL that he wanted one kilogram of cocaine but would take additional kilograms if they are available.

### February 22, 2016 at 6:12 p.m. – 8:03 p.m.

145.    On the same date, at approximately 6:12 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text to OCASIO on **Target Telephone 4**, which read, "The landlord called." At approximately 7:01 p.m., SAMPEL received an incoming text on **Target Telephone 2** from OCASIO on **Target Telephone 5**, which read, "Yo what the landlord said about the room." At approximately 8:00 p.m., SAMPEL received another incoming text on **Target Telephone 2** from OCASIO on **Target Telephone 5**, which read,

"What the landlord talking about?" At approximately 8:03 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text to OCASIO on **Target Telephone 5**, which read, "Tomorrow same job as last week urs plus 1 and whatever u want to do." I believe that when SAMPEL texted, "The landlord called," he was informing OCASIO that SMITH wants to purchase cocaine. I further believe that when OCASIO asked "What the landlord talking about," OCASIO was asking SAMPEL how much cocaine SMITH wants to purchase. I believe that when SAMPEL said, "Tomorrow same job as last week urs plus 1," SAMPEL was telling OCASIO that the cocaine transaction will occur the next day (February 23, 2016) and that SMITH wants to purchase the same amount of cocaine that he purchased last week plus an additional quantity of cocaine. Finally, I believe that when SAMPEL texted, "and whatever u want to do," SAMPEL was telling OCASIO that SMITH will take any additional cocaine that OCASIO wants to give him on consignment.

### February 23, 2016 at 5:20 p.m.

146.    The next day, on February 23, 2016, at approximately 5:20 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing call to SMITH on **Target Telephone 1**. During the ensuing conversation, SAMPEL asked SMITH, "So you did, did the umm, you did the breaker panel installation all ready for this guy?" and SMITH replied, "Yes." SAMPEL then asked SMITH, "you finished another breaker panel also?" and SMITH replied, "Oh shit, umm, I got, got the old and a two new." SAMPEL then advised SMITH that he would "work on that" and that would see SMITH "in a few." I believe that when SAMPEL asked SMITH if he "did the breaker panel installation all ready for this guy," SAMPEL was asking if SMITH had the money ready for the cocaine purchase, to which

SMITH responded affirmatively. I further believe that when SAMPEL asked, "you finished another breaker panel also," SAMPEL was asking SMITH how much cocaine he wanted to purchase. I further believe when Smith said, "Oh shit, umm, I got, got the old and a two new," SMITH was requesting 3 kilograms of cocaine to purchase from SAMPEL.

**February 23, 2016 at 5:22 p.m.**

147. Immediately after speaking with SMITH, SAMPEL utilized **Target Telephone 2** to place an outgoing call to OCASIO on **Target Telephone 5.** The following is a transcript of that call:

**Angel Ocasio (AO):** Yeah.

**Juan SAMPEL (JS):** Hey buddy, what's going on man?

**AO:** I'll text you in a few.

**JS:** Yeah, no he can, I just want to let you know that umm, my man he installed, he installed the breaker panel for you. The one you gave him to install, and he had two more to install, that he is almost finished with right now.

**AO:** Ok, so…. You got me all fucked up.

**JS:** (Laughing) Three nigger.

**AO:** He did, he got three breaker panels, two installed. One, one was the one that you, you had him do. And, and he had the other two for you.

**AO:** Ok, he got another two.

**JS:** Yeah, yeah.

**AO:** Ok.

**JS:** Ok, so whatever, just call me I'm, I really don't wanna go home and take a shower or nuttin, but.

**AO:** I'm waiting on somebody, I'm waiting on somebody, so I will text you soon, it going to be short right now. By, by six o'clock.

**JS:** Yeah, ok, no problem sounds great.

**AO:** Ok I'll text you.

\* \* \*

148.   I believe that when SAMPEL said, "my man he installed, he installed the breaker panel for you. The one you gave him to install, and he had two more to install, that he is almost finished with right now," SAMPEL was attempting to inform OCASIO in code that SMITH wants to purchase three kilograms of cocaine.  I further believe when OCASIO responded, "Ok, so…. You got me all fucked up," he was telling SAMPEL that he does not understand the code that SAMPEL was using, which prompted SAMPEL to laugh and tell OCASIO the number of kilograms of cocaine ("three nigger").   I further believe when OCASIO responded, "He did, he got three breaker panels, two installed. One, one was the one that you, you had him do. And, and he had the other two for you" ... "Ok, he got another two," OCASIO was confirming that he understands the quantity of cocaine that SMITH wants to purchase.

### February 23, 2016 at 7:18 p.m.

149.   On this same date, at approximately 7:18 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text to OCASIO **Target Telephone 5**, which read, "Yo 1min here." I believe when SAMPEL texted, "Yo 1min here," he was informing OCASIO that he was close to OCASIO's location (**Premise 5**) to pick up the cocaine.

150.   On that same date, at approximately 7:10 p.m., SAMPEL's gray Pathfinder (**Vehicle 2**) departed his residence at 4 Bru Mar Drive (**Premise 4**), and drove directly to OCASIO's residence at 425 Lakeview Park (**Premise 5**) where DEA Special Agent Jeff

Plattos observed **Vehicle 2** pull into the driveway of **Premise 5**. Approximately three minutes later, agents observed **Vehicle 2** depart the location and drive directly back to **Premise 4** (4 Bru Mar Drive). At approximately 9:30 p.m., surveillance members observed SMITH's white Yukon (**Vehicle 1**) arrive at the parking lot near the South Clinton Apartments (**Premise 1**). At approximately 9:36 p.m., law enforcement observed SAMPEL's gray Pathfinder (**Vehicle 2**) park in the same lot and observed SAMPEL exit **Vehicle 2** carrying a bag and walk towards the entrance to **Premise 1**. At approximately 9:57 p.m., agents observed SAMPEL and SMITH exit from the area of **Premise 1** and observed **Vehicle 2** leave the parking lot.

### February 23, 2016 at 10:04 p.m.

151.    A few minutes later on this same date, at approximately 10:04 p.m., SAMPEL utilized **Target Telephone 2** to place an outgoing call to OCASIO on **Target Telephone 5**. During the ensuing conversation, SAMPEL stated, "I didn't know if you want to come over to my house and pick up the tools or not you can pick up the the you can pick the tools from my wife at work cause she's got a policy for you anyway some paperwork for you for sure." OCASIO responded, "Yeah, yeah and I got to pay the insurance too Ok. Just have that do that then." SAMPEL then stated, "Ok no problem so she'll have the paperwork and all the policy and application ready to you tomorrow morning you can go by there anytime Ok?," to which OCASIO replied, "No problem."

152.    I believe that when SAMPEL said, "I didn't know if you want to come over to my house and pick up the tools or not you can pick up the the you can pick the tools from my wife at work cause she's got a policy for you anyway some paperwork for you for sure,"

SAMPEL was asking OCASIO if OCASIO wanted to pick up the cash from the cocaine sale with SMITH at SAMPEL's house (**Premise 4**) that night or the next day from SAMPEL's wife at the insurance office located 1038 Lyell Avenue, Rochester, New York. I further believe that when OCASIO said, "Yeah, yeah and I got to pay the insurance too Ok. Just have that do that then," OCASIO was indicating to SAMPEL that he will pick up the money from SAMPEL's wife at the insurance company the next day.

### February 24, 2016 at 1:54 p.m.

153.    The next day, on February 24, 2016, at approximately 1:54 p.m., agents utilized a cover surveillance camera to observe **Vehicle 6** (tan Ford F-150) drive up and park in front of SAMPEL's insurance company located at 1038 Lyell Avenue, Rochester, New York. A male wearing a hat and hooded sweatshirt matching the physical description of OCASIO, who was the sole occupant of the vehicle, exited **Vehicle 6** and then entered the insurance company. At approximately 2:12 p.m., this same individual exited the insurance company carrying a box and entered **Vehicle 6** and departed the area.

154.    Based on my training and experience, the substance of the above listed intercepted communications on February 22, 2016 to February 24, 2016, the observations of the investigative team members on those dates, and the information obtained during this investigation, I believe that SAMPEL obtained three kilograms of cocaine from OCASIO at 425 Lakeview Park (**Premise 5**) and then SAMPEL took the cocaine to his residence located at Bru Mar Drive (**Premise 4**). A couple hours later, SAMPEL then transported the cocaine to SMITH at 1045 South Clinton Avenue, Apartment 3 (**Premise 1**). After leaving **Premise 1**, SAMPEL took the money that he had gotten from SMITH for the cocaine and took it to

his residence, **Premise 4**. The next day, OCASIO drove **Vehicle 6** to SAMPEL's insurance

company located at 1038 Lyell Avenue and picked up the money for the cocaine.

### March 26, 2016 at 11:29 a.m.

155.    On March 26, 2016, at approximately 11:29 a.m., SAMPEL received an

incoming call on **Target Telephone 2** from SMITH on **Target Telephone 1**. The following

is a transcript of that call:

**Juan Sampel (JS):** Yo mister. What's up? I was just on my way to the park over here.

**Dennis Smith (DS):** Huh? What did you say?

**JS:** Uhh, I was just on my way to over here, to the Glide, to the park over there. Watch the kids play football or whatever.

**DS:** Uhh, well (unintelligible) I'm home. You heard me?

**JS:** What happened?

**DS:** I said I'm home.

**JS:** You are?

**DS:** Yeah.

**JS:** I'll be right there.

**DS:** Ok.
[End of Call]

156.    I believe that when SAMPEL stated, "I was just on my way to over here, to

the Glide, to the park over there," SAMPEL was using code to inform SMITH that

SAMPEL was on his way to SMITH's residence at 1076 Glide Street, Rochester, New York

(**Premise 2**). When SMITH stated, "I'm home," SMITH was confirming to SAMPEL that

he was at **Premise 2**.

### March 26, 2016 at 11:34 a.m.

157.    On March 26, 2016, at approximately 11:34 a.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text to SMITH on **Target Telephone 1**, which read, "Here."  On the same day, at approximately 11:34 a.m., GRANET Task Force Officer Timothy Pearce utilized a covert surveillance camera to observe SAMPEL arrive at **Premise 2** (1076 Glide Street, Rochester, New York), in **Vehicle 4** (Hyundai Sonata).  On the same day, at approximately 11:38 a.m., Investigator Pearce observed SAMPEL exit the driver's door to **Vehicle 4** and enter **Premise 2**.  On the same day, at approximately 11:47 a.m., Investigator Pearce observed SAMPEL exit SMITH's residence (**Premise 2**) carrying an undetermined object.  SAMPEL then returned to **Vehicle 4** and departed northbound on Glide Street.

### March 26, 2016 at 11:48 a.m.

158.    On March 26, 2016, at approximately 11:48 a.m., SAMPEL utilized **Target Telephone 2** to place an outgoing call to OCASIO on **Target Telephone 4** that went unanswered.  On the same day, at approximately 11:49 a.m., SAMPEL utilized **Target Telephone 2** to place an outgoing text to OCASIO on **Target Telephone 4**, which read, "On way to ur house."  On the same day, at approximately 11:56 a.m., Investigator Pearce utilized a covert surveillance camera to observe SAMPEL arrive at **Premise 5** (425 Lakeview Park) in **Vehicle 4**.  Investigator Pearce observed SAMPEL exit the driver's door to **Vehicle 4** and walk to the front door of **Premise 5** carrying a shoebox under his arm.  Investigator Pearce observed SAMPEL knocking on the door and then utilizing a cell phone.  On the same day, at approximately 11:57 a.m., SAMPEL utilized **Target**

Telephone 2 to place an outgoing call to OCASIO on **Target Telephone 4** that went unanswered. On the same day, at approximately 12:02 p.m., Investigator Pearce observed SAMPEL return to **Vehicle 4** with the shoebox after not receiving an answer at the door to **Premise 5**. SAMPEL departed the area in **Vehicle 4** shortly afterward.

159. Based on my training and experience, the substance of the above listed intercepted communications on March 26, 2016, the observations of the investigative team members on that date, and the information obtained during this investigation, I believe SAMPEL traveled to SMITH's residence located at 1076 Glide Street, Rochester, New York (**Premise 2**) in **Vehicle 4** order to pick up cash so that SAMPEL could take the currency to OCASIO at **Premise 5** to obtain a quantity of cocaine.

160. Based on the foregoing, and following information contained in this affidavit, your affiant has probable cause to believe that JUAN SAMPEL is involved an ongoing conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine and cocaine base. Further, your affiant further believes that there is probable cause to conclude that items listed on the annexed Schedule of Items to be Seized will be found at his residence (**Premise 4**) and in his vehicles (**Vehicles 2 and 4**) and that those items are evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 846, and Title 18, United States Code, Sections 924 (c)(1), 1956 & 1957. Moreover, your affiant believes that it is likely that controlled substances will be located at **Premise 4** and that requiring law enforcement to knock and announce their presence before entering will allow the occupants the opportunity to detroy or dispose of the controlled substances and possibly arm themselves. Accordingly, your affiant requests that execution

of the warrant be exempt from the knock-and-announce requirement of 18 U.S.C. § 3109 and related legal authority. Additionally, because the members of this drug trafficking organization conduct their drug trafficking business at all hours of the day, your affiant requests permission to execute the search warrants at **Premise 4** and **Vehicles 2 and 4** at any time of the day or night.

**Premise 5:** 425 Lakeview Park, Rochester, New York

**Vehicle 5:** 2010 Honda Accord, New York State registration EJC -4180 with VIN number of 1HGCP2F30AA063778

**Vehicle 6:** 2007 Ford F-150 XLT, New York State registration 94008-MH with VIN number of 1FTPW14VX7FA73862

**ANGEL OCASIO:** 18 U.S.C. 846 (Conspiracy to Possess with intent to Distribute and to distribute 5 kilograms or more of cocaine)

**LUZ MORALES a/k/a/ LEIDA:** 18 U.S.C. 846 (Conspiracy to Possess with intent to Distribute and to distribute 5 kilograms or more of cocaine)

161. The investigative team has determined that ANGEL OCASIO and LUZ MORALES are involved in an ongoing conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine. Further, the investigative team has determined that both OASIO and MORALES reside at and **Premise 5** (425 Lakeview Park, Rochester, New York) and utilize that location to store, process and distribute controlled substances, including cocaine, as well as drug proceeds. The investigative team has confirmed this from physical surveillance, public records databases and other investigative techniques. On April 20, 2016, your affiant received records from Rochester Gas and Electric pursuant to a Federal Grand Jury subpoena that showed that the utilities at 425 Lakeview Park have been

in the name of LUZ MORALES since 2002. Records from the Monroe County Clerk's Office reveal that **Premise 5** has been owned by MORALES since 2002 as well.

162. **Premise 5, 425 Lakeview Park, Rochester, New York**, is a two and a half story single family dwelling, white in color, located on the south side of Lakeview Park. There are no numerals affixed to the north side of the dwelling. The front door is to be entered and is located on the west side of the dwelling and faces east. This door leads you directly into the dwelling to be searched.

163. **Vehicle 5,** 2010 Honda Accord, color gray, bearing New York State license plate EJC -4180, vehicle identification number 1HGCP2F30AA063778, registered to Luz L. Morales, date of birth 12-30-1976 of 425 Lakeview Park, Rochester, New York.

164. **Vehicle 6,** 2007 Ford F-150 XLT, color tan, bearing New York State license plate 94008-MH, vehicle identification number 1FTPW14VX7FA73862, registered to Jose Luis Quintana, date of birth 10-26-1987 of 35 Oakman Street, Rochester, New York.

165. The investigative team has determined, through physical surveillance, that ANGEL OCASIO operates **Vehicle 6.** Specifically, ANGEL OCASIO has been observed operating **Vehicle 6** on numerous occasions during the course of this investigation and **Vehicle 6** has been observed parked at **Premises 5** on a regular basis throughout this investigation, including as recently as April 25, 2016. Additionally, the investigative team has determined that OCASIO's girlfriend, LUZ MORALES, operates **Vehicle 5.** MORALES has been observed operating **Vehicle 5** on numerous occasions during the course of this investigation and **Vehicle 5** has been observed parked at **Premise 5** on a regular basis, the most recent occasion being April 25, 2016.

166.   The investigation has established probable cause to find that ANGEL OCASIO and LUZ MORALES are involved in an ongoing conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine in violation of Title 18, United States Code, Section 846. Further, the investigation has established probable cause to find that OCASIO and MORALES utilize **Premise 5,** and that OCASIO utilizes **Vehicle 6** and MORALES utilizes **Vehicle 5** to maintain, distribute and transport controlled substances, including cocaine and drug proceeds. The following is a sample of various intercepted telephone conversations, and other investigative findings, which demonstrate ANGEL OCASIO'S and LUZ MORALES' drug trafficking activities:

167.   The sequence of intercepted wire and electronic communications between SMITH utilizing **Target Telephone 1**, SAMPEL utilizing **Target Telephone 2**, and OCASIO utilizing **Target Telephones 4 and 5** on February 12, 2016, and April 14, 2016, set forth at paragraphs 42 through 74, above, demonstrate OCASIO's involvement in an ongoing conspiracy with SMITH, SAMPEL and others to distribute cocaine. Similar communications were intercepted between SMITH, SAMPEL and OCASIO on multiple other dates during this investigation, including as recently as April 22, 2016.

168.   As set forth above, in February 2016, CS-6 advised law enforcement officers that JUAN QUINTANA and ANGEL OCASIO are brothers and are involved in distributing large amounts of cocaine. CS-6 further stated that OCASIO and QUINTANA stash large amounts of cocaine and drug proceeds at **Premises 6** (35 Oakman Street, Rochester, New York). Additionally, during the course of this investigation, agents have identified LUZ MORALES as the girlfriend of OCASIO and have determined that she

resides with him at **Premise 5**. Based upon the investigation to date, including a public database search and surveillance photographs and records from the United States Postal Service (USPS), agents have identified "Leida Morales" as an alias utilized by MORALES.

169. Additionally, based upon the investigation to date, including intercepted communications on **Target Telephones 4 and 5**, records and surveillance photographs from the USPS, and the search of seven USPS parcels discussed below, agents believe that OCASIO, MORALES and others are utilizing the USPS to receive packages containing cocaine from a source in Puerto Rico and to send packages containing cash proceeds from the sale of cocaine to Puerto Rico.

### USPS Records

170. Records from the USPS reveal that between January 25, 2016 and April 13, 2016, there have been 71 Priority Mail parcels sent to Puerto Rico bearing the sender address of 425 Lakeview Park (**Premise 5**). MORALES' alias, "Leida Morales," is listed as the sender's name on 49 of those parcels. The remaining parcels bear the sender name of "Angelica Ocasio" who agents believe, based upon search of a public records database and the content of intercepted communications, is the daughter of MORALES and OCASIO. The postage for the majority of the packages sent to Puerto Rico with a sender address of 425 Lakeview Park was $6.80 and the packages all generally weighed approximately one pound.

### Intercepted Communications

171. During the course of this investigation, agents have intercepted communications between OCASIO and MORALES over **Target Telephones 4 and 5**

which, based upon their training and experience and the investigation to date, agents believe are conversations concerning the mailing of drug proceeds to Puerto Rico.   For example, on March 16, 2016, at approximately 3:02 p.m., OCASIO utilized **Target Telephone 4** to place an outgoing call to MORALES utilizing telephone instrument (585) 281-9223. During the ensuing conversation, MORALES asked OCASIO, "You said nine (9) each, right?" and OCASIO responded, "I knew you was gonna ask that. Yeah!"  MORALES then told OCASIO, "Well, hurry up because I think that you are gonna have to come over here 'cause I'm missing one (1)," and told OCASIO, "I'm talking about the plastics." OCASIO then asked MORALES, "A bag?" and MORALES responded, "Yeah."  OCASIO instructed MORALES to "Just put it in something then" and then told MORALES, "I'll be right there."

172.   I believe that when MORALES stated, "You said nine (9) each, right," MORALES was asking OCASIO if he wanted nine thousand dollars of U.S. currency to be put in each box that that would be shipped to Puerto Rico.  I further believe that when MORALES stated, "Well, hurry up because I think that you are gonna have to come over here 'cause I'm missing one," MORALES was telling OCASIO that she was missing a plastic bag in which to place the US currency.

173.   On March 17, 2016, at approximately 12:57 p.m., OCASIO received an incoming text message on **Target Telephone 4** from MORALES utilizing telephone instrument (585) 281-9223 which read, "Go to the post and grab some more of both.!"  On the same date, at approximately 1:04 p.m., OCASIO received another text message on **Target Telephone 4** from MORALES which read, "Plus go grab so envelops."  I believe

that when MORALES texted, "Go to the post and grab some more of both.!," and "Plus go grab so envelops," MORALES was telling OCASIO to go to the post office and pick up boxes and envelopes so they can use them to ship US currency to Puerto Rico.

174.   Additionally, based upon the investigation to date, including intercepted wire and electronic communications over **Target Telephones 4 and 5**, agents believe that MORALES is involved in transporting cocaine for OCASIO.  For example, on or about March 15, 2016, agents intercepted several communications between OCASIO on **Target Telephone 5** and MORALES on (585) 281-9223 and between OCASIO on **Target Telephone 5** and SAMPEL on **Target Telephone 2**, indicating that OCASIO was going to receive cocaine on that date[8].

175.   On that same date, at approximately 4:26 p.m., OCASIO utilized **Target Telephone 5** to send the following text message to MORALES at (585) 281-9223, "7 yo keys top of table."  At approximately 4:38 p.m., MORALES sent a reply to OCASIO, texting, "How many boxes."  At 4:40 p.m., OCASIO utilized **Target Telephone 5** to reply, "7 I txt u already I ddnt want txt it like that man."  I believe that when OCASIO texted "7 yo keys top of table" OCASIO was indicating in code what quantity of cocaine he wanted MORALES to obtain.  I further believe that when MORALES texted, "How many boxes," she was asking OCASIO what quantity of cocaine she should obtain and OCASIO confirmed the quantity of seven in his reply text.

---

[8] Those intercepted communications included a text message from SAMPEL stating that he "need[s] to finish that job before six o'clock" and "he has an appointment at 7" which agent believe are references to a quantity of cocaine needed for SMITH, and a replies from OCASIO stating, "Going to be available" and "Trying to."

–98–

176.    Based upon those intercepted communications, agents believed that on that date, MORALES would be picking up a quantity of cocaine for OCASIO.  On that date, at approximately 4:39 p.m., agents utilized a covert surveillance camera to observe MORALES exit **Premise 5** (425 Lakeview Park), and then enter **Vehicle 5** (Honda Accord) and depart the area.  On that same date, at approximately 4:40 p.m., OCASIO utilized **Target Telephone 5** to send the following text message to MORALES, "If u haven't left make it 8 tickets at 1 dollar straight."  I believe that when OCASIO stated "make it 8 tickets," OCASIO was referring to the quantity of cocaine that he wished MORALES to obtain if she was still at the location.

177.    On that same date, at approximately 4:51 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing telephone call to MORALES utilizing telephone instrument (585) 281-9223.  During the telephone call, OCASIO asked MORALES, "You got it?" to which MORALES responded, "I'm trying to.  Stop calling and texting me." During the telephone call, OCASIO told MORALES, "Okay.  Put it in between the seat and the box, pull the seat forward [U/I].  Place it in between the seat and the box," to which MORALES responded, "Uh?"  OCASIO then stated, "Put it in between the seat and the speaker, put the back seat forward.  Bye."

178.    I believe that when OCASIO said, "You got it?" OCASIO was asking MORALES if she had possession of the cocaine that she was picking up for him.  I further believe that when MORALES said, "I'm trying to.  Stop calling and texting me," MORALES was indicating to OCASIO that she was in the process of receiving the cocaine. I further believe that when OCASIO said, "Put it in between the seat and the box, pull the

seat forward" OCASIO was directing MORALES where to place the cocaine in **Vehicle 5** (Honda Accord), which MORALES was observed driving that day the purpose of concealing the narcotics. I believe that when MORALES responded, "Uh?" MORALES was indicating that she did not understand OCASIO's instructions. Finally, I believe that when OCASIO said, "Put it in between the seat and the speaker, put the back seat forward. Bye," OCASIO was again giving MORALES directions on how to operate a hidden compartment in **Vehicle 5** to place the cocaine inside.

179.   On that same date, March 15, 2016, at approximately 5:20 p.m., MORALES sent a text message to OCASIO on **Target Telephone 5** which read, "Hay some one still at the house???" At approximately 5:22 p.m., agents observed, via a covert surveillance camera, **Vehicle 5** arrive back at **Premise 5** (425 Lakeview Park) and at approximately 5:27 p.m., agents observed MORALES exit **Vehicle 5** and enter **Premise 5**. Based upon intercepted communications over **Target Telephones 4 and 5**, agents determined that at the time MORALES arrived at **Premise 5**, OCASIO was inside the residence with a construction contractor for remodeling that was being done at the residence. Just prior to 5:51 p.m., the contractor left the residence and departed the area. Quickly thereafter, at approximately 5:51 p.m., MORALES exited the residence, went to **Vehicle 5** and retrieved a black bag from the **Vehicle 5**, and then went back inside **Premise 5** with the black bag.

180.   Based on my training and experience, the substance of the above listed intercepted communications on March 15, 2016, the observations of the investigative team members on that date, and the information obtained during this investigation, I believe MORALES obtained a quantity of cocaine from an unknown source for OCASIO and

picked up the cocaine utilizing **Vehicle 5** and took the cocaine into 425 Lakeview Park (**Premise 5**).

**April 5, 2016 Mail Parcels**

181.    On April 5, 2016, the investigative team intercepted communications between OCASIO and MORALES that they believed indicated that MORALES would be mailing additional parcels containing drug proceeds to Puerto Rico. Specifically, on April 5, 2016, at approximately 2:43 p.m., OCASIO received an incoming text message on **Target Telephone 4** from MORALES utilizing telephone instrument (585) 281-9223 which read, "In sets of 9 right? Also cell don't work??" On that same date, at approximately 3:27 p.m., OCASIO received another incoming text message on **Target Telephone 4** from MORALES utilizing telephone instrument (585) 281-9223 which read, "Hellooo hay do I use the same letters for the last ones I got from top to bottom?" On that same date, at approximately 3:30 p.m., OCASIO utilized **Target Telephone 4** to place an outgoing call to MORALES utilizing telephone instrument (585) 281-9223.    During the ensuring conversation, MORALES asked OCASIO, "You did the thing [unintelligible] letters the way you sent it to me last time?" and "The last ones that were sent to me, these are it just like this?" OCASIO responded, stating, "Yeah, Just like that."

182.    I believe that when MORALES texted, "In sets of 9, right," she was asking OCASIO if the money she was mailing should be divided into parcels containing $9,000 each.  I further believe that when MORALES texted, ""Hellooo hay do I use the same letters for the last ones I got from top to bottom," MORALES was asking OCASIO about how she should address the parcels. Finally, I believe that when OCASIO stated, "Yeah,

just like that," OCASIO was confirming the way in which MORALES should address the parcels.

183.    On April 5, 2016, U.S. Postal Investigation Service Inspector Landon Hawkins reviewed outbound mail from the Dewey Station Post Office in Rochester, New York, identified six Priority Mail parcels going to Puerto Rico, and noted that each parcel had handwritten labels, were heavily taped, and bore the return name of Leida Morales (MORALES' alias) and a return address of 425 Lakeview Pk, Rochester, New York (**Premise 5**). Based upon his review of video surveillance from the post office where the parcels were mailed, Inspector Hawkins believed that MORALES presented the parcels for mailing. Thereafter, Inspector Hawkins applied for and received a warrant authorizing the search and seizure of the six USPS Priority Mail parcels. Each of the six parcels, which were standard Priority Mail flat rate boxes, were opened pursuant to the search warrant; four of the parcels contained $9,000 in cash, one parcel contained $8900, and one parcel contained $9100. The cash in each box was located inside a gray padded envelope. Nothing else was located inside the boxes. The cash totaled $54,000. Each parcel and its contents was photographed and documented and then resealed and delivered to the addressee on each package.

184.    According to USPS records, the recipient names and addresses on the six parcels searched were the same or similar to names and addresses utilized on the prior US Priority Mail parcels that bore a return address of 425 Lakeview Park (**Premise 5**). All six of the recipient names and addresses were used on parcels that were mailed on March 16, 2016. Two of the recipient names on the cash parcels were: "Bayamon Auto Mall, P.O.

Box 1287, San Lorenzo, P.R. 00754" and "Jam Auto Fashion Corp, P.O. Box 10258, Humacao P.R. 00792." Six other similar Priority Mail parcels were sent from 425 Lakeview Park to "Bayamon Auto Mall" between January 24, 2016 and April 13, 2016 and four other parcels were sent between those dates addressed to "Jam Auto Fashion Corp."

185.   As detailed at paragraph 200, below, on April 5, 2016, Inspector Hawkins applied for and received a federal search warrant for an incoming Priority Mail parcel sent from Puerto Rico to an address in Honeoye Falls, New York that contained 2085.54 grams of a white powdery substance that field tested positive for cocaine. On that same date, OCASIO utilized **Target Telephone 5** to contact the post office in Honeoye Falls, New York. During the call, OCASIO inquired about the location of the seized parcel that was found to contain cocaine. OCASIO was advised by post office personnel at that time that the package tracking data indicated that the parcel was mailed from Puerto Rico and had not been received yet by the post office in Honeoye Falls.

186.   Based on the foregoing, and following information contained in this affidavit, your affiant has probable cause to believe that ANGEL OCASIO and LUZ MORALES are involved in an ongoing conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine in violation of Title 21, United States Code, Section 846. Your affiant further believes that there is probable cause to conclude that items listed on the annexed Schedule of Items to be Seized will be found at **Premise 5** and in **Vehicle 5** and **Vehicle 6** and that those items are evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 846, and Title 18, United States Code, Sections 924 (c)(1), 1956 & 1957. Moreover, your affiant believes that it is likely that controlled

substances will be located at **Premise 5** and in **Vehicle 5** and **Vehicle 6** and that requiring law enforcement to knock and announce their presence before entering will allow the occupants the opportunity to detroy or dispose of the controlled substances and possibly arm themselves. Accordingly, your affiant requests that execution of the warrant be exempt from the knock-and-announce requirement of 18 U.S.C. § 3109 and related legal authority. Additionally, because the members of this drug trafficking organization conduct their drug trafficking business at all hours of the day, your affiant requests permission to execute the search warrants at **Premise 5** and in **Vehicle 5** and **Vehicle 6** at any time of the day or night.

<u>Premise 10:</u> 5908 Stonehill Road Lot 10, Lakeville, New York

<u>Vehicle 8:</u> Tan Honda Odyssey with New York registration HBB-7266

<u>JASON GIBSON:</u>   18 U.S.C. 846 (Conspiracy to Possess with Intent to Distribute and Distribute 5 kilograms or more of cocaine)

<u>KELLY SHANKS:</u>   18 U.S.C. 846 (Conspiracy to Possess with Intent to Distribute and Distribute 5 kilograms or more of cocaine)

187.   The investigative team has determined that JASON GIBSON and KELLY SHANKS are involved in an ongoing conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine in violation of Title 21, United States Code, Section 846. Further, the investigative team has determined that GIBSON resides at 5908 Stonehill Road Lot 10, Lakeville, New York (**Premise 10**). The investigative team confirmed that fact from physical surveillance, public records databases and other investigative techniques. On April 20, 2016, your affiant received records from Rochester Gas and Electric pursuant to a Federal Grand Jury subpoena that showed that the utilities at 5908 Stonehill Road Lot 10, Lakeville, New York (**Premises 10**) have been in the name of JASON GIBSON since May 5, 2015. Moreover, as set forth below, on March 17, 2016, GIBSON provides **Premise 10** as his address to OCASIO in an intercepted communication.

188.   **Premise 10, 5908 Stonehill Road Lot 10, Lakeville, New York,** is a single story trailer, tan and white in color. The house located on the south side of Stonehill Road. The numeral "10" is clearly affixed to the north side of the dwelling. This door is on the north side of the trailer and is the only door on that side.

189.  **Vehicle 8,** a 2004 Honda Odyssey, color tan, with New York registration HBB-7266 vehicle identification number 5FNRL18094B148972, registered to Barrita L. Shanks, date of birth 06-03-1965 of 2191 Pond Road, Lima, New York.  As indicated at paragraph, 223, below, GIBSON and SHANKS were observed meeting OCASIO in **Vehicle 8** to deliver a Priority Mail parcel that agents believe contained cocaine.  Further, on April 14, 2016, Investigator Pearce observed **Vehicle 8** parked in the driveway of **Premise 10** and it was observed at **Premise 10** as recently as April 17, 2016.

190.  The investigation has established probable cause to find that JASON GIBSON and KELLY SHANKS are involved in an ongoing conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine in violation of Title 21, United States Code, Section 846.  Further the investigation has established probable cause to find that GIBSON utilizes **Premise 10** to receive, maintain and distribute controlled substances and **Vehicle 8** transport controlled substances.  The following is a sample of various intercepted telephone conversations, and other investigative findings, which demonstrate JASON GIBSON'S and KELLY SHANKS' drug trafficking activities:

191.  On or about March 9, 2016, the Livingston County Sheriff's Office received a tip from an anonymous caller that a male named Jason GIBSON is trafficking cocaine through the U.S. mail.  The anonymous caller also reported that GIBSON lives in the trailer park on Stone Hill Road in trailer #10 (**Premise 10**) and identified two vehicles that GIBSON drives, one of which was **Vehicle 8** (Honda Odyssey).

### March 11, 2016 at 1:33 a.m.

192.    On March 11, 2016, at approximately 1:33 a.m., OCASIO utilized **Target Telephone 5** to place two outgoing texts to GIBSON utilizing telephone instrument (585) 406-6018 which read, "I'm not trying to lecture u son, or be in your business. I just hate that I put someone on and we call I quit they in the same situation they was b4. I," and "was doing the math. cause I keep record of everything. You have maid 19.400 dollars. And how much u got in the card." I believe that GIBSON works for OCASIO in this drug organization and when OCASIO texted, "I just hate that I put someone on and we call I quit they in the same situation they was b4. I," OCASIO was telling GIBSON that he should be saving his money because if OCASIO no longer needs GIBSON, OCASIO does not want him to be broke. I further believe that when OCASIO texted, "I keep record of everything . You have maid 19.400 dollars," OCASIO was telling GIBSON that OCASIO keeps track of all of the money he pays GIBSION and OCASIO has paid GIBSON $19,400 dollars since he started working with OCASIO.

### March 11, 2016 at 1:35 a.m.

193.    On the same date, at approximately 1:35 a.m., OCASIO utilized **Target Telephone 5** to place an outgoing text to GIBSON utilizing telephone instrument (585) 406-6018 which read, "And that's not counting this round here. That would be another 7.100 that will be 26.500 my dude wow." I believe that when OCASIO texted, "And that's not counting this round here. That would be another 7.100 that will be 26.500 my dude wow," OCASIO was telling GIBSON that amount of money in the prior text message does not

include the upcoming shipment of cocaine where GIBSON will make an additional $7,100 for a total of $26,500.

### March 11, 2016 at 1:47 a.m.

194.   On the same date, at approximately 1:47 a.m., OCASIO utilized **Target Telephone 5** to place an outgoing text to GIBSON utilizing telephone instrument (585) 406-6018 which read, "No its not buddy. I'm not worried ps I'm just telling facts. I'm going txt you everything I got. We started the sept.17th." I believe that when OCASIO texted, "I'm going txt you everything I got. We started the sept.17th," OCASIO is telling GIBSON that OCASIO will send him the records of their drug transactions since GIBSON started working for OCASIO on September 17, 2015.

### March 11, 2016 at 1:59 a.m.

195.   On the same date, at approximately 1:59 a.m., OCASIO utilized **Target Telephone 5** to place two outgoing texts to GIBSON utilizing telephone instrument (585) 406-6018 which read, "Between September 17 and October 30  we did 16letters[9] that's 500?16 that's 8k. Then we did November 2 till December 3 .we did 11 letters 5.5k then we sta," and "rted again January 8 till January 31 did 10 that's 5k. And now we doing 12 letters 12?650 7.800.total 26,300. You just don't relive it." I believe that when OCASIO texted, "Between September 17 and October 30 we did 16letters that's 500?16 that's 8k" OCASIO was telling GIBSON that between September 17, 2015 and October 30, 2015, there were

---

[9] During an intercepted electronic communications between OCASIO and GIBSION over **Target Telephone 5** on March 10, 2016 and March 11, 2016, OCASIO advised GIBSON to refer to the addresses that GIBSON located for packages of cocaine to be sent to as "letters." Specifically, Gibson texted OCASIO an address and then sent another text asking, "did you u get new address." OCASIO responded, "Don't use that word. I always tell letters."

sixteen kilograms of cocaine that were delivered through the mail and that GIBSON got $500.00 per kilogram for a total of $8,000 for assisting with those kilograms of cocaine. I further believe that when OCASIO texted, "Then we did November 2 till December 3 .we did 11 letters 5.5k," OCASIO was telling GIBSON that between November 2, 2015, and December 3, 2015 there were eleven kilograms of cocaine that were delivered through the mail and that GIBSON got $500.00 per kilogram for a total of $5,500 for assisting OCASIO. When OCASIO texted, "January 8 till January 31 did 10 that's 5k," I believe that OCASIO was telling GIBSON that between January 8, 2016, and January 31, 2016, there were ten kilograms of cocaine that were delivered through the mail and GIBSON got $500.00 per kilogram for a total of $5,000 for assisting OCASIO. Finally, I believe that when OCASIO texted, "And now we doing 12 letters 12?650 7.800.total 26,300," OCASIO was telling GIBSON that there are twelve kilograms of cocaine that will be delivered through the mail and GIBSON will receive $650.00 per kilogram, for a total of $7,800 and a grand total of $26,000 dollars since September 2015.

### March 17, 2016

196.   On March 17, 2016, at approximately 2:58 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing text to JASON GIBSON utilizing telephone instrument (585) 447-4864, which read in two parts, "Well this was a short vacation. Send me thar last letter u did. I erase by mistake. And please bay attenti I ñ to ur cell. especially in the mornings." and "You got to be there. Send me yours to now." On the same date, at approximately 3:02 p.m., OCASIO received an incoming text message on **Target Telephone 5** from GIBSON utilizing telephone instrument (585) 447-4864, which read,

"Jason Gibson...5908 stonehill rd lot 10 Lakeville ny 14480...JGibb$.Da.1."   At approximately 3:08 p.m., GIBSON sent OCASIO another text message on **Target Telephone 5**, which read, "Jason Temelkovski...3589 Rush-Mendon rd....Honeoye Falls, NY 14472...JGibb$.Da.1."[10]

197.    I believe that when OCASIO stated, "Well this was a short vacation . Send me thar last letter u did .I erase by mistake," and "Send me yours now" OCASIO was informing GIBSON that OCASIO was preparing to have additional quantities of cocaine shipped from Puerto Rico and that OCASIO wanted addresses from GIBSON to send the packages of cocaine to, including GIBSON's address. I further believe that when OCASIO stated, "And please bay attenti I ñ to ur cell . especially in the mornings" and "You got to be there," OCASIO instructing GIBSON to pay attention to his cell phone so OCASIO could alert GIBSON when OCASIO expected the parcels to arrive.

198.    I believe that when GIBSON texted, "Jason Gibson...5908 stonehill rd lot 10 Lakeville ny 14480" GIBSON was providing OCASIO with his address (**Premise 10**) to use to send a package of cocaine to.  I further believe that when GIBSON texted, "Jason Temelkovski...3589 Rush-Mendon rd....Honeoye Falls, NY 14472," GIBSON was providing OCASIO with another name and address for OCASIO to have a package of cocaine sent to.

### Seizure of Priority Mail Package Containing Cocaine

200.    On April 2, 2016, Inspector Hawkins identified an incoming Priority Mail parcel (tracking number 9505 5111 1473 6092 3569 66) sent from Puerto Rico addressed to

---

[10] "JGibb$.Da.1.10" is an electronic signature utilized by GIBSON.

Jason Temelkovski, 3589 Rush-Mendon Rd, Honeoye Falls, NY 14472, which is the address GIBSON provided OCASIO on March 17, 2016. Inspector Hawkins applied for and received a federal search warrant authorizing the search and seizure of the parcel, which was executed on April 5, 2016. Upon execution of the warrant, the parcel was found to contain approximately 2085.54 grams of white powdery substance that field tested positive for cocaine.

### April 5, 2016

201.    On April 5, 2016, at 6:51 a.m., OCASIO utilizing **Target Telephone 5** sent a text message to GIBSON at (585) 447-4864 stating, "Yo get up dude," and text message to SHANKS at (585) 406-6018 stating, "Yo get up." At 7:05 a.m., GIBSON replied from (585) 447-4864, "I'm up." At 7:07 a.m., OCASIO utilizing **Target Telephone 5** sent SHANKS the following text at (585) 406-6018 ".shit should be here soon. For that other guy Jason Temelkovski. So pay attention." At 7:08 a.m., OCASIO texted GIBSION at (585) 447-4864 "pay attn dude. Shit should be at there to drop off." At that point GIBSON, utilizing (585) 447-4864, sent OCASIO text messages indicating that GIBSON's van was out of gas. At approximately 7:13 a.m., OCASIO texted GIBSON at (585) 447-4864, "Now I got to find someone with a license and pay them to take me fuck..." At approximately 7:20 a.m. and 7:21 a.m., OCASIO texted the following two messages to GIBSON at (585) 447-4864: "call dude tell him I be there soon in a brown truck. a girl and a big Spanish guy" and "omg wtf I ddnt even look at this fucking letter. This fucking close to city." At 7:22 a.m., GIBSON sent a text to **Target Telephone 5** from (585) 447-4864 stating, "It's mendon/victor's." At approximately 7:25 a.m., OCASIO sent GIBSON a text message at (585) 447-4864 which

−111−

read, in part, "I got to go dude. I'm waiting 4 my sister get ready. You called him. Dam man I told you I don't work in victor."

202. I believe that when OCASIO texted SHANKS to "get up" and "shit should be here soon" OCASIO was advising SHANKS that the packages of cocaine were going to be delivered that day. I believe OCASIO was indicating the same thing to GIBSON when he texted, "pay attn dude. Shit should be at there to drop off." I also believe that when OCASIO texted, "omg wtf I ddnt even look at this fucking letter. This fucking close to city" OCASIO was telling GIBSON that the Honeoye Falls address for the package being sent to "Jason Temelkovski" was too close to the City of Rochester.

203. As noted above, on that same date, at approximately at 10:51 a.m., OCASIO utilized **Target Telephone 5** to contact the post office in Honeoye Falls, New York to inquire about the location of the parcel. During the call, OCASIO stated that he was "Jason Temelkovski" and was expecting a package. OCASIO was advised by post office personnel that the package tracking data indicated that the parcel was mailed from Puerto Rico and had not been received yet by the post office in Honeoye Falls.

### Additional Packages

204. On April 1, 2016, at approximately 12:30 a.m., OCASIO utilized **Target Telephone 5** to send a text message to GIBSON at (585) 447-4864 that read, "Dude I need another letter." At 2:44 a.m., GIBSON replied, utilizing (585) 447-4864, "Kelly Shanks, 2191 Pond rd. Lima, NY 14485." OCASIO immediately responded by texting, "Who live there." At 2:45 a.m., GIBSON responded with two text messages stating, "Kelly lives there" and "Her parents house." I believe that when OCASIO asked for another "letter," OCASIO was

indicating to GISBON that OCASIO needed another address to send a package of cocaine to from Puerto Rico.

205.    On April 4, 2016 at approximately 11:38 a.m., OCASIO received an incoming call on **Target Telephone 5** from SHANKS (and GIBSON in background) utilizing (585) 406-6018. The following is a transcript of a pertinent portion of the call:

* * *

**Kelly SHANKS (KS)**: I said, "Is there a package today?"

**Jason GIBSON (JG)**: [Background: Nah!].

**ANGEL OCASIO (AO)**: No. Not today. Tomorrow. I guess the snow storm must fucken delayed shit.

**KS:** Okay. Well then, fuck him and all this bullshit. Can you give me the money for the package...for tomorrow, so I can go home to my family? And not get fucken beat up by him again? And then, tomorrow he still... you said the money was... for me, right? So, can you say "yes" out loud? I'll go meet [U/I][11] myself?

**KS:** I'm in charge that one, [U/I].

[Voices overlap]

**JG:** [Background: Is never supposed to be that. So what are you doing?].

**KS:** [Aside: No is not Jason. You can do whatever the fuck you want.] I'm just letting him be here for it.

**JG:** [Background: Fuck!].

**AO:** [Grunts] Why are y'all fighting? Come on, man!

[Pause]

**KS:** I was gonna wait tonight as soon as we get the packet, the money for the package is tomorrow?

---

[11] Portions of the intercepted communication that are unintelligible to the transcriber are denoted by "[U/I]."

**AO:** Whatever. I don't know what y'all doing. It's up to y'all. [Mumbles] I know, I... I... I gotta check the one left for you. Uh, uh... because I know he said that he was gonna send you those two (2); so let me... let me call and check it. I'll let you know.

**KS:** Okay, let me know.

**AO:** Okay. You gotta go to your parent 'cause it's going over there, so... I'll let you know.

**KS:** Yeah, I know. I'm gonna be living there anyway. So, that's... that's fine.

**AO:** I'll let you know in a few. Okay?

**KS:** Huh?

**AO:** I'll let you know in a few!

**KS:** Okay.

**AO:** Okay?

**KS:** Yes.

\* \* \*

206. I believe that when SHANKS asked, "Is there a package today?" SHANKS was asking OCASIO whether the package containing cocaine that was addressed to her parent's house in Lima, New York, was going to be delivered on that date. I further believe that when SHANKS stated, "Can you give me the money for the package...for tomorrow" and "you said the money was...for me, right?" SHANKS was asking OCASIO about the arrangements for her payment for accepting the package and delivering it to OCASIO.

207. On April 5, 2016, at approximately 5:03 p.m., OCASIO utilized **Target Telephone 5** to send an outgoing text message to SHANKS at (585) 406-6018 which stated, "You got to go to ur parents. Shit getting there 2marrow or thursday..don't txt no more about it I let u know. Pay attn. to ur phone especially in the am." I believe that when OCASIO

texted, "Shit getting there 2marrow or thursday" OCASIO was advising SHANKS that the package containing cocaine that was being sent to her parent's address in Lima, New York would be arriving on April 6, 2016 or April 7, 2016.

208.    During the course of the investigation, and based upon intercepted communications on **Target Telephone 4 and 5**, the investigative team identified a Priority Mail package addressed to "Jason GIBSON, 5908 Stonehill Rd, Lotr 10, Lakeville, New York" **(Premise 10)** that was mailed on April 4, 2016, in Puerto Rico and a package addressed to "Kelly SHANKS, 2119 Pond Rd, Lima, New York" that was mailed on that same date. The sender information for the package addressed to SHANKS at the Lima address was identical to the sender information for the Honeoye Falls package that was seized on April 5, 2016, and found to contain cocaine. The packages addressed to GIBSON and SHANKS were delivered by the USPS on April 7, 2016.

### April 7, 2016 at 12:42 p.m. and 1:05 p.m.

209.    On April 7, 2016, at approximately 12:42 p.m., OCASIO utilized **Target Telephone 5** to send another outgoing text message to SHANKS at (585) 406-6018 which read, "Just be patient it be there . Do not call it's in the truck." I believe that when OCASIO stated, "it's in the truck," he was advising SHANKS that the package containing the cocaine was in the mail truck for delivery to her at the Lima, New York address.

210.    On that same date, at approximately 1:05 p.m., OCASIO utilized **Target Telephone 5** to place on outgoing call to SHANKS at (585) 406-6018. The following is a transcript of that call:

**Kelly Shanks (KS):**  Hello?

**Angel Ocasio (AO):** Kelly?

**KS:**  Yo, can you hear me?

**AO:**  Yup.

**KS:**  Something is wrong with my phone, hello?

**AO:**  Yeah!

**KS:**  Yeah, I got it. I'm on my way.
[Voices overlap]

**AO:**  (Unintelligible) Alright. Jay already knows, tell'm umm, the groceries, the, the store, the grocery store on Lake Avenue.

**KS:**  Umm, some store on Lake Avenue, you said?

**AO:**  Yeah, same place! I don't wanna say the name!

**KS:**  What? The Tops?

**AO:**  Oh my God! I just told you I don't wanna say the name! Meet me at the Tops then. Yeah?

**KS:**  My bad! Whatever! Yeah.

**AO:**  [Laughs] Alright then.
[End of Call]

211.  I believe that when SHANKS stated, "Yeah, I got it. I'm on my way," SHANKS was informing OCASIO that she was in possession of a quantity of cocaine for OCASIO and that SHANKS was on her way to meet OCASIO. When OCASIO stated, "Alright. Jay already knows, tell'm umm, the groceries, the, the store, the grocery store on Lake Avenue," OCASIO was informing SHANKS that GIBSON should know the location that OCASIO was expecting to meet at to obtain the quantity of cocaine, but was also reminding SHANKS that the location was a grocery store on Lake Avenue in Rochester,

–116–

New York. When SHANKS stated, "The Tops," SHANKS was confirming that OCASIO wanted to meet at the Tops Friendly Markets grocery store, located at 710 Lake Avenue, Rochester, New York.

### April 7, 2016 at 1:10 p.m.

212. On that same date, at approximately 1:10 p.m., OCASIO received an incoming text on **Target Telephone 5** from GIBSON at (585) 447-4864, which read, "Eta, 15." On the same date, at approximately 1:28 p.m., OCASIO received another incoming text on **Target Telephone 5** from GIBSON utilizing (585) 447-4864, which read, "3 minutes." On the same date, at approximately 1:29 p.m., OCASIO received an incoming text on **Target Telephone 5** from SHANKS utilizing (585) 406-6018, which read, "Bout to pull in." I believe that when GIBSON stated, "Eta, 15," GIBSON was informing OCASIO that GIBSON and SHANKS would be arriving at Tops on Lake Avenue in Rochester, New York in approximately 15 minutes in order to provide OCASIO with a quantity of cocaine. I believe that when SHANKS stated, "Bout to pull in," SHANKS was informing OCASIO that SHANKS and GIBSON were about to arrive at the Tops on Lake Avenue in Rochester, New York in order to provide OCASIO with the quantity of cocaine.

213. On the same date, at approximately 1:28 p.m., TFO Bates physically observed OCASIO pull into the Tops Friendly Markets grocery store parking lot, located at 710 Lake Avenue, Rochester, New York (hereinafter the "Tops parking lot") driving **Vehicle 6** (Ford F-150) and drive to the east end of the parking lot. At approximately 1:30 p.m., TFO Bates physically observed **Vehicle 8** pull into the Tops parking lot and park next to **Vehicle 6**. TFO Bates observed GIBSON exit the rear of **Vehicle 8** attired in a hooded

sweatshirt, and put a covered box in the passenger side rear door of **Vehicle 6** before returning to **Vehicle 8**. TFO Bates then physically observed both vehicles travel to the southeast corner of the Tops parking lot and park side by side. The vehicles remained parked in the southeast corner of the Tops parking lot for approximately five minutes, at which time TFO Bates physically observed OCASIO depart in the northbound direction of Lake Avenue in **Vehicle 6**. TFO Bates then physically observed **Vehicle 8** depart in the northbound direction of Lake Avenue with two adult females in the front of the vehicle and GIBSON in the rear passenger area of the vehicle with a child.

214.   On the same date, at approximately 1:43 p.m., agents utilized a covert surveillance camera to observe OCASIO return to **Premise 5** (425 Lakeview Park) in **Vehicle 6**. Agents observed OCASIO pull into the driveway of **Premise 5** and enter the residence through the front door. Immediately afterward, agents observed OCASIO return to **Vehicle 6** retrieve a box from the passenger side rear door, and then walk back into the front door of **Premise 5** with the box.

215. Based on my training and experience, the substance of the above listed intercepted communications on April 7, 2016, records from the USPIS, the observations of the investigative team members on that date, and the information obtained during this investigation, I believe GIBSON and SHANKS received packages of cocaine in the mail at GIBSON's residence (**Premise 10**) and at SHANKS' parents' house at 2191 Pond Road, Lima, New York and then both transported the cocaine in **Vehicle 8** (Honda Odyssey) to the Tops Supermarket on Lake Avenue where OCASIO then met them in **Vehicle 6** and then brought the cocaine to **Premise 5**.

216.     Based on the foregoing, and following information contained in this affidavit, your affiant has probable cause to believe that JASON GIBSON and KELLY SHANKS are involved in an ongoing conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine in violation of Title 21, United States Code, Section 846. Your affiant further believes that there is probable cause to conclude that items listed on the annexed Schedule of Items to be Seized will be found at **Premise 10** (GIBSON's residence) and **Vehicle 8** (vehicle utilized by GIBSON), and that those items are evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 846, and Title 18, United States Code, Sections 924 (c)(1), 1956 & 1957.  Moreover, your affiant believes that it is likely that controlled substances will be located at **Premise 10** and **Vehicle 8** and that requiring law enforcement to knock and announce their presence before entering will allow the occupants the opportunity to destroy or dispose of the controlled substances and possibly arm themselves.   Accordingly, your affiant requests that execution of the warrant be exempt from the knock-and-announce requirement of 18 U.S.C. § 3109 and related legal authority. Additionally, because the members of this drug trafficking organization conduct their drug trafficking business at all hours of the day, your affiant requests permission to execute the search warrants at **Premise 10** and **Vehicle 8** at any time of the day or night.

<u>Premise 6:</u> 35 Oakman Street, Rochester, New York

<u>JOSE QUINTANA:</u> 21 U.S.C. 846 (Conspiracy to Possess with Intent To Distribute 5 kilograms or more of Cocaine and Cocaine base)

217.    The investigative team has determined that JUAN QUINTANA is involved in an ongoing conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine in violation of Title 21, United States Code, Section 846. The investigation has also determined that QUINTANA resides at 35 Oakman Street, Rochester, New York **(Premise 6)**. The investigative team confirmed that fact from physical surveillance, public records databases and other investigative techniques. The investigative team also believes that QUINTANA utilizes that location to store and distribute cocaine. On April 20, 2016, your affiant received records from Rochester Gas and Electric pursuant to a Federal Grand Jury subpoena that showed that the utilities at 35 Oakman Street have been in the name of Caroline Rivera since December 16, 2014. According to prisoner data reports, Caroline Rivera and Jose QUINTANA list Carmen Rivera as their mother, indicating that QUINTANA and Caroline Rivera are siblings through Carmen Rivera. CS-6 identified 35 Oakman Street **(Premise 6)** as the location where QUINTANA lives and **Premise 6** is listed as QUINTANA's residence in records

from the New York State Department of Motor Vehicles. Additionally, law enforcement have observed QUINTANA at **Premise 6** during the investigation and as recently as April 26, 2016. Furthermore, on January 14, 2016, Rochester Police Department Officer Dennis Andrews responded to 35 Oakman Street, Rochester, New York for a Identity Theft incident (CR# 2016-00015258). The victim for this incident was JOSE QUINTANA who stated that he resided at 35 Oakman Street (**Premise 6**) and provided the officer with a contact number of 585-939-5548. It should be noted that during this investigation agents intercepted QUINTANA utilizing this phone number to contact OCASIO on **Target Telephones 4 and 5**.

218.   On four separate occasions in the early morning hours during the week of April 10, 2016, DEA Special Agent William MacMillan observed QUINTANA's black Ford F-150 bearing New York State registration 35594-MH, registered to QUINTANA at **Premise 6** (35 Oakman Street) parked in the driveway of **Premise 6**. Further, QUINTANA has been observed driving this vehicle during the investigation.

219.   **Premise 6, 35 Oakman Street, Rochester, New York**, is a two and half story single family dwelling, yellow in color with white colored trim, located on the south side of Oakman Street. The numeral "35" is clearly affixed to the front porch of the north side of the dwelling. 35 Oakman Street is the location to be entered and the door is the eastern most door on the front side porch of the dwelling. This door leads you directly into the dwelling to be searched.

220.   The investigation has established probable cause to find that JOSE QUINTANA resides at **Premise 6** and utilizes **Premise 6** to store and process controlled

substances, including cocaine and cash proceeds. The following is a sample of various intercepted telephone conversations, and other investigative findings, which demonstrate JOSE QUINTANA'S drug trafficking activities:

### March 10, 2016 at 9:14 p.m.

221.    On March 10, 2016, at approximately 9:14 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing text to JOSE QUINTANA utilizing telephone instrument (716) 939-8297, which read, "How much of the b.rock each of this little one got on it?" At approximately 9:15 p.m., OCASIO received an incoming text on **Target Telephone 5** from QUINTANA, which read, "None...Y." At approximately 9:18 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing text to QUINTANA, which read, "There something wrong here. These never  come over . And all this u send me weight 1035.8. That's 36g over." At approximately 9:20 p.m., OCASIO received an incoming text message on **Target Telephone 5** from QUINTANA, which read, "Then that's my 31 I'm missing..." At approximately 9:21 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing text to QUINTANA, which read, "So how much u took out." QUINTANA immediately responded with a text message that read, "Its not from there its from the last ones."

222.    I believe that when OCASIO stated, "How much of the b.rock each of this little one got on it," OCASIO was asking QUINTANA how much cutting agent QUINTANA added to the quantity of cocaine that OCASIO was currently possessing. When QUINTANA stated, "None...Y," I believe that QUINTANA was informing OCASIO that QUINTANA did not add anything to the quantity of cocaine that OCASIO had. When OCASIO stated, "There something wrong here. These never  come over . And

all this u send me weight 1035.8. That's 36g over," I believe that OCASIO was telling QUINTANA that the quantity of cocaine weighed approximately 36 grams over the normal weight for a kilogram of cocaine. When QUINTANA stated, "Then that's my 31 I'm missing…," I believe that QUINTANA was telling OCASIO that he was missing a 31 gram quantity of cocaine and was assuming that the extra amount of cocaine OCASIO currently possessed was QUINTANA's missing cocaine. I believe that when OCASIO stated, "So how much u took out," OCASIO was asking QUINTANA how much cocaine QUINTANA removed. Finally, I believe that when QUINTANA stated, "Its not from there its from the last ones," QUINTANA was informing OCASIO that the missing 31 grams of cocaine was from a previous quantity of cocaine, not the cocaine that OCASIO was currently processing.

### March 10, 2016 at 9:22 p.m.

223.   On the same date, at approximately 9:22 p.m., OCASIO received an incoming telephone call on **Target Telephone 5** from QUINTANA utilizing telephone instrument (716) 939-8297. The following is a transcript[12] of that call:

**Angel Ocasio (AO):**   Yeah?

**Jose Quintana (JQ):**   *Listen, bro. It isn't that I added to it.* [Sighs] *It isn't that I added to it. It's…. you know the one that I just got rid of?*

**AO:**   Uh-huh.

**JQ:**   I was sure… I was missing *one (1)* and I wasn't sure.

[Voices overlap]

---

[12] Portions of the intercepted communication that were translated from Spanish to English are set forth in italics in the transcript.

**AO:**   Uh-huh.

**JQ:**   And I wasn't sure.   *I didn't... I wasn't...*   I wasn't sure how m... *what, I took from there and what I didn't take.*   And that's the one that I'm missing.   *Do you know what I mean?*

**AO:**   Yeah.

**JQ:**   Because...

[Voices overlap]

**AO:**   (Unintelligible) *the same as this because this* seems shaved off.

**JQ:**   Yeah, *but*, uh, *Angel* [Stutters] take... take it.   *It doesn't, it doesn't have* [Stammers] they don't know, they don't do nothing, they don't do nothing at all.   [Voices in the background] Nothing at all, bro.   *Check it and see, so you know.   I'm on my way there right now.*

[Voices overlap]

**AO:**   [U/I] it's good.   It's good.   It's orderly (phonetic).        [Voices in the background]

Everybody that had *that* they got complaint.

**JQ:**   So, I... I...I'll be there in a minute.   Give me a minute.   I'm doing something right [U/I].

**AO:**   But, I'm going to, uh, the thing.   I just wanted put it up and gotta, I gotta go see Lee. He gotta [Mumbles]   [U/I] *to bring something to him.   I'm going to bring this same stuff to him,* fuck that!

**JQ:**   Alright.

**AO:**   That shit is good, bro.   This shit is nothing wrong with it.

**JQ:**   Alright.

[Voices overlap]

**AO:**   Bye.

**JQ:**   Eh...

[End of Call]

224.    I believe that when QUINTANA stated, *"Listen, bro. It isn't that I added to it.* [Sighs] *It isn't that I added to it. It's....* you know the one that I just got rid of," QUINTANA was informing OCASIO that he did not add anything to the cocaine described in the previous text communications. I believe that when QUINTANA stated, "I wasn't sure how m... *what, I took from there and what I didn't take.* And that's the one that I'm missing. *Do you know what I mean,"* QUINTANA was stating that he believes that the extra quantity that OCASIO currently possessed was what QUINTANA was missing from a previous quantity of cocaine.

### March 13, 2016

225.    On March 13, 2016, at approximately 5:12 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing text to JOSE QUINTANA utilizing telephone instrument (585) 939-5548, which read, "Txt me from ur other phone asap wiz." At approximately 5:13 p.m., OCASIO received an incoming text on **Target Telephone 5** from QUINTANA utilizing telephone instrument (716) 939-8297, which read, "What's up." At approximately 5:16 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing text to QUINTANA on (716) 939-8297, which read, "2 big for that wiz." At approximately 5:16 p.m., QUINTANA responded with a text which read, "Give me a few."

226.    At approximately 5:30 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing text to QUINTANA on (716) 939-8297, which read, "He home what's a few pa.. yo we coming back over here." At approximately 5:37 p.m., QUINTANA responded, "30 mins." At approximately 5:38 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing text to QUINTANA at (585) 939-5548, which read, "He home." At

approximately 5:38 p.m., OCASIO received an incoming text message on **Target Telephone 5** from QUINTANA at (585) 939-5548, which read, "OK stop Txt my family phone...Elgoldo[13]."

227.    I believe that when OCASIO stated, "Txt me from ur other phone asap wiz," OCASIO was instructing QUINTANA to text OCASIO from (716) 939-8297 because QUINTANA preferred to use that phone when discussing narcotics transactions. I further believe that when OCASIO stated, "2 big for that wiz," OCASIO was telling QUINTANA that OCASIO needed two quantities of cocaine to complete a drug transaction. I believe that when QUINTANA stated, "Give me a few," QUINTANA was informing OCASIO that he would bring the two quantities of cocaine to OCASIO shortly. When OCASIO stated, "He home what's a few pa.. yo we coming back over here," OCASIO was telling QUINTANA that the customer was ready for the cocaine and was asking QUINTANA how long he would take to supply OCASIO with the cocaine. When QUINTANA stated, "30 mins," I believe that he was informing OCASIO that he would provide OCASIO the requested cocaine in approximately 30 minutes. When OCASIO stated, "He home," OCASIO was reminding QUINTANA that the customer was ready for the cocaine. I believe that when QUINTANA stated, "OK stop Txt my family phone," QUINTANA was instructing OCASIO to not discuss narcotics on telephone instrument (585) 939-5548.

### March 13, 2016 at 10:34 p.m.

228.    On the same date, at approximately 10:34 p.m., OCASIO received an

---

[13] "Elgoldo" is the electronic signature that QUINTANA utilizes in some electronic communications. Based upon the investigation to date, including the intercepted communications, agents have determined that QUINTANA goes by the Spanish nickname "Gordo" pronounced "Goldo."

incoming call on **Target Telephone 5** from QUINTANA utilizing telephone instrument

(716) 939-8297. The following is a transcript of that call:

**Angel Ocasio (AO):**   Hello.

**Jose Quintana (JQ):**   You here already?

**AO:**  No. I'm leaving now.

**JQ:**   You leaving now?

[Voices overlap]

**AO:**   Yo, the nigga called me back, yo.

**JQ:**   What happened?

**AO:**   I don't know. Something that ain't come alright. I don't know. What thing you gave him?

**JQ:**   I gave him the new one! It's the same thing as yesterday.

**AO:**   I know, that's what I told him.   Alright.  (Unintelligible)

[Voices overlap]

**JQ:**   I'm... Listen to me...

**AO:**   Hmm?

**JQ:**   Do you have the money from the other day?

**AO:**   Uh?

**JQ:**   Is he giving you the money from the other days?

**AO:**   No, didn't he give it you yesterday?

**JQ:**   Hmm, no, he told, uh, this time he told me. He just gave me, uh, money for a big one and a little one today.

**AO:**   Uh huh.

**JQ:**   Did, did, didn't he owe you a big one?  The one...

[Voice overlap]

**AO:**   No...

**JQ:**   ... I gave him the other day.

**AO:**   Oh, hasn't he given it to you?

**JQ:**   No, unless he gave it to me, he gave it to me today then.

**AO:**   Yeah, he was supposed to give it you then.

[Voices overlap]

**JQ:**   But...

**AO:**   (Unintelligible) he had everything.

**JQ:**   Alright.  Yeah.  Alright, so it's the two (2).  The only thing he owes is what he's got now, the three (3) he has now.

**AO:**  Okay then.  What was I going to tell you... okay I'll be there in a few Pa.

**JQ:**  Bye.

[End of Call]

229.    I believe that when OCASIO stated, "Yo, the nigga called me back, yo" and "Something that ain't come alright...What thing you gave him?" OCASIO was indicating that someone QUINTANA provided cocaine to called and complained about the cocaine and was asking QUINTANA what cocaine he provided to the person.  I further believe that when QUINTANA stated, "I gave him the new one!  It's the same thing as yesterday," QUINTANA was telling OCASIO which cocaine he distributed and was indicating that it was the same cocaine QUINANA had distributed to this person the day before.  I further believe that when QUINTANA stated, "Is he giving you the money from the other days,"

QUINTANA was asking OCASIO if the person QUINTANA and/or OCASIO previously supplied cocaine to was going to provide OCASIO with the money for the cocaine. When OCASIO stated, "No, didn't he give it you yesterday," I believe that OCASIO was asking if QUINTANA had collected the money from the person. I further believe that when QUINTANA stated, "He just gave me, uh, money for a big one and a little one today," QUINTANA was telling OCASIO what quantities of cocaine the person had paid for. I believe that when QUINTANA stated, "The only thing he owes is what he's got now, the three (3) he has now," QUINTANA was still discussing how much the person owes QUINTANA and OCASIO, and determined that the individual owes them for three packages of an unknown quantity of cocaine that the person currently possesses.

### March 14, 2016 at 6:17 p.m.

230. On March 14, 2016, at approximately 6:17 p.m., OCASIO received an incoming call on **Target Telephone 5** from QUINTANA utilizing telephone instrument (585) 309-6824. The following is a transcript of a pertinent portion of that call:

\* \* \*

**Angel OCASIO [AO]:** What we're gonna, uh, wiz [PH] got clean? They don't owe that, right?

**Jose QUINTANA [JQ]:** Yeah he owes us. You gotta asked him. *I don't know if that day he paid me... I know he paid me the, the, the small one from the day before. And, he gave me two thousand four hundred (2400), and I don't know if it was a thing he gave me or if he owed you that.*

AO: Uh-huh.

JQ: *You get it?*

[Voices overlap]

**AO:**   *What about for yesterday and the day before, did he pay it all?*

**JQ:**   *Angel, the only thing he gave me was three thousand fou (3000)...* I mean, yeah, *three thousand four hundred (3400) pe, three thousand (3000)... three thousand three hundred (3300) pesos.* He owe me, uhm, three hundred dollars ($300). He told me that.

**AO:**   Uh-huh

**JQ:**   So, you ask him, he's gonna tell you. *Because he gave me, he gave me three thousand three hundred (3300) but... two thousand (2000), thousand one hundred (1100) was for, uhm, thousand two hundred (1200) was for...*

[Voices overlap]

**AO:**   *For...*

**JQ:**   *... for the small one I gave him the day before.*

**AO:**   Uh-huh.

**JQ:**   *Remember? You said: "take it, take the money he's going to give you today and I'll get that from the money you owe me."*

**AO:**   Okay.

**JQ:**   *You get it? But, uh, uh, I don't if he paid me that or if he owed you one.  Get it?*

**AO:**   *What color did you see at the store that day? Do you remember?*

**JQ:**   Yeah, the fifth (5th).

**AO:**   (Unintelligible) what day?

**JQ:**   *Which?* The other day when I was with Caro?

**AO:**   Yeah.

**JQ:**   *Yes, he paid, he paid me for the day before. And, he took one and told me: "I'll call you." And I said: "No just call Angel". Remember you said: "just take the money he's going to give you and, and he's going to give me from there." So, he gave me the money he owed me from that one...*

**AO:**   Uh-huh

**JQ:**   *... and money from some big ones I left with him, so he has to give me the money for a small one and three hundred (300) pesos.*   [Breath heavily]

**AO:**   Okay, bye.

**JQ:**   Okay?

**AO:**   Okay, bye.

**JQ:**   Bye.

**AO:**   [Sighs]

[End of Call]

231.   Based on my training and experience, the substance of this and other intercepted communications, and the information contained in the affidavits submitted with the prior applications referenced above, I believe that when OCASIO stated, "wiz [PH] got clean? They don't owe that, right?" he was asking QUINTANA if a person they supplied cocaine to owed OASCIO and QUINTANA for a quantity of cocaine. When QUINTANA stated, "Yeah he owes us. You gotta asked him. *I don't know if that day he paid me... I know he paid me the, the, the small one from the day before. And, he gave me two thousand four hundred (2400), and I don't know if it was a thing he gave me or if he owed you that,*" QUINTANA was telling OCASIO that a customer provided QUINTANA with $2,400 for a quantity of cocaine. Based on my training and experience, $2,400 is consistent with the pricing for a 62 gram quantity of cocaine in the City of Rochester. I believe that during the conversation that continued thereafter, QUINTANA and OCASIO discussed various currency amounts in an attempt to determine the amount owed to them for previously provided cocaine.

### March 16, 2016 at 2:14 p.m.

232.   On March 16, 2016, at approximately 2:14 p.m., OCASIO utilized **Target**

Telephone 5 to place an outgoing text to JOSE QUINTANA utilizing (716) 939-8297, which read, "Just left ur house." At approximately 2:14 p.m., OCASIO received an incoming text message on Target Telephone 5 from QUINTANA, which read, "I know I'm up stairs." Agents utilized information provided from a GPS tracking device placed on Vehicle 6 to observe that OCASIO was in close proximity of Premise 6 (35 Oakman Street) between approximately 2:11 p.m. and 2:19 p.m. on March 16, 2016. Additionally, cell site data provided for Target Telephone 5 during these communications to confirmed that Target Telephone 5 was in the vicinity of Premise 6 (35 Oakman Street) at the time OCASIO stated that he had "just left" QUINTANA's house.

### March 18, 2016 at 6:23 p.m. 6:29 p.m.

233. On March 18, 2106, at approximately 6:23 p.m., OCASIO received an incoming text on Target Telephone 5 from QUINTANA utilizing (716) 939-8297 that read, "8 small." At 6:24 p.m, OCASIO texted back, "Nope." QUINTANA then texted, "What" and OCASIO replied, "Gone." At 6:26 p.m., QUINTANA, utilizing the same phone texted, "Everything" and OCASIO replied, "Na, I'm not g oing over there I'm gttg ready to bounce." At 6:28 p.m. and 6:29 p.m., QUINTANA texted OCASIO "Damn nigga...U serious," "Its not going to take u long," and "Primo done and need more." I believe that when QUINTANA texted "8," he was requesting a quantity of cocaine from OCASIO. I further believe that when OCASIO replied, "I'm not g oing over there I'm gttg ready to bounce," OCASIO was informing QUINTANA that he did not have time to take cocaine to QUINTANA because he was going somewhere. Finally, I believe that when QUINTANA said, "Primo done and need more," QUINTANA was referring a drug customer that had

finished selling a quantity of cocaine and needed more to sell.

### March 27, 2016 at 10:13 p.m.

234.    On March 27, 2016, at approximately 10:13 p.m., OCASIO received an incoming text on **Target Telephone 5** from QUINTANA utilizing (716) 939-8297, which read, "I'm at Caro's...This looks like the one u gave u back..."  OCASIO immediately responded via text stating, "It wasn't open was it."  At approximately 10:14 p.m., OCASIO utilized **Target Telephone 5** to place another outgoing text to QUINTANA, which read, "If it was that is the one dum dum."  At approximately 10:15 p.m., QUINTANA sent a text message to OCASIO that read, "No."  At approximately 10:16 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing text to QUINTANA, which read, "Ow well is not that beige it got like middle finger up."  At approximately 10:17 p.m., QUINTANA responded to OCASIO via text message that read, "No middle finger."   OCASIO immediately responded by text which read, "Its a crown."  At approximately 10:20 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing text to QUINTANA, which read, "That didn't come back from Juan dude kept those. I got that here from my boy ."  At approximately 10:21 p.m., QUINTANA responded by texting, "But its a lil moist."  At approximately 10:22 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing text to QUINTANA, which read, "Good."

235.    I believe that during this text message exchange, QUINTANA and OCASIO are discussing the quality of a quantity of cocaine.  Specifically, I believe that when QUINTANA stated, "This looks like the one u gave u back...," QUINTANA was informing OCASIO that the quantity of cocaine QUINTANA was currently possessing

looked like a quantity of cocaine that QUINTANA had previously returned to OCASIO. When OCASIO stated, "It wasn't open was it," and "If it was that is the one dum dum," OCASIO was asking QUINTANA whether the packaging for the quantity of cocaine that QUINTANA was referring to was open. When OCASIO stated, "Ow well is not that beige it got like middle finger up," OCASIO was referring to the color of the cocaine and the stamp located on a kilogram quantity of cocaine. I believe that when QUINTANA stated, "No middle finger" and "Its a crown," QUINTANA was advising OCASIO that the stamp on the kilogram quantity of cocaine was not a middle finger, but was actually shaped like a crown. When OCASIO stated, "I got that here from my boy," OCASIO was informing QUINTANA where he received that quantity of cocaine from and when QUINTANA stated, "But its a lil moist," QUINTANA was describing the quality of the cocaine.

### April 7, 2016 at 9:44 p.m.

236.    On April 7, 2016, at approximately 9:44 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing text message to two telephones utilized by QUINTANA, (716) 939-8297 and (585) 939-5548, which read, "Check out WhatsApp Messenger for your smartphone.  Download it today from https://whatsapp.com/dl/."  I believe that when OCASIO stated, "Check out WhatsApp Messenger for your smartphone.  Download it today from https://whatsapp.com/dl/," he was instructing QUINTANA to download WhatsApp, a messaging application on smartphones that allows users to send encrypted messages to other users of the application. It should be noted that on April 5, 2016, several national news outlets reported that WhatsApp had enabled end-to-end encryption in its application that ensured that only the sender and the receiver of a message could view the

message. OCASIO has also sent this identical message to at least six other contacts, and has also instructed additional co-conspirators to download the Whatsapp Messenger application during phone calls. Based on my training and experience, OCASIO wants to use the WhatsApp application with his co-conspirators in order to encrypt drug related communications from law enforcement. I believe that OCASIO sent this message instructing QUINTANA to download the application on two telephone instruments that QUINTANA uses to frequently communicate with OCASIO in an attempt to shield their drug-related conversations from law enforcement interception. Agents have not intercepted wire or electronic communications from OCASIO concerning the WhatsApp application to individuals not believed to be involved in OCASIO's drug distribution and money laundering activities.

237. Based on the foregoing, and following information contained in this affidavit, your affiant has probable cause to believe that JOSE QUINTANA is involved in an ongoing conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine in violation of Title 21, United States Code, Section 846. Your affiant further believes that there is probable cause to conclude that items listed on the annexed Schedule of Items to be Seized will be found at QUINTANA's residence, **Premise 6,** and that those items are evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 846, and Title 18, United States Code, Sections 924 (c)(1), 1956 & 1957. Moreover, your affiant believes that it is likely that controlled substances will be located at **Premise 6** and that requiring law enforcement to knock and announce their presence before entering will allow the occupants the opportunity to detroy or dispose of the controlled

–135–

substances and possibly arm themselves. Accordingly, your affiant requests that execution of the warrant be exempt from the knock-and-announce requirement of 18 U.S.C. § 3109 and related legal authority. Additionally, because the members of this drug trafficking organization conduct their drug trafficking business at all hours of the day, your affiant requests permission to execute the search warrants at **Premise 6** at any time of the day or night.

## Premise 7: 50 Bennett Street, Rochester, New York

238.   The investigative team has determined that SHAVONNE RIVERA is involved in assisting OCASIO with his drug and money laundering activities. The investigative team has determined that RIVERA resides at 50 Bennett Street, Rochester, New York **(Premise 7)** and believes that RIVERA stores cash drug proceeds for OCASIO at that location. The investigative team confirmed that fact from physical surveillance, public records databases and other investigative techniques. On April 20, 2016, your affiant received records from Rochester Gas and Electric pursuant to a Federal Grand Jury subpoena that showed that the utilities at 50 Bennett Street have been in RIVERA's name since December 31, 2015. (585) 709-7237, which is the telephone utilized by RIVERA during this investigation, is listed as the contact number for RIVERA on the RG&E documents. Subscriber information for (585) 709-7237 is in the name of "Luz Bethancourt" at 50 Bennett Avenue **(Premise 7)**. According to records of the Monroe County Clerk's Office, **Premise 7** has been owned by Edvin E. and Maria C. Bethancourt since May 15, 1997. Additionally, on April 25, 2016, at approximately 1:16 p.m., OCASIO placed an

outgoing call to RIVERA utilizing **Target Telephone 4**. During the call, OCASIO indicated that he was RIVERA's residence. GPS data for **Target Telephone 4** and **Vehicle 6** (Ford F150) indicated that **Target Telephone 4** and **Vehicle 6** were at **Premise 7** (50 Bennett Avenue) at the time of the call.

239. **Premise 7, 50 Bennett Street, Rochester, New York**, is an one and half story single family dwelling, light yellow in color. The numeral "50" is clearly affixed to the west side of the dwelling. 50 Bennett Avenue is the location to be entered and the door is the only door on the west side of the dwelling. This door leads you directly into the dwelling to be searched.

240. The investigation has established probable cause to find that SHAVONNE RIVERA is involved in laundering cash drug proceeds to facilitate ANGEL OCASIO's drug trafficking activities and that RIVERA resides at **Premise 7**. The following is a sample of various intercepted telephone conversations, and other investigative findings, which demonstrate SHAVONNE RIVERA'S involvement with ANGEL OCASIO'S drug trafficking activities:

### March 14, 2016

241. On March 14, 2016, at approximately 12:23 p.m., OCASIO utilized **Target Telephone 5** to place an outgoing call to RIVERA utilizing (585) 709-7237. During the ensuing conversation, OCASIO stated, "I need you to come to my house" and "I'll give you the combination of my thing so you can take out, uh, [U/I] $9,000, take $9,100 hundred dollars and go pay for two (2) more cars." RIVERA then replied, "Alright." During the conversation, OCASIO instructed RIVERA to let him know when she is at his house and

RIVERA agreed. On that same date at 12:29 p.m., RIVERA, utilizing (585) 709-7237, sent OCASIO a text message on **Target Telephone 5** which stated, "Ok.. let the cake finish in the oven I be on my way." On that same date, at approximately 12:31 p.m., OCASIO utilized **Target Telephone 5** to send an outgoing text message to RIVERA at (585) 709-7237 which read, "K. Take out 10k not in big bills in 20s." At 12:32 p.m., OCASIO sent another text message to RIVERA which read, "Bayamon Auto Mall Inc. Buyer # 174672 2015 Nissan Sentra Stock # 16846748 $4045.00 2015 Mitsubishi Lancer Stock # 1633420 $3738.00."

242.   On that same date, at 12:39 p.m., OCASIO utilized **Target Telephone 5** to send RIVERA a text message that read, "combo to my sfe is press clear 86844. Erase afr u done." At 2:00 p.m., OCASIO utilized **Target Telephone 4** to send RIVERA a text message that read, "u made it." At 2:02 p.m., RIVERA replied, "Yes i am heading there now." At 2:10 p.m., RIVERA sent a text message to OCASIO on **Target Telephone 5** that read, "What I do with rest of cash it was too much." At 2:11 p.m., RIVERA sent a text message to OCASIO on **Target Telephone 4**, which read, "Total was 7803." At 2:16 p.m. OCASIO utilized **Target Telephone 4** to text RIVERA, "with ur 100 7900." At 2:41 p.m., RIVERA sent OCASIO a text message on **Target Telephone 4**, which read, "Done."

243.   As indicated at paragraph 184 above, Bayamon Auto Mall was the recipient name of one of the six Priority Mail Parcels that were searched on April 6, 2016, each containing approximately $9,000 in cash. Moreover, six similar Priority Mail parcels were sent to Bayamon Auto Mall from 425 Lakeview Park (**Premise 5**) between January 24, 2016 and April 13, 2016. Based upon my training and experience, I am aware that it is very

expensive to transport vehicles to and from the Island of Puerto Rico, as a result, prices for vehicles sold in Puerto Rico tend to be more expensive than prices for the same or similar vehicles in the continental United States, including Rochester, New York. Based upon my training and experience, the content of the intercepted wire and electronic communications and the investigation to date, including the records from the USPS and the Priority Mail search warrants executed in this case, I believe that during the communications on March 14, 2016, OCASIO was instructing RIVERA to take cash proceeds from the sale of cocaine and send them to Puerto Rico as payment for cocaine. I believe that when OCASIO indicated that he needed RIVERA to "go pay for two (2) more cars," he was using coded language to refer to a quantity of cocaine. I further believe that when he texted, "with ur 100 7900," he was referring to the $100 he was going to pay RIVERA for helping him.

### March 29, 2016

244.    On March 29, 2016, at 11:06 a.m. OCASIO utilized **Target Telephone 4** to send an outgoing text message to RIVERA at (585) 709-7237 which read, "I need to go pay some cars . I'm going send u the info .let me know when u can come pick up the money. I gut u bby?" At 11:07 a.m., OCASIO sent a second text message that read, "Jo i need you pay this for me today please; Bayamon Auto Mall Inc., 2012 Hyunday Genesis, stock # 16313321, $2,225, 2015 Sea Doo, Stock # 16976134, $6,698. So they will give me the money here."

245.    On March 29, 2016, from approximately 12:19 p.m. to 12:48 p.m, OCASIO utilized **Target Telephone 5** to place and receive a series of text messages to and from Shavonne RIVERA at telephone instrument (585) 709-7237. The text messages are as

follows. OCASIO stated, "Got get paid b4 230." RIVERA replied, "I am home if u want come pick me up" and "Bro just bring the money my car is set." OCASIO then texted, "Who taking to get it" and RIVERA replied, "Jose." OCASIO then stated, "Ok come by house I'm going get it togather ok. Text me when u close" and "Smell like a good idea. What I got left that u have babe." RIVERA replied, "700."

246.   I believe that when OCASIO texted, "Got get paid b4 230" OCASIO was telling RIVERA that she had to get money orders before 2:30 p.m. I further believe that when RIVERA stated, "I am home if u want come pick me up" and "Bro just bring the money my car is set," RIVERA was telling OCASIO that her vehicle was ready to be picked up and that she wanted OCASIO to bring the money to her house located at **Premise 7** (50 Bennett Street). I further believe that when OCASIO said, "Ok come by house I'm going get it together ok. Text me when u close," OCASIO was telling RIVERA that he was going to get the money ready for her to pick up and for RIVERA to come to his residence (**Premise 5**) to pick up the money. I further believe that when OCASIO said, "What I got left that u have babe," OCASIO was asking RIVERA how much money she still had that OCASIO had given to her before. I believe that when RIVERA replied, "700," RIVERA was indicating that she had $700 remaining with her at **Premise 7**.

247.   On the same date, at approximately 1:48 p.m., OCASIO received an incoming text message on **Target Telephone 5** from RIVERA at telephone instrument (585) 709-7237 which read, "2225 n 6690." OCASIO immediately replied "Yes." I believe that when RIVERA texted, "2225 n 6690" and OCASIO replied, "Yes," RIVERA was asking him if he wanted her to purchase money orders in the amount of $2,225 and $6,690 and

OCASIO confirmed he wanted the money orders in those amounts when he replied to Rivera, "Yes."

248. Based on the intercepted communications on **Target Telephone 5**, agents established surveillance in the vicinity of **Premise 5** (425 Lakeview Park). At approximately 1:43 p.m., agents utilized a covert surveillance camera to observe a female matching the description of Shavonne RIVERA exit a maroon colored sedan and enter **Premise 5**. Special Agent Smith observed the New York registration of the maroon sedan as EAN-2081. A Department of Motor Vehicle check on New York Registration EAN-2081 revealed that the 2011 maroon Kia Optima is registered to Hugo Bethancourt of 50 Bennett Street, Rochester, New York (**Premise 7**). At approximatley 1:44 p.m., Special Agent Smith observed RIVERA exit **Premise 5** and enter the maroon Optima and depart the location. Special Agent Smith observed RIVERA arrive and park at the Top's Supermarket on Lake Avenue, Rochester, New York. RIVERA exited the maroon Optima and entered the supermarket. Special Agent Smith confirmed that the driver of the maroon Optima was Shavonne RIVERA and Special Agent Smith observed RIVERA at the Citizens Bank counter where Special Agent Smith observed her counting a large sum of cash. Subpeonaed information received from Citizens Bank revealed that at this date and time, RIVERA received two cashiers checks made out to Insurance Auto Auction in the amount of $2,225 and $6,690. At approxiamtely 2:10 p.m., Special Agent Smith observed RIVERA exit the supermarket and enter the maroon Optima and depart the area, at this time surveillance lost sight of RIVERA. At 2:31 p.m., RIVERA sent a text message to OCASIO on **Target Telephone 4** which read, "Done."

**April 3, 2016 at 3:30 p.m.**

249.   On April 3, 2016, at approximately 3:30 p.m., OCASIO utilized **Target
Telephone 4** to place an outgoing call to RIVERA, on telephone instrument (585) 709-7237.
The following is a transcript of that call:

**Shavonne Rivera (SR):**      [Aside:  You told me something.  Look in the ear.]

**Angel Ocasio (AO):** Uh?

**SR:**    What are you doing?

**AO:** I'm... calculating something.  Shovanne?

**SR:**    What baby?

**AO:** Last month, when we... that over there, right?  Uh, umm, we went, umm what date
was it that we go to, the fourth (4th) right?  The beginning of the month?

**SR:**    Yeah.

**AO:** Right?

**SR:**    Yeah.  Yup.  Why, what happened?

**AO:** Hmm, just calculating a bit.  He owe me, he owe me, he gotta credit me something.

**SR:**    Hey, are you going out?

**AO:** Where?

[Voices overlap]

**SR:**    So you can come to mom's house to eat some ears.

**AO:** I gotta go to Home Depot and Lowe's because I'm going to buy the stuff for the kitchen
later.  I'm waiting for the black guy to call me shortly.

**SR:**    That's... that's fine then.

**AO:** You know, but do you remember if we just... dropped off?

**SR:**    Last month we went to [unintelligible] we went to drop off, and then we went to

–142–

drop off and take off.

**AO:** On the fourth (4th) we went there... to...

**SR:**   Drop, drop.

**AO:** You sure?

**SR:**   Yeah, positive.

**AO:** It was just me and you, right?

**SR:**   Yup, it was just me and you.

**AO:** And... and Gordo, right?

**SR:**   No, it was just me and you, because then, then is with me, you, and Leida. [Pause] With Angelica [unintelligible].

**AO:** [unintelligible] that was the fourth (4th), right?

**SR:**   Hm-hm

**AO:** That weekend.

**SR:**   Hm-hm

**AO:** Okay, bye.
[End of Call]

250.   I believe that when OCASIO stated, "I'm... calculating something" and "Last month, when we... that over there, right?  Uh, umm, we went, umm what date was it that we go to, the fourth (4th) right," he was asking RIVERA the date when they sent money to his cocaine source of supply in Puerto Rico.  I further believe that when OCASIO stated, "Hmm, just calculating a bit.  He owe me, he owe me, he gotta credit me something," OCASIO was calculating the amount of money he has sent to his cocaine supplier versus the amount of cocaine that he has received and OCASIO was telling RIVERA that his calculations indicate that OCASIO's supplier owes him cocaine.

–143–

251. Based on my training and experience, the substance of the above listed intercepted communications on March 29, 2016 and April 3, 2016 the observations of the investigative team members on that date, and the information obtained during this investigation, I believe RIVERA helps OCASIO launder his money back to his cocaine source in Puerto Rico and stores drug proceeds at **Premise 7**.

252. Based on the foregoing, and following information contained in this affidavit, your affiant has probable cause to believe that SHAVONNE RIVERA is involved in assisting OCASIO and others with drug activities, including sending payment for cocaine. Your affiant further believes that there is probable cause to conclude that RIVERA resides at **Premise 7** (50 Bennett Avenue) and that items listed on the annexed Schedule of Items to be Seized-Books and Records will be found at **Premise 7** and that those items are evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 846, and Title 18, United States Code, Sections 924 (c)(1), 1956 & 1957.

Premise 9: 155/157 Burrows Street-Upstairs Apartment, Rochester, New York

**KALEAF BALL a/k/a "Leaf" - 21 U.S.C. 846 (conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine and cocaine base)**

253.   The investigation has established probable cause to find that KALEAF BALL is involved in an ongoing conspiracy to distribute controlled substances, including five kilograms or more of cocaine, in violation of Title 21, United States Code, Section 846. Moreover the investigative team has determined that BALL resides at 155/157 Burrows Street, Upstairs Apartment, Rochester, New York (**Premise 9**).  The investigative team confirmed that fact from physical surveillance, public records databases and other investigative techniques.  On April 24, 2016, public records from the City of Rochester indicate that the property at 155 Burrows Street, Rochester, New York is a two family residence.  On April 20, 2016, your affiant received records from Rochester Gas and Electric pursuant to a Federal Grand Jury subpoena that showed that two separate utilities are serviced at that address and pursuant to RG&E records, the two apartments are designated as 155 Burrows Street and 157 Burrows Street, Upstairs.  According to RG&E, the utilities for 157 Burrows Street-Upstairs have been in the name of KALEAF BALL since March 22, 2012.   On August 3, 2013, BALL provided 155 Burrows Street, Rochester (without reference to which apartment) as his address to RPD, which was documented on a Domestic Incident Report (2103-00220302).  Further, GPS data for **Target Telephone 3,**

utilized by BALL, revealed that BALL's cellular telephone was frequently in the area of **Premise 9** during early morning hours and late at night between March 8, 2016, and April 6, 2016. For example, **TARGET TELEPHONE 3** was found to be in the area of **Premise 9** on the following dates:

| Start Date | Start Time | End Date | End Time | Approx. Duration |
|---|---|---|---|---|
| 4/3/2016 | 10:41 pm | 4/4/2016 | 8:59 am | 10 hours |
| 4/2/2016 | 9:36 pm | 4/3/2016 | 9:40 am | 12 hours |
| 4/1/2016 | 11:28 pm | 4/2/2016 | 6:21 am | 7 hours |
| 3/28/2016 | 1:24 am | 3/28/2016 | 7:35 am | 6 hours |

254.   **Premise 9, 155/157 Burrows Street-Upstairs, Rochester, New York**, 155/157 Burrows Street is a two story residence with green siding and white trim located on Burrows Street in Rochester, New York between Otis Street and Haloid Street. The residence is a two family residence, with 155 Burrows Street commonly identified as the downstairs apartment and 157 Burrows Street commonly identified as the upstairs apartment. The front door of this residence is white and faces East toward Burrows Street with the number 155 in black numbers adjacent to the door to the left and 157 in black numbers to the right of the front door. The apartment to be searched is the upstairs apartment.

255.   The investigation has established probable cause to find that KALEAF BALL is involved in an ongoing conspiracy to distribute controlled substances, including five kilograms or more of cocaine and cocaine base, in violation of Title 21, United States Code,

Section 846. The investigation has also established probable cause that BALL resides at and maintains **Premise 9**. The following is a sample of various intercepted telephone conversations, and other investigative findings, which demonstrate KALEAF BALL'S drug trafficking activities:

### February 8, 2016 at 2:55 p.m.

256.    On February 8, 2016, at approximately 2:55 p.m., SMITH utilized **Target Telephone 1** to place an outgoing telephone call to BALL on **Target Telephone 3**. The following is a transcript of that call:

**Dennis Smith (DS):** What's going on with you man?

**Kaleaf Ball (KB):** Hello.

**DS:** Yo.

**KB:** Yo.

**DS:** I'm over here by you; where you you on Weyl?

**KB:** You outside?

**DS:** I don't know I'm ah shit I'm right...

**KB:** Yeah, I'm right where you said though yeah.

**DS:** Alright I'll see you about three minutes.

**KB:** Alright.
[End of Call]

257.    Based on my training and experience, the substance of this and other intercepted communications, and the information contained in the affidavits submitted with prior applications referenced above, I believe that when SMITH said, "where you you on Weyl?" SMITH was asking BALL if BALL was still at a residence on Weyl Street. As set

forth at paragraph 53 in the affidavit in support of the January 22, 2016 order, SMITH is the owner of the property at 111 Weyl Street, although it cannot be determined at this time if that was the exact location on Weyl that SMITH was referring to. I further believe that when BALL said, "Yeah, I'm right where you said," BALL was confirming for SMITH that he was on Weyl Street. I believe that when SMITH stated, "I'll see you about three minutes," SMITH was indicating to BALL that he would be stopping by. I further believe that the purpose and context of this communication between SMITH and BALL was for SMITH to confirm BALL's whereabouts so that SMITH could speak with BALL in person.

### February 8, 2016 at 5:01 p.m.

258. On the same date, at approximately 5:01 p.m., SMITH utilized **Target Telephone 1** to place an outgoing telephone call to SAMPEL on **Target Telephone 2.** The following is a transcript of that call:

**Juan Sampel (JS):** What's going on Mister?

**Dennis Smith (DS):** What's going on Big Dog?

**JS:** Nothing much, just got out of work.

**DS:** Alright, do you have an ETA?

**JS:** Say what?

**DS:** Remember, remember the other guy that (unintelligible) might have called me man.

**JS:** Oh, word?

**DS:** Yeah.

**JS:** What the fuck?

**DS:** Yeah.

**JS:** Yeah, weird, shit man, he just uh, he got the call the other day that's when I called you so, I don't think, I don't think he's around right now.

**DS:** Ok, I'm about to shoot you a text.

**JS:** Yeah ok.

**DS:** Alright.

**JS:** Yup.
[End of Call]

259.   Based on my training and experience, the substance of this and other intercepted communications, and the information contained in the affidavits submitted with prior applications referenced above, I believe that when SMITH stated, "remember the other guy that (unintelligible) might have called me man," SMITH was using a cryptic code to tell SAMPEL that SMITH's co-conspirator (BALL) who wanted to purchase cocaine on February 2, 2016, contacted SMITH looking to purchase cocaine and SMITH wanted to know if SAMPEL had cocaine to sell.  I further believe that when SAMPEL stated, "I don't think he's around right now," SAMPEL was advising SMITH that SAMPEL was unsure if SAMPEL's cocaine source of supply was available at that time.


**February 8, 2016 at 5:06 p.m.**

260.   On that same date, at approximately 5:06 p.m., SMITH utilized **Target Telephone 1** to place an outgoing text to SAMPEL on **Target Telephone 2**, which read, "eta cause if soon I got him if not he got to wait let me know as soon as possible."  Based on my training and experience, the substance of this and other intercepted communications, and the information contained in the affidavits submitted with the prior applications

referenced above, I believe that when SMITH texted "eta cause if soon I got him if not he got to wait let me know as soon as possible," he was asking SAMPEL to let him know quickly if SAMPEL's cocaine source of supply was available with cocaine for SMITH's co-conspirator, previously identified as BALL.

### February 8, 2016 at 5:17 p.m.

261.   On that same date, at approximately 5:17 p.m., **Target Telephone 1** received an incoming text from SAMPEL on **Target Telephone 2**, which read, "He can do one room tonight and by thurs he can finish the rest if not u can work it and u can be set for thur." Based on my training and experience, the substance of this and other intercepted communications, and the information contained in the affidavits submitted with the prior applications referenced above, I believe that when SAMPEL stated, "He can do one room tonight and by thurs he can finish the rest," SAMPEL was using cryptic code to confirm to SMITH that SAMPEL's cocaine source of supply has one kilogram of cocaine available for SMITH to give to his co-conspirator BALL and that by Thursday, February 11, 2016, the source of supply will be able to provide SMITH with the additional cocaine that BALL desires.

### February 8, 2016 at 5:39 p.m.

262.   At approximately 5:39 p.m., SMITH utilized **Target Telephone 1** to place an outgoing text to SAMPEL on **Target Telephone 2**, which read, "hit me ill have it tonight." Based on my training and experience, the substance of this and other intercepted communications, and the information contained in the affidavits submitted with the prior applications referenced above, I believe that when SMITH stated, "hit me ill have it

tonight," SMITH was confirming to SAMPEL that SMITH will have money will for the
kilogram of cocaine referenced in the previous text message.

### February 8, 2016 at 5:46 p.m.

263.    On that same date, at approximately 5:46 p.m., **Target Telephone 1** received
an incoming text from SAMPEL on **Target Telephone 2**, which read, "I'll pick up paint
sprayer should take in hr." Based on my training and experience, the substance of this and
other intercepted communications, and the information contained in the affidavits
submitted with the prior applications referenced above, I believe that when SAMPEL
stated, "I'll pick up paint sprayer should take in hr," SAMPEL was using cryptic code to
notify SMITH that it would take SAMPEL an hour to obtain the kilogram of cocaine from
SAMPEL's source of supply. At approximately 5:47 p.m., SMITH utilized **Target
Telephone 1** to place an outgoing text to SAMPEL on **Target Telephone 2**, which read,
"ok," confirming to SAMPEL that SMITH had received SAMPEL's previous text and that
SMITH would be ready in approximately an hour.

### February 8, 2016 at 6:14 p.m.

264.    On that same date, at approximately 6:14 p.m., **Target Telephone 1** received
an incoming text from SAMPEL on **Target Telephone 2**, which read, "What's the location
u at." At approximately 6:15 p.m., SMITH utilized **Target Telephone 1** to place an
outgoing text to SAMPEL on **Target Telephone 2**, which read, "club." At approximately
6:21 p.m., **Target Telephone 1** received an incoming text from SAMPEL on **Target
Telephone 2**, which read, "K." Based on my training and experience, the substance of this
and other intercepted communications, and the information contained in the affidavits

submitted with the prior applications referenced above, I believe that when SAMPEL stated, "What's the location u at," SAMPEL was asking SMITH where he should meet SMITH in order to complete the cocaine transaction. SMITH's response, "club," confirmed that SMITH wanted to meet SAMPEL at **Premise 1**. SAMPEL's final text in this sequence confirmed that SAMPEL understood where to meet SMITH.

### February 8, 2016 at 5:55 p.m.

265.    On that same date, at approximately 5:55 p.m., SMITH utilized **Target Telephone 1** to place an outgoing text to BALL on **Target Telephone 3**, which read, "wassup." At approximately 5:56 p.m., **Target Telephone 1** received an incoming text from BALL on **Target Telephone 3**, which read, "Waiting on u bra." At approximately 6:10 p.m., **Target Telephone 1** received another incoming text from BALL on **Target Telephone 3** which read, "Yooo." At approximately 6:15 p.m., **Target Telephone 1** received another incoming text from BALL on **Target Telephone 3** which read, "Big bra what's up let me know sumtin???" Based on my training and experience, the substance of this and other intercepted communications, and the information contained in the affidavits submitted with the prior applications referenced above, I believe that when BALL stated. "Waiting on u bra" and "let me know sumtin," BALL was contacting to confirm the availability of the kilogram of cocaine that SMITH was obtaining from co-conspirator SAMPEL.

### February 8, 2016 at 6:16 p.m.

266.    On that same date, at approximately 6:16 p.m., SMITH utilized **Target Telephone 1** to place an outgoing call to BALL on **Target Telephone 3**. The following is a transcript of a pertinent portion of that call:

**Kaleaf Ball (KB):** Yo.

**Dennis Smith (DS):** Calm down man i left the game i had to take a shit man.

**KB:** I figured you would text me I'm calling you like what the fuck like what's up what's up.
* * *

**DS:** So boo um he just ... I'm just (Unintelligible) just meet me at the clubhouse. I'm headed there now.

**KB:** You said go just over to the clubhouse?

**DS:** Yeah.

**KB:** Alright (Unintelligible) I'll leave from there.

**DS:** Huh?

**KB:** I said I'm about to leave from where I'm at my house now I'm about to leave from here and meet you over there I guess.

**DS:** Alright.

**KB:** Alright.
[End of Call]

267.    I believe that when SMITH stated, "just meet me at the clubhouse I'm headed there now," SMITH instructed BALL to travel to **Premise 1** so that they can prepare to obtain the kilogram of cocaine from SAMPEL, SMITH's source of supply. I further believe that when BALL stated, "I'm at my house now I'm about to leave from here and meet you over there I guess," BALL was confirming that he would leave his residence, (**Premise 9**) meet SMITH at **Premise 1**.

268.   On that same date, at approximately 6:25 p.m.[14], Special Agent Mahaffy utilized covert video surveillance to observe SMITH depart from **Premise 2**, in SMITH's white Yukon (**Vehicle 1**).   At approximately 6:38 p.m., Special Agent Mahaffy, again utilizing covert video surveillance, observed SMITH arrive in the parking lot of **Premise 1** in **Vehicle 1** and walk towards the entrance door of **Premise 1**.   At approximately 6:43 p.m., Special Agent Mahaffy further observed a black Mercedes Benz sedan (hereinafter "black Mercedes"), later determined to have New York registration number GDR-1585, which is registered to Mercedes Benz of Rochester, arrive in the parking lot of **Premise 1** via the same covert camera surveillance.   Special Agent Mahaffy observed a single adult male with a heavier build exit the black Mercedes and walk towards the entrance door of **Premise 1**. Although the physical build of the male that exited the black Mercedes was consistent with BALL's physical build, Special Agent Mahaffy was not able positively identify the male due to the poor lighting conditions.   At approximately 6:46 p.m., Special Agent Mahaffy observed SMITH and the heavier build male walk from the door of **Premise 1** to the back entrance of the Loop Lounge.

### February 8, 2016 at 6:44 p.m.

269.   On that same date, at approximately 6:44 p.m., **Target Telephone 1** received an incoming text from SAMPEL on **Target Telephone 2**, which read, "Eta5." I believe that when SAMPEL texted "Eta5," SAMPEL was informing SMITH that SAMPEL would be arriving at **Premise 1** in approximately five minutes.   At approximately 6:52 p.m., Special

---

[14] During the investigation agents have discovered that the timestamp on the equipment monitoring the wire and electronic communications and the timestamp on the covert video surveillance software are not perfectly aligned.

Agent Jeffrey Plattos physically observed SAMPEL's grey Pathfinder (**Vehicle 2**) arrive at **Premise 1**. At approximately 6:52 p.m., Special Agent Mahaffy observed a male, believed to be SAMPEL based upon the previously described communications, walk from **Vehicle 2** toward the entrance of **Premise 1** via the covert video surveillance.

### February 8, 2016 at 6:51 p.m.

270.    On that same date, at approximately 6:51 p.m., SMITH received an incoming call on **Target Telephone 1** from SAMPEL on **Target Telephone 2**. The following is a transcript of that call:

**Dennis Smith (DS):** Yo.

**Juan Sampel (JS):** Where you at little buddy?

**DS:** Big dog.

**JS:** Huh?

**DS:** What up?

**JS:** What you doing? What you doing? Getting something to drink?

**DS:** [Aside: Yo, I forgot something over here next door.]
[End of Call]

271.    I believe that when SAMPEL stated, "What you doing? Getting something to drink," SAMPEL was asking SMITH if SMITH was over at the Loop Lounge next door to **Premise 1** because SAMPEL did not locate SMITH in **Premise 1**. I further believe that when SMITH responded, "Yo, I forgot something over here next door," SMITH was speaking to BALL who was inside Loop Lounge with SMITH to create a ruse in order to

-155-

leave BALL in the Loop Lounge so that SMITH could meet SAMPEL alone at **Premise 1**
to obtain the kilogram of cocaine from SAMPEL.

272.   On that same date, at approximately 6:55 p.m., Special Agent Mahaffy
observed a male, via the covert camera surveillance, that Special Agent Mahaffy believed to
be SMITH based on the previous communication exit the Loop Lounge and walk towards
the entrance of **Premise 1**. At approximately 7:01 p.m., Special Agent Mahaffy observed a
male walk from the door of **Premise 1** to **Vehicle 2**. DEA Special Agent Brian Hanley
physically observed **Vehicle 2** depart the parking lot shortly afterward.

273.   On that same date at approximately 7:18 p.m., Special Agent Mahaffy
observed a heavier build male, believed to be BALL based on the previously referenced
communications and BALL's physical description, walk from the door of **Premise 1** to the
black Mercedes via the surveillance pole camera.[15]  The male believed to be BALL then
opened the rear driver's side door to the black Mercedes and leaned toward the floor of the
vehicle in a manner consistent with placing something on the ground.  Special Agent
Mahaffy then observed the male believed to be BALL close the rear door of the vehicle and
enter the driver's side front door before departing in the parking lot in the black Mercedes.

274.   Based on my training and experience, the substance of the above listed
intercepted communications on February 8, 2016 the observations of the investigative team
members on that date, and the information obtained during this investigation, I believe that
BALL contacted SMITH looking to purchase a kilogram of cocaine.  Thereafter, I believe
that SMITH contacted SAMPEL to obtain the cocaine for BALL and that SMITH directed

---

[15] On February 8, 2016, between approximately 7:01 p.m.. and 7:12 p.m., there was a malfunction in the recording
for the covert surveillance camera and agents were unable to view individuals entering or leaving Loop Lounge or
the South Clinton Apartments during that time period.

both BALL and SAMPEL to meet him at **Premise 1**. I further believe that BALL arrived at

**Premise 1** driving a black Mercedes Benz and that SMITH and BALL were inside the Loop

Lounge when SAMPEL arrived. I further believe that when SAMPEL arrived in **Vehicle 2**,

SMITH left Loop Lounge to meet with SAMPEL to obtain the cocaine that SMITH

thereafter sold to BALL inside **Premise 1**.

### March 4, 2016 at 2:22 p.m.

275.    On March 4, 2016, at 2:22 p.m., SMITH utilized **Target Telephone 1** to place

an outgoing telephone call to BALL on **Target Telephone 3**. The following is a transcript

of a pertinent portion of that call:

**Kaleaf Ball (KB):** Hello.

**Dennis SMITH (DS):**    What's up man?
                                                    * * *

**KB:** Ohh, that nigger crazy, oh man. Shit, what's, what's, what's going, what's going on
though. Want me to slide up on ya.

**DS:** Yea, yea, slide, I'm at the house. You, you around here?

**KB:** I'm actually, I'm at this delta sonic over here in Irondequoit, but as soon as, um I leave
here I could be right to you.

**DS:** All right. Well I'm getting ready, and a, I ready to get, come over to the south side. Just
hit me up, come over to the south side.

**KB:** Ok that is what I was going to say, just call me when um, you close by over there, and I
will just shoot, zoom right over there.
                                                    * * *

276.    I believe that when BALL stated, "Ohh, that nigger crazy, oh man. Shit,

what's, what's, what's going, what's going on though. Want me to slide up on ya," BALL

was asking SMITH if he can meet up with SMITH. I further believe that when SMITH

said, "All right. Well I'm getting ready, and a, I ready to get, come over to the south side. Just hit me up, come over to the south side," SMITH was telling BALL that he will be going over to **Premise 1** soon and they can meet up there.

### March 4, 2016 at 4:46 p.m.

277.   On the same date, at 4:46 p.m., SMITH utilized **Target Telephone 1** to receive an incoming telephone from BALL on **Target Telephone 3**. The following is a transcript of that call:

**Dennis SMITH (DS):**   Haha... what up man?

**Kaleaf Ball (KB):**   Dude, I was around here and i didn't see your truck or nothing.

**DS:** Huh?

**KB:** I said I was over here around the clubhouse.

**DS:** Yeah I'm here.

**KB:** Alright.

**DS:** The girl got my truck because cause her brakes aint working right cause she's got a lot of riding around to do and I wasn't fixing to take her.

**KB:** I'm here though.
**DS:** Come on in.

**KB:** Alright.

**DS:** Yep.
[End of Call]

278.   I believe that when BALL stated, "Dude, I was around here and i didn't see your truck or nothing" and "I said I was over here around the clubhouse," BALL was telling SMITH that he is at **Premise 1** but does not see SMITH's white Yukon (**Vehicle 1**),

so BALL did not think that SMITH was there. I further believe that when SMITH said, "The girl got my truck" and "Come on in," SMITH was telling BALL that his girlfriend has **Vehicle 1** and for BALL to come into **Premise 1** (1045 South Clinton Avenue, Apartment 3). On the same date, at approximately 4:41 p.m., agents observed, via a covert camera, a grey Mercedes-Benz arrive at **Premise 1**. After a couple of minutes, the grey Mercedes-Benz backed into a parking spot at **Premise 1** and BALL was observed walking to the door of **Premise 1** and entering the residence.

### March 4, 2016 at 4:49 p.m.

279. On the same date, at approximately 4:49 p.m., SMITH utilized **Target Telephone 1** to place an outgoing text to SAMPEL on **Target Telephone 2**, which read, "yo." I believe that when SMITH texted, "yo," SMITH was reaching out to SAMPEL so that he could get some cocaine for BALL.

### March 4, 2016 at 4:51 p.m.

280. On the same date, at 4:51 p.m., SMITH utilized **Target Telephone 1** to place an outgoing telephone to SAMPEL on at **Target Telephone 2**. The following is a transcript of that call:

**Juan Sampel (JS):** Yo, Yo.

**Dennis SMITH (DS):** Hey, what's up big dog?

**JS:** Ah nothing much, chilling, just got home from work.

**DS:** Yeah, my homie passed through here man, and shit, he was seeing if ya'll were available for a job.

**JS:** I can find out.

**DS:** Alright find out, cause you know me, I like to keep my shit in the clutch (laughing).

**JS:** Yeah no problem; let me find out and I'll let you know.

**DS:** Alright.

**JS:** Alright.
[End of Call]

281.    I believe that when SMITH stated, "my homie passed through here man and shit, he was seeing if ya'll were available for a job," SMITH was referring to BALL and was telling SAMPEL that SMITH was looking to see if SAMPEL can get cocaine from his source for SMITH to give to BALL.  I further believe that when SMITH said, "Alright find out, cause you know me I like to keep my shit in the clutch," SMITH is telling SAMPEL that he still has cocaine but does not want to give BALL his cocaine because if there is a cocaine drought, SMITH will not have enough.

## March 4, 2016 at 5:32 p.m.

282.    On the same date, at approximately 5:32 p.m., SMITH received an incoming text on **Target Telephone 1** from SAMPEL on **Target Telephone 2**, which read, "All good."  I believe that when SAMPEL texted, "All good," SAMPEL was telling SMITH that SAMPEL's source (OCASIO) had cocaine for SMITH.

## March 4, 2016 at 5:48 p.m.

283.    On the same date, at 5:48 p.m., SMITH utilized **Target Telephone 1** to place an outgoing telephone to SAMPEL on at **Target Telephone 2**. The following is a transcript of that call:

**Dennis SMITH (DS):** Hello?

**Juan Sampel (JS):** Hey what's going on buddy?

**DS:** My bad man, I left my phone on the desk.

**JS:** No, I went to go see my boss and he said no problem, no problem whatsoever. He's going to call me and I can go and do that. I can go and pick up the equipment that we need for the job, if you want, you can let him do what you got now, and then I got you.

**DS:** Ok.

**JS:** You know what I mean?

**DS:** Alright.

**JS:** Ok.

**JS:** Peace.

**DS:** Peace.
[End of Call]

284.    I believe that when SAMPEL stated, "I went to go see my boss and he said no problem," SAMPEL was indicating that his source (OCASIO) had cocaine to supply SMITH. I further believe that when SAMPEL stated, "if you want, you can let him do what you got now and then I got you," SAMPEL was telling SMITH that if SMITH wants to give BALL a quantity of the cocaine SMITH currently possessed first, then SAMPEL will give SMITH more cocaine to replace it and SMITH replied, "Ok."

285.    On that same date, at approximately 6:01 p.m., agents utilized covert camera surveillance to observe BALL leave **Premise 1,** enter the grey Mercedes-Benz and leave the location.

### March 4, 2016 at 8:58 p.m.

286.    On the same date, at approximately 8:58 p.m., SMITH received an incoming

–161–

text message on **Target Telephone 1** from BALL on **Target Telephone 3**, which read, "Yooooo damn bro pick up I'm trying to tell you bout the dinner." I believe that when BALL texted, "Yooooo damn bro pick up I'm trying to tell you bout the dinner," BALL is trying to get a hold of SMITH so BALL can tell SMITH about the cocaine that he just received from SMITH.

### March 4, 2016 at 8:59 p.m.

287.   On the same date, at 8:59 p.m., SMITH utilized **Target Telephone 1** to place an outgoing telephone call to BALL on **Target Telephone 3**. The following is a transcript of that call:

**Kaleaf Ball (KB):**  Yo bro.

**Dennis SMITH (DS)**:   Yo what's up?

**KB:** I were the shit, where yous at bro?

**DS:** Shit I just ran into the house real quick I was taking a shit.

**KB:** I was I mean um um um.

[Voices Overlapping]

**DS:** What's up?  I fitting to head back over there.  Where you at?

**KB:** I'm over here um, um, um, um, on the ham.

**DS:** Round from my way?

**KB:** No, no, over here in the hood.

**DS:** Alright, you come come coming back this way right?

**KB:** Uh, Nah, why don't you pull up on me real quick bro. Why don't you do that?

**DS:** Oh shit man, I aint got my nigga on the highway real quick fitting to jump off I'm about to take care of something real quick.  Let me, let me, let me, take care of.

**KB:** I'm I'm just asking just stop doing, know what I'm saying? I just want you, you know what I'm saying? She, She, don't look like she's all the way there, you know what I mean? I was gonna just put her in and see, you know what I mean? And see, because you know my word is good, but i just stop right now you know what I'm saying? It's how, she, she, aint even ... no, no, no even nothing on that motherfucker, she just, broke up!

**DS:** oh shit this coming, coming. (indiscernible)

**KB:** She left bad out.

**DS:** Just come, come, come, back and let me come shit let me take care of this and I'll come that way or you just come my way

**KB:** Yeah, just take care of that I'm waiting on you.

**DS:** Alright.

**KB:** Alright.
[End of Call]

288. I believe that when BALL stated, "Nah why don't you pull up on me real quick bro. why don't you do that," BALL was asking SMITH if they can meet up. I further believe that when BALL said, "She don't look like she all the way there;" "I was just going to put her in and see, you know what I'm saying?" and "She just, broke up!" BALL was referring to the cocaine and was attempting to tell SMITH in code that BALL was trying to cook the cocaine into cocaine base and was having trouble with the cocaine.

### March 4, 2016 at 9:18 p.m.

289. On the same date, at approximately 9:18 p.m., SMITH utilized **Target Telephone 1** to place an outgoing text to SAMPEL on **Target Telephone 2**, which read, "he having a problem omw to check it out." I believe that when SMITH texted, "he having a problem omw to check it out," SMITH was telling SAMPEL that he was going to meet with BALL because BALL was having trouble with the quality of the cocaine and turning

the cocaine into cocaine base.

## March 4, 2016 at 9:35 p.m.

290. On the same date, at approximately 9:35 p.m., SMITH received an incoming text on **Target Telephone 1** from SAMPEL on **Target Telephone 2**, which read, "I'm have ur spray gun he leaves to out of town needs back tonight real bad." I believe that when SAMPEL texted, "I'm have ur spray gun," SAMPEL was telling SMITH that SAMPEL has cocaine for SMITH. I further believe that when SAMPEL stated, "he leaves to out of town needs back tonight real bad," SAMPEL was telling SMITH SAMPEL's source needs the money back tonight.

## March 4, 2016 at 9:44 p.m.

291. On the same date, at 9:44 p.m., SMITH utilized **Target Telephone 1** to place an outgoing telephone to SAMPEL on at **Target Telephone 2**. The following is a transcript of that call:

**Juan Sampel (JS):** Yo, Yo.

**Dennis SMITH (DS):** What's up man?

**JS:** Ah nothing much man, just you know, chilling in my driveway man, hanging out waiting for my brother to come by and see me.

**DS:** Alright, well shit I'm headed that way. Was a little slight problem, but I'll straighten it out when I see you.

**JS:** So you want me to see you at the club?

**DS:** Yup.

**JS:** Okay, no problem.

**DS:** No, I'm going to the club.

**JS:** Yeah I'll go to the club no problem.

**DS:** Alright.

**JS:** Yup.
[End of Call]

292.   I believe that when SMITH stated, "Alright, well shit I'm headed that way. Was a little slight problem, but I'll straighten it out when I see you," SMITH was telling SAMPEL that BALL had a problem with the cocaine that SMITH gave BALL, but that SMITH will meet SAMPEL to get the replacement cocaine from SAMPEL and tell SAMPEL about the problem. I believe that when SMITH stated, "No, I'm going to the club," SMITH was telling SAMPEL to meet at **Premise 1** (1045 South Clinton Avenue, Apartment 3) to do the cocaine transaction.

### April 8, 2016 at 12:24 p.m.

293.   On April 8, 2016, at 12:24 p.m., SMITH utilized **Target Telephone 1** to place an outgoing telephone call to KALEAF BALL at **Target Telephone 3**.  The following is a transcript of that call:

**Kaleaf Ball (KB):** Yo. Hello.

**Dennis SMITH (DS):**  Lucky mother fucker.

**KB:** (Laughing)…what's up with you?

**DS:** You didn't answer your phone yesterday, that means he ain't coming back.

**KB:** I ain't fucking with you all (laughing), what you all got going on?

**DS:** Oh Shit, but um, me and you got to get together and talk brother.

**KB:** What had happened?

**DS:** Um, I really don't want to talk on this phone cause, cause I really don't know what,

–165–

you see what I'm saying.

**KB:** Right, ok.

**DS:** I got some letters from over there.

**KB:** You said some letters?
**DS:** Yup.

**KB:** Ok, yup, I'll get over there to you.  Where you at?

**DS:** I'm at home.

**KB:** Ok, I'm over here around the corner and I'm about to peel out and come get with you.

**DS:** Alright.

**KB:** Alright.

**DS:** Yup.

**KB:** Yup.
[End of Call]

294.    I believe that when SMITH stated, "me and you got to get together and talk brother" and "Um, I really don't want to talk on this phone cause, cause I really don't know what, you see what I'm saying," SMITH was telling BALL that they should meet and talk in person because SMITH does not want to talk over the phone.  I believe that when SMITH stated, "I'm at home," SMITH was at **Premise 2** (1076 Glide Street).  I believe that when BALL responded, "Ok, I'm over here around the corner," I believe that BALL was indicating that he was at his residence at 155/157 Burrows Street, Upstairs Apartment (**Premise 9**), which is in very close proximately to **Premise 2**.

### April 8, 2016

295.    On the same date, at approximately 12:52 p.m., surveillance agents physically

observed a white Mercedes-Benz hatchback, New York registration number GUU-5374, arrive at SMITH's residence (**Premise 2**). TFO Joseph Bates observed BALL get out of the driver's side of the white Mercedes-Benz and walk to the front door and enter (**Premise 2**). At approximately 1:27 p.m., surveillance agents observed BALL return to the driver's side of the white Mercedes-Benz hatchback and depart in the northbound direction on Glide Street.

### April 19, 2016

296.    On April 19, 2016, at approximately 5:02 a.m., TFO Tim Pearce physically observed a white Mercedes-Benz hatchback with New York registration number GUU-5374, parked in the driveway behind **Premise 9**.

### April 22, 2016 at 10:49 a.m.

297.    On April 22, 2016, at 10:49 a.m., SMITH received an incoming call on **Target Telephone 1** from KALEAF BALL utilizing **Target Telephone 3**. The following is a transcript of that call:

**Kaleaf Ball (KB):** Yo man.

**Dennis Smith (DS):** What's good though?

**KB:** What's good bro?

**DS:** You same-timed me.

**KB:** Shit. Whatchu, what you want me to do?

**DS:** Come see me.

**KB:** I gotta come all the way over there?

**DS:** I'm at my house nigga.

**KB:** Alright, I'm at the house. I'm just getting up. Give me a second though.

**DS:** Alright, uhh, I'm about to shoot out of here in about like uhh an hour and go to Home Depot and meet Dave to get some supplies.

**KB:** (Unintelligible) should get, I should grab a couple (unintelligible).

**DS:** For hour. OK.

**KB:** Yup. Alright.

**DS:** Yeah.
[End of Call]

298.    I believe that when SMITH stated, "Come see me," SMITH was instructing BALL to travel to SMITH's residence in order for SMITH to supply BALL with a quantity of cocaine. When BALL stated, "I should grab a couple," BALL was stating that he needed cocaine from SMITH.

### April 22, 2016 at 11:53 a.m.

299.    On April 22, 2016, at 11:53 a.m., SMITH received an incoming call on Target Telephone 1 from KALEAF BALL utilizing telephone instrument (585) 415-5730. The following is a transcript of that call:

**Dennis Smith (DS):** Yo.

**Kaleaf Ball (KB):** Bro, you still at the house?

**DS:** Yup.

**KB:** Alright. Umm, just, I just got out the shower. I was going to say, you ain't going, you ain't just want to stop by my house?

**DS:** No, I'm here man.

**KB:** Alright.

**DS:** I'm over here. Come through here.

**KB:** Alright.

**DS:** Yup.
[End of Call]

300.    I believe that when BALL stated, "you ain't just want to stop by my house," BALL was asking SMITH if SMITH could bring the quantity of cocaine to BALL's residence (**Premise 9**). When SMITH stated, "No, I'm here man" and "I'm over here. Come through here," SMITH was instructing BALL to travel to SMITH's residence (**Premise 2**) to obtain the cocaine from SMITH so that SMITH did not have to travel with the cocaine in his possession.

### April 22, 2016 at 12:38 p.m.

301.    On April 22, 2016, at 12:38 p.m., SMITH utilized **Target Telephone 1** to place an outgoing call to KALEAF BALL utilizing telephone instrument (585) 415-5730. The following is a transcript of that call:

**Kaleaf Ball (KB):**  Open up man.

**Dennis Smith (DS):**  Thank you.
[End of Call]

302.    I believe that when BALL stated, "Open up man," BALL was instructing SMITH to open the door to his residence (**Premise 2**) because BALL was arriving to purchase a quantity of cocaine.

303.    On the same date, at approximately 11:55 a.m., TFO Alvarado conducted surveillance in the area of **Premise 9** (155/157 Burrows Street, Upper) and observed the front end of a silver Nissan vehicle backed into the driveway at **Premise 9**. At 12:45 p.m., TFO Joseph Bates physically observed BALL arrive at **Premise 2** (1076 Glide Street)

–169–

operating a 2016 silver Nissan SUV, Pennsylvania registration GKG-3520. This vehicle was determined to be registered to Hertz Vehicle LLC, 8201 Bartram Avenue, Philadelphia, Pennsylvania. TFO Bates and agents monitoring a surveillance pole camera overlooking **Premise 2** observed BALL retrieve a bag from the driver's side rear door of the silver Nissan SUV and walk into **Premise 2** through the front door. At approximately 12:52 p.m., agents observed BALL exit **Premise 2** with a bag. BALL returned to the silver Nissan SUV and placed the bag inside the driver's side rear door before departing northbound on Glide Street.

304. Based on the foregoing, and following information contained in this affidavit, your affiant has probable cause to believe that KALEAF BALL is involved in an ongoing conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine in violation of Title 21, United States Code, Section 846. Your affiant further believes that there is probable cause to conclude that items listed on the annexed Schedule of Items to be Seized will be found at BALL's residence, **Premise 9** (155/157 Burrows Street-Upstairs), and that those items are evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 846, and Title 18, United States Code, Sections 924 (c)(1), 1956 & 1957. Moreover, your affiant believes that it is likely that controlled substances will be located at **Premise 9** and that requiring law enforcement to knock and announce their presence before entering will allow the occupants the opportunity to detroy or dispose of the controlled substances and possibly arm themselves. Accordingly, your affiant requests that execution of the warrant be exempt from the knock-and-announce requirement of 18 U.S.C. § 3109 and related legal authority. Additionally, because the

members of this drug trafficking organization conduct their drug trafficking business at all hours of the day, your affiant requests permission to execute the search warrant at **Premise 9** at any time of the day or night.

## REGINALD STREETER: 21 U.S.C. 846 (Conspiracy to Possess with Intent to Distribute and to Distribute 5 kilograms or more of cocaine and cocaine base)

305.   The investigation has established probable cause to find that REGINALD STREETER is involved in an ongoing conspiracy to distribute controlled substances, including five kilograms or more of cocaine and cocaine base, in violation of Title 21, United States Code, Section 846.   The following is a sample of various intercepted telephone conversations, and other investigative findings, which demonstrate REGINALD STREETER'S drug trafficking activities:

### January 26, 2016 at 5:43 p.m.

306.   On January 26, 2016, at approximately 5:43 p.m., SMITH utilized **Target Telephone 1** to receive an incoming call from STREETER on (315) 359-0741.   The following is a transcript of that call:

**Dennis Smith (DS):** Yep

**Reginald Streeter (RS):**   I'm fixing to say um, I have um 15.

**DS:** Okay, I'm, I'm here.

**RS:** Alright

**DS:** Yup

**RS:** I am just saying so you could have been right by the time I got there.

**DS:** Alright, what am I going to do?  The whole thing?

**RS:** Yup, same way.

**DS:** Okay, hold, hold up, hold up, let me see something, let me see something.

**RS:** Huh?

**DS:** You got the 15?

**RS:** Yeah.

**DS:** So INAUDIBLE

**RS:** The whole thing, with the um, the way we did it the last time.

**DS:** Got the whole thing?

**RS:** Yeah, with the 15, with the 15.

**DS:** Okay, INAUDIBLE, yup, bye.
[End of Call]

307.    I believe that when STREETER said, "I'm fixing to say um, I have um 15," STREETER was telling SMITH that he had a certain quantity of US currency to purchase cocaine from SMITH and SMITH responded, "Okay, I'm, I'm here" meaning that SMITH was at **Premise 1** and had cocaine. I further believe that when SMITH said, "Alright, what am I going to do? The whole thing," SMITH was asking STREETER if he needed all of the cocaine that STREETER was purchasing processed into cocaine base and STREETER responded, "Yup, same way," indicating for SMITH to process the cocaine as he has done on previous occasions.

308.    As set forth at paragraph 85, above, on January 28, 2016, at approximately 6:23 p.m., SMITH received an incoming call on **Target Telephone 1** from STREETER utilizing (315) 573-5663.   As set forth at paragraph 86, I believe that STREETER called

–172–

SMITH to purchase a quantity of cocaine base.   I further believe that during the conversation when SMITH said, "Watcha ya trying to do?" SMITH was asking STREETER how much cocaine STREETER wanted to purchase and that when STREETER replied, "20 put 12 on it," STREETER was referring to the amount of cocaine he wanted to purchase using a cryptic code.  I further believe that when SMITH said, "Um, I am dancing it, or just putting it together," SMITH was asking STREETER, in code, whether STREETER wanted the cocaine cooked into cocaine base.   When STREETER responded, "Yea, dancing, dancing," I believe that STREETER was indicating to SMITH that he wanted the cocaine cooked into crack cocaine.   Based on my training and experience, including conversations with reliable confidential informants and other drug dealers, "dancing" is coded language commonly utilized by drug dealers when referencing the process of cooking powder cocaine into cocaine base.

### January 29, 2016 at 8:27 p.m.

309.   On January 29, 2016, at approximately 8:27 p.m., SMITH received an incoming call on **Target Telephone 1** from STREETER on (315) 359-0741.  The following is a transcript of that call:

**Dennis Smith (DS):** Street.

**Reginald Streeter (RS):** What's going on?

**DS:** What's up with ya?

**RS:** I just left, I just hollered at your home girl.

**DS:** What?

**RS:** I said shit man, this nigger just hollered at your home girl. Not, no dance, I don't need them to dance I just need them to holler.

**DS:** All right, I am here.

(Both talking)

**RS:** Off of berlin, probably 20 minutes I am just waiting on my boy.

**DS:** All right. I am probably be at, I'm probably be at the bar just hit me.

**RS:** All right.

**DS:** Yup.

**RS:** All right.
[End of Call]

310.    I believe that when STREETER said, "I said shit man, this nigger just hollered at your home girl. Not, no dance, I don't need them to dance I just need them to holler," STREETER was telling SMITH that he had needed a quantity of powder cocaine from SMITH and did not need it processed into cocaine base "I don't need them to dance." I believe when SMITH responded, "All right, I am here" SMITH was indicating to STREETER that he was at **Premise 1** and had cocaine available.

311.    Moreover, as set forth at paragraphs 87 through 91, above, based upon the intercepted conversations between SMITH and STREETER on February 11, 2016, including surveillance of STREETER at **Premise 1** (1045 South Clinton Avenue, Apartment 3), agents believe that STREET met SMITH on that occasion to again obtain a quantity of cocaine.

### February 29, 2016 at 2:34 p.m.

312.    On February 29, 2016, at approximately 5:20 p.m., SMITH utilized **Target Telephone 1** to place an outgoing call to STREETER utilizing telephone instrument (315)

–174–

359-0741. The following is a transcript of a pertinent portion of that call:

**Dennis Smith (DS):** (Talking in the background.)

**Reginald Streeter (RS):** (Talking in background) Yo.

**DS:** What's up my nigger?

\* \* \*

**RS:** Ok, (Unintelligible), I'm the same way, got you and then that. So, by the time get there then.

**DS:** All right come up then.

**RS:** All right.

**DS:** Yup.
[End of Call]

313. I believe that when STREETER said, "I'm the same way, got you and then that. So, by the time get there then," STREETER was telling SMITH that he was on his way to the clubhouse (**Premise 1**) to get cocaine from SMITH the same way STREETER got it during the last transaction from SMITH. I believe that when SMITH stated, "All right come up then," SMITH was advising STREETER to meet him at the clubhouse (**Premise 1**) to do the drug transaction.

### February 29, 2016 at 4:38 p.m.

314. On February 29, 2016, at approximately 4:38 p.m., SMITH utilized **Target Telephone 1** to place an outgoing call to STREETER utilizing telephone instrument (315) 359-0741. The following is a transcript of that call:

**Reginald Streeter (RS):** Hey now, when I am thinking about, I am leaving now.

**Dennis Smith (DS):** Huh!

**RS:** I said, I was leaving out, out right now.

**DS:** All right, I'm ready.

**RS:** All right, all right then.
[End of Call]

315. I believe that when STREETER said, "I am leaving now," STREETER was telling SMITH that he was on his way to the clubhouse at the South Clinton Apartments to do the drug transaction. I further believe that when SMITH said, "All right, I'm ready," SMITH was advising STREETER that SMITH has the cocaine for STREETER and that SMITH is ready to conduct the cocaine transaction. Information obtained from the GPS tracking device on **Vehicle 1** (SMITH's white Yukon) showed that on the same date, at approximately 4:00 p.m., the white Yukon departed **Premise 2** (1076 Glide Street) and traveled directly to **Premise 1** (1045 South Clinton Avenue, Apartment 3), arriving at approximately 4:11 p.m. The data obtained from the GPS tracking device showed that SMITH's white Yukon remained in the vicinity of **Premise 1** until approximately 1:37 a.m. on March 1, 2016.

### February 29, 2016 at 6:47 p.m.

316. On that same date, at approximately 6:47 p.m., SMITH utilized **Target Telephone 1** to place an outgoing call to STREETER on (315) 359-0741. During the call, STREETER advised SMITH that right before the parking lot for "the clubhouse" (**Premise 1**), "there's a cracker in that orange car with like a baseball cap on like he's smoking one of them vapor cigarettes just sitting there." Based upon your affiant's training and experience, the content of this and other intercepted communications and the information set forth in the prior affidavits referenced above, your affiant believes that when STREETER said, "there's a cracker in that orange car with like a baseball cap on like he's smoking one of

–176–

them vapor cigarettes just sitting there" STREETER was warning SMITH that there was male sitting in an orange vehicle in front of the parking lot to (**Premise 1**) who STREETER believed might be the police. SMITH responded to STREETER stating, "Yeah they you have to give them more credit than that they ain't gonna sit out in the damn open like that." During the conversation, STREETER further stated, "I'm just saying just to give you a little heads up."

### March 15, 2016 at 6:02 p.m.

317. On March 15, 2016, at approximately 6:02 p.m., SMITH received an incoming text message on **Target Telephone 1** from STREETER on (315) 359-0741, which read, "Yo take 4 out then dance wit rest bout time I get there." I believe that when STREETER texted, "Yo take 4 out then dance wit rest" STREETER was telling SMITH to take out four of an unknown quantity of cocaine and then process the rest into cocaine base. I further believe that when STREETER texted, "bout time I get there," STREETER was indicating that the cocaine base should be done processing by the time STREETER gets to SMITH.

### April 15, 2016 at 5:26 p.m.

318. On April 15, 2016, at approximately 5:26 p.m., SMITH placed an outgoing call to REGINALD STREETER utilizing telephone instrument (315) 573-5663. The following is a transcript of that call:

**Reginald Streeter (RS):** Hello.

**Dennis Smith (DS):** Hello Street.

**RS:** How are you? What going on with you? Right here on North.

**DS:** I'm over here.

**RS:** Alright.

[End of Call]

319.   I believe that when STREETER stated, "What going on with you?  Right here on North," STREETER was asking SMITH if he was available to meet with to obtain a quantity of cocaine and was informing SMITH that STREETER was in the Rochester, New York area.   When SMITH stated, "I'm over here," SMITH was informing STREETER that he was at the South Clinton Apartments and was available to provide STREETER with a quantity of cocaine.

320.   On April 22, 2016, agents intercepted communications over **Target Telephone 1** between SMITH and STREETER indicating that SMITH and STREETER were going to meet at **Premise 1**.  Specifically, at on that date, SMITH sent STREETER a text message stating, "I'm here," and STREETER responded with a short text message indicating that he was on his way.   Thereafter, there were a few additional brief communications between SMITH and STREETER discussing where STREETER was located.  Based upon the content of the intercepted communications, the investigative team believed that STREETER may be obtaining a quantity of cocaine and/or making payment to SMITH for cocaine previously obtained.  STREETER was observed at **Premise 1** and then followed by law enforcement after he left **Premise 1**.  STREETER was driving a vehicle with two other individuals inside. On Route 104 in Wayne County, STREETER was stopped by members of the New York State Police for a violation of the New York State Vehicle and Traffic Law.  The NYSP trooper who approached the vehicle observed a

–178–

small quantity of marijuana inside a mason jar plain view inside the vehicle and one of STREETER's occupants advised the trooper of the marijuana.   The vehicle was subsequently searched and no other contraband was located.   At the time STREETER's vehicle was pulled over, STREETER was driving on a rural area at dusk.   Given the location of the stop and the lighting conditions, agents believe, based upon their training and experience, that if STREETER had cocaine in the vehicle, STREETER or one of the occupants would have had the opportunity to discard the cocaine from the vehicle upon observing the trooper and/or secreted the cocaine in a body cavity or hidden compartment within the vehicle.

## CONCLUSION

331.   Your affiant believes that the information detailed in this affidavit provides probable cause to believe that DENNIS SMITH a.k.a. "FISH," DARREN SMITH, KALEAF BALL, REGINALD STREETER, JUAN SAMPEL, ANGEL OCASIO, JOSE QUINTANA, LUZ MORALES, SHAVONNE RIVERA, JASON GIBSON, and KELLY SHANKS and others, known and unknown, are involved in an ongoing drug trafficking and money laundering activities in violation of Title 21 Section 841(a)(1) (possession with intent to distribute cocaine and cocaine base); Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute and distribute cocaine and cocaine base); and Title 18, United States Code, Section 924 (c)(1) (the unlawful possession of a firearm in furtherance of a drug trafficking crime) and Title 18, United States Code Sections 1956 and 1957 (money laundering offenses).   Additionally, your affiant believes that there is probable cause to believe that the items listed on the annexed Schedule of Items to be Seized will be

found at **Premises 1-6, 10 and** in **Vehicles 1-6 and 8,** and that items listed on the annexted Schedule of Items to be Seized- Books and Records will be found at **Premises 7, 8 and 9,** and those items are evidence, fruits, records and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 846, and Title 18, United States Code, Sections 924 (c)(1), 1956 and 1957. Therefore, I respectfully request that search warrants be issued for **Premise 1-10 and Vehicles 1-6 and 8,** for the seizure of items identified in the annexed Schedules of Items to be Seized.

332.   Your affiant also believes that the information set forth herein establishes probable cause that DENNIS SMITH a/k/a "Fish," DARREN SMITH a/k/a "Fat Boy," KALEAF BALL a/k/a "Leaf," REGINALD STREETER a/k/a "Street," JUAN SAMPEL, ANGEL OCASIO, JOSE QUINTANA, LUZ MORALES a/k/a "Leida," JASON GIBSON and KELLY SHANKS have committed a violation of Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine and cocaine base).

333.   Finally, your affiant respectfully requests that the Court order that the Warrants, Application, Complaints and Affidavit be sealed in order to protect this ongoing investigation.   DENNIS SMITH a.k.a. "FISH," DARREN SMITH, REGINALD STREETER, KALEAF BALL, JUAN SAMPEL, ANGEL OCASIO, JOSE QUINTANA, LUZ MORALES, SHAVONNE RIVERA, JASON GIBSON, and KELLY SHANKS are targets of an on-going Organized Crime Drug Enforcement Task Force (OCDETF) investigation. Disclosure of the affidavit at this time would compromise the integrity of this active investigation and may result in fugitives. Therefore, disclosure of the affidavit at this

−180−

time would compromise the safety of agents, confidential informants, and others working

this investigation.

_____
CHRISTOPHER MAHAFFY
DEA SPECIAL AGENT

Subscribed and sworn to before

me this 26 day of April, 2016 at 2:31 P .m.

_____
HONORABLE CHARLES J. SIRAGUSA
UNITED STATES DISTRICT JUDGE